Kent M. Henderson      (SBN 139530); hendolaw@gmail.com
Angel Carrazco, Jr.      (SBN 230845); angel@carrazcolawapc.com
**GUIZAR, HENDERSON & CARRAZCO, LLP**
18301 Irvine Boulevard
Tustin, CA  92780
Telephone: (714) 541-8600
Facsimile: (714) 541-8601

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMA L. FIGUEROA DE MAGDALENO, individually and as Successor in Interest to JAVIER MAGDALENO GUTIERREZ; JUAN JAVIER MAGDALENO, individually; YOSELIN MAGDALENO, individually; and IVETA MAGDALENO, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF RIVERSIDE, a legal subdivision of the State of California; CALIFORNIA HIGHWAY PATROL, a governmental agency of the State of California; DEREK THOMAS, an individual; DOE CHP OFFICER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO:  5:21-CV-02027-JGB-SHK <br><br> **PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hrg. Date:      August 7, 2023 <br> Time:             9:00 a.m. <br> Courtroom:    1 (Riverside) <br> Judge:           Hon. Jesus G. Bernal <br><br> *(Filed concurrently with Plaintiffs' Points and Authorities in Opposition to Motion for Summary Judgment of Defendants; Plaintiffs' Statement of Objections to Defendants' Proffered Evidence; Declaration of Angel Carrazco, Jr.; and Exhibits A-T in support thereto)* |

\\

\\

**PLEASE TAKE NOTICE** that Plaintiffs, ALMA L. FIGUEROA DE MAGDALENO, individually and as Successor in Interest to JAVIER MAGDALENO GUTIERREZ; JUAN JAVIER MAGDALENO, individually; YOSELIN MAGDALENO, individually; and IVETA MAGDALENO, individually (collectively at times "Plaintiffs") hereby submit Plaintiffs' Response to Defendants' Separate Statement of Undisputed Material Facts and also submit Plaintiffs' Statement of Undisputed Material Facts (hereinafter sometimes referred to as "PUMF"), together with references to supporting evidence, in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

| Def's SUF No. | Fact | Supporting Evidence | Plaintiffs' Response |
|---|---|---|---|
| 1. | Defendant John Gette has been employed as a Patrol Officer for the California Highway Patrol (CHP) since October 31, 2008. | Declaration of Defendant John Gette in Support of Motion for by Defendants California Highway Patrol and John Gette for Summary Judgment, or, in the Alternative, Partial Summary Judgment of Claims [hereafter "Gette Decl."], ¶ 1. | Undisputed. |
| 2. | On January 29, 2021, Officer Gette was on duty and wearing a blue CHP uniform that displayed a badge patch on his left chest area and CHP | Gette Decl., ¶ 1 | Undisputed. |

| | | | |
|---|---|---|---|
| | patches on both upper arms. | | |
| 3. | On that day, Officer Gette was assigned to canine patrol with a radio designation of Border King-6. | Gette Decl., ¶ 1. | Undisputed. |
| 4. | Officer Gette was driving a marked, black and white 2016 CHP Ford Patrol Interceptor Utility Vehicle bearing California license plate number 1484491. | Gette Decl., ¶ 1. | Undisputed. |
| 5. | At approximately 12:45 p.m., Officer Gette was eating lunch and completing paperwork at his house when he began hearing CHP dispatch putting out a be-on-the-lookout for a red truck. | Getter Decl., ¶ 2. | Undisputed. |
| 6. | Officer Gette heard dispatch report that a woman had run into a Rite Aid, was frantic, and had notified a clerk that her husband was armed with a rifle and was in a truck outside the Rite Aid. | Gette Decl., ¶ 2. | Undisputed. |
| 7. | From what he had heard on dispatch, Officer Gette formed an understanding that this was a domestic violence situation. | Gette Decl., ¶ 2. | Undisputed. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| 8. | Officer Gette heard CHP Officer Ramon Perez (CHP ID No. 17467) and dispatch exchange transmissions that ultimately confirmed that the suspect vehicle was a red Ford pickup. | Gette Decl., ¶ 4. | Undisputed. | |
| 9. | Officer Gette next heard Officer Perez stating something to the effect that Riverside Sheriff's Office was out on a stop with the red truck at the Rite Aid. | Gette Decl., ¶ 4. | Undisputed. | |
| 10. | Around that time, Officer Gette got into his patrol car and continued to monitor radio traffic. | Gette Decl., ¶ 4. | Undisputed. | |
| 11. | Officer Gette began leaving his house and heard Officer Perez broadcast that the suspect vehicle was taking off and heading onto southbound Washington. | Gette Decl., ¶ 4. | Undisputed. | |
| 12. | Officer Gette waited to hear where the truck was going so he could start responding to that direction to help out, because Officer Perez was solo with the Sheriff's unit in pursuit of this vehicle. | Gette Decl., ¶ 4. | Undisputed. | |
| 13. | At that time, Officer Gette was thinking that the | Gette Decl., ¶ 4. | Undisputed. | |

4

| | | | |
|---|---|---|---|
| | person in the red truck had a rifle and that there was only a Sheriff's Unit and a CHP Officer. | | |
| 14. | Officer Gette announced on dispatch that King-6 (short for his call sign of Border King-6) was enroute. | Gette Decl., ¶ 4. | Undisputed. |
| 15. | At some point after leaving his house and before joining the pursuit, Officer Gette activated his patrol vehicle's Code 3 emergency lights and siren as he proceeded toward the area where he believed the pursuit was heading. | Gette Decl., ¶ 5. | Undisputed. |
| 16. | Officer Gette's vehicle was equipped with a MVARS (Mobile Video Audio Recording System) device that recorded video of much of his course of travel toward the pursuit as well as events occurring after he joined the pursuit and beyond the time when shots were fired in this incident. | Gette Decl., ¶ 5. | Undisputed. |
| 17. | Soon after radioing in that he was enroute, Officer Gette heard Officer Perez confirm that the pursuit was then heading eastbound on Country | Gette Decl., ¶ 7 | Undisputed. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | | Club from Washington. | | |
| | 18. | Officer Gette then began heading eastbound on Fred Waring, believing the red truck would likely emerge somewhere around Indio Boulevard. | Gette Decl., ¶ 7 | Undisputed. |
| | 19. | Officer Gette continued to listening to dispatch as he began heading that direction. | Gette Decl., ¶ 7 | Undisputed. |
| | 20. | Officer Gette then heard Officer Perez call out that they were heading southbound on Jefferson. | Gette Decl., ¶ 7 | Undisputed. |
| | 21. | Officer Gette came to a stop at Fred Waring and Jefferson to wait to hear more about where the pursuit was heading and temporarily deactivated his siren. | Gette Decl., ¶ 8; Gette MVARS 2:06 – 2:34. | Undisputed. |
| | 22. | When it became clear that the pursuit would soon be coming past his location, Officer Gette reactivated his siren and kept his Code 3 lights on to warn traffic and hold the intersection. | Gette Decl., ¶ 8. | Undisputed. |
| | 23. | Officer Gette continued to hold the intersection, and then he saw the pursuit coming toward the intersection. | Gette Decl., ¶ 8; Gette MVARS 2:35 – 3:18. | Undisputed. |

6

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| 24. | Officer Gette then saw the suspect red truck pass through the intersection followed in sequence by the Sheriff's deputy's marked, black-and-white SUV, Officer Perez's marked, black-and-white CHP Dodge Charger, and Officer Silva's marked, black-and-white CHP Dodge Charger. | Gette Decl., ¶ 8; Gette MVARS 3:19 – 3:28.) | Undisputed. |
| 25. | Officer Gette recalled seeing and hearing that Officer Perez's vehicle had its Code 3 lights and siren activated. | Gette Decl., ¶ 8; Gette MVARS 3:19 – 3:28 | Undisputed. |
| 26. | Although Officer Gette does not recall whether the deputy and Officer Perez were sounding their sirens as they passed through the intersection, the Gette MVARS shows their Code 3 lights were on. | Gette Decl., ¶ 8; Gette MVARS 3:19 – 3:28. | Undisputed. |
| 27. | Once the pursuit passed Officer Gette's position, he began driving southbound on Jefferson, with his Code 3 lights and siren still activated. | Gette Decl., ¶ 9; Gette MVARS 3:28 – 3:30. | Undisputed. |
| 28. | As Officer Gette proceeded southbound, Officer Silva slowed down and moved over and began waving for Officer | Gette Decl., ¶ 9. | Undisputed. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | Gette to take over his position. | | |
| 29. | Officer Gette passed Officer Silva and got behind Officer Perez | Gette Decl., ¶ 9; Gette MVARS 3:30 – 3:36. | Undisputed. |
| 30. | Officer Gette then began broadcasting the pursuit's direction of travel and lanes, speeds, intersections they were passing, and actions of the red truck. | Gette Decl., ¶ 9. | Undisputed. |
| 31. | Officer Gette continued the pursuit until it came to a stop just north of Avenue 48. | Gette Decl., ¶ 9; MVARS 3:36 – 5:13. | Undisputed. |
| 32. | During his involvement with the pursuit, Officer Gette witnessed the red truck traveling at excessive speeds for the area and in violation of the Vehicle Code. | Gette Decl., ¶ 10. | Disputed. The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck |

8

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
|---|---|---|---|
| 33. | Officer Gette saw the truck run red lights and make unsafe lane changes. | Gette Decl., ¶ 10. | Undisputed. |
| 34. | From what he had already heard over dispatch before joining the pursuit and and from his own observations of the red truck's actions after he joined the pursuit, Officer Gette was aware the driver of the red truck had been fleeing from the police for several minutes. | Gette Decl., ¶ 10. | Disputed. The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations. Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160. Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |

9

| | | | |
|---|---|---|---|
| 35. | Officer Gette believed at the time that the driving behavior of the person in the red truck had crossed over the line to felony level evasion. | Gette Decl., ¶ 10. | <u>Disputed.</u> The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
| 36. | The driver of the red truck was not yielding to the lights and sirens of the Sheriff's vehicle and the three pursuing CHP vehicles. | Gette Decl., ¶ 10. | <u>Disputed.</u> The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any |

10

| | | | | |
|---|---|---|---|---|
| | | | | police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
| | 37. | Officer Gette concluded that the driver did not want to stop and get caught and that he posed a serious danger to law enforcement and the other drivers on the road. | Gette Decl., ¶ 10. | Disputed. The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and |

11

| | | | |
|---|---|---|---|
| | | | never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
| 38. | Knowing that the suspect was armed with a rifle and engaging in such reckless flight from police officers, Officer Gette had serious concerns that the suspect was a severe danger to the pursing deputy and officers and to nearby civilians on the road. | Gette Decl., ¶ 10. | Disputed. The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
| 39. | Officer Gette knew that they would be engaging in a high-risk, felony stop if the pursuit came to a stop, which would mean they would be exiting their | Gette Decl., ¶ 10. | Disputed. The fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was cited for traffic violations.  Though the |

| | | | |
|---|---|---|---|
| | vehicles with firearms drawn and pointing at the truck. | | chase began due a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. |
| 40. | When the pursuit was nearing the intersection with Avenue 48, Officer Gette broadcast on the radio that the pursuit was approaching Avenue 48. | Gette Decl., ¶ 11. | Undisputed. |
| 41. | After noticing Officer Perez start moving over to the right, Officer Gette also began moving over to the right and then suddenly saw the red truck move in an almost 90-degree direction toward the right side of the road and roll to a stop. | Gette Decl., ¶ 11; Gette MVARS 5:06 – 5:11.) | Undisputed. |

13

| 42. | The red truck came to a stop almost perpendicular with and slightly over the right curbline of southbound Jefferson Street and facing westward. | Gette Decl., ¶ 11; Gette MVARS 5:10 – 5:12.) . | Undisputed. |
|---|---|---|---|
| 43. | The red truck was located northward of Avenue 48. | Gette Decl., ¶ 11 | Undisputed. |
| 44. | As the red truck rolled to a stop, Officer Perez came to a stop, and then Officer Gette came to a stop right behind Officer Perez. | Gette Decl., ¶ 12; Gette MVARS 5:12 – 5:13.) | Undisputed. |
| 45. | Officer Silva came to a stop to the left and forward of Officer Perez's vehicle. | Gette Decl., ¶ 12; Gette MVARS 5:18 – 5:21.) | Undisputed. |
| 46. | The aerial photograph in Exhibit 2 to Officer Gette's declaration fairly and accurately shows where Officer Perez's, Officer Silva's, and Officer Gette's vehicles came to a stop relative to the red truck's position and where they remained at the time shots were fired. | Gette Decl., ¶ 12; Gette Decl. Ex. 2. | Undisputed. |
| 47. | Officer Gette's vehicle was the one with the number 491 and the designation of K-9 on its top in Exhibit 2. | Gette Decl., ¶ 12; Gette Decl., Ex. 2. | Undisputed. |

14

| 48. | Officer Perez's vehicle was the one with the number 726 on its top in Exhibit 2. | Gette Decl., ¶ 12. | Undisputed. |
| --- | --- | --- | --- |
| 49. | Officer Silva's vehicle was the one with the number 067 on the top in Exhibit 2. | Gette Decl., ¶ 12; Gette Decl., Ex. 2. | Undisputed. |
| 50. | Exhibit 2 also shows where Deputy Derek Thomas (the deputy who began pursuing the suspect in the red truck from the Rite Aid) stopped his vehicle. It is shown with the number 062 on top. | Gette Decl., ¶ 13; Gette Decl., Ex. 2. | Undisputed. |
| 51. | Officer Gette was also aware when he came to a stop that the white RV (motor home) depicted toward the top of Exhibit 2 was present when the pursuit came to a stop. | Gette Decl., ¶ 14. | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno aiming the rifle, holding the rifle (or even Mr. Magdaleno himself) before he fired), and bullet trajectory photos demonstrating he |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
| 52. | Officer Gette had seen the white RV driving and pulling over to the right curb line as the pursuit neared this location. | Gette Decl., ¶ 14. | | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
| 53. | Officer Gette was therefore aware that the RV had one or more people inside of it. | Gette Decl., ¶ 14. | | <u>Disputed.</u>  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 199, 200, 201, 202, 203, 204. |
|---|---|---|---|---|
| 54. | Officer Gette was also generally aware of the presence of other civilian vehicles that had been driving and came to a stop in the immediate area. | Gette Decl., ¶ 14. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 55. | Immediately after coming to a stop, Officer Gette released the Electrolock in his vehicle and retrieved his AR-15 rifle, while also watching Officer Perez get out of Perez's vehicle, pull his handgun out, and take a position behind the open driver's door of Perez's vehicle. | Gette Decl., ¶ 15; Gette MVARS 5:13 – 5:20. | Undisputed. |
|---|---|---|---|
| 56. | As Officer Gette got out of his patrol vehicle and started heading towards Officer Perez's vehicle, he heard Officer Perez screaming "He's got a rifle!" about three times. | Gette Decl., ¶ 15. | Disputed.  This fact offered by Defendants is purported with the intent to suggest Javier Magdaleno posed a threat of immediate harm, which is an unreasonable and subjective interpretation, based on the MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating Mr. Magdaleno was not pointing a rifle at anyone and was underneath the window line of the red truck when he was shot. See PUMF Nos. 21, 22, |

19

| | | | 31,32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
|---|---|---|---|
| 57. | Officer Gette heard Officer Perez shouting these words within five to ten seconds after they had come to a stop in their vehicles. | Gette Decl., ¶ 15. | Undisputed. |
| 58. | Officer Gette interpreted these words as Officer Perez saying that he saw the suspect in the red truck with a rifle. | Gette Decl., ¶ 15. | Disputed.  This fact offered by Defendants is purported with the intent to suggest  that because based on what Officer Gette **thought he heard**, Javier Magdaleno posed a threat of immediate harm, which is an unreasonable and subjective interpretation, based on the MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr.** |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | **Magdaleno himself before he fired),** and bullet trajectory photos demonstrate Mr. Magdaleno was not pointing a rifle at anyone and was underneath the window line of the red truck when he was shot. See PUMF Nos. 21, 22, 31,32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
| 59. | Between counter mark 5:22 and 5:24 of the Gette MVARS, Officer Gette can be seen moving from the left of the screen to a kneeling position behind the right rear of Officer Perez's vehicle. | Gette Decl., ¶ 15; Gette MVARS 5:22 – 5:24. | Undisputed. | |
| 60. | Between counter mark 5:24 and 5:26 of the Gette MVARS, Officer Perez can be seen moving from the driver side door frame area of his patrol vehicle to a kneeling position behind the left rear of his patrol vehicle. | Gette Decl., ¶ 15; Gette MVARS 5:24 – 5:26. | Undisputed. | |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| 61. | After analysis of photographs and MVARS recordings, Officer Gette estimates that the distance between his position behind Officer Perez's vehicle and the driver's side window of the red truck was about 80 feet. | Gette Decl., ¶ 15. | <u>Undisputed.</u> | |
| 62. | A few seconds after initially taking up a kneeling position at the right rear of Officer Perez's vehicle, Officer Gette can be seen in his MVARS (approximately at marker 5:29) moving to a position outward from the right side of the rear of Officer Perez's vehicle. | Gette Decl., ¶ 16; Gette MVARS 5:29. | <u>Undisputed.</u> | |
| 63. | From that vantage point, Officer Gette was then able to look through the passenger side window of the red truck and see the barrel of a rifle almost vertical and bouncing near the passenger side window. | Gette Decl., ¶ 16. | <u>Disputed.</u> MVARS of Officers Silva and Perez, multiple witness testimony, and testimony of Officer Silva all show that no rifle could be seen in the red truck. Further, Defendant Deputy Thomas also testified he stopped firing because he no longer saw any threat. See PUMF Nos. 21, 22, 31, 32, 51, 52, 59, 60, 77, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160. | |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 64. | At almost the same time, Officer Gette heard a series of gunshots but could not tell where they were coming from. | Gette Decl., ¶ 17. | Disputed. This fact is offered for the suggestion that this was a rapidly evolving situation due to Mr. Magdaleno's actions and that it was objectively reasonable to shoot and kill him. The f acts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. The MVARS of Officers Silva and Perez, multiple witness testimony, and testimony of Officer |
|---|---|---|---|

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | Silva all show that no rifle could be seen in the red truck; further, Defendant Deputy Thomas also testified he stopped firing because he no longer saw any threat. See PUMF Nos. 21, 22, 31, 32, 51, 52, 59, 60, 77, 86, 87, 94, 95, 96,100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160. |
| | 65. | Although the events were occurring too fast for Officer Gette to now recall whether he began to try to fire his rifle at the truck after hearing this first round of gunshots or at the same time, he has since been able to discern from reviewing MVARS that he began firing after that first round of shots ended. | Gette Decl., ¶ 17. | Disputed.  Facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.  Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing |

24

| | | | | |
|---|---|---|---|---|
| | | | | seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27. |
| 66. | Regardless, while he was looking through the passenger window of the truck and before he started firing, Officer Gette could see the barrel of the rifle in the red truck arcing downward from a near vertical position to point in the direction to be able to fire on his position, the position of the other CHP officers, and the nearby civilians. | Gette Decl., ¶ 17. | | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 67. | This sequence of events was happening very fast, and Officer Gette perceived the immediate risk that the subject in the truck would begin firing at their area within an instant. | Gette Decl., ¶ 17. | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | | | bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
| 68. | Officer Gette immediately feared for his own life and the lives of the officers and civilians around him. | Gette Decl., ¶ 17. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, |

| | | | | |
|---|---|---|---|---|
| 1 | | | | 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
| | | | | |
| | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
| 69. | Believing there was an immediate threat that the rifle could finish lowering and fire directly at their position in a split second, Officer Gette took aim to begin firing at the rifle to stop the threat. | Gette Decl., ¶ 17. | <u>Disputed.</u> This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of |

28

| | | | | Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
| 70. | Officer Gette believed the operator of the rifle would be behind the barrel and that he posed a deadly threat to officers and civilians. | Gette Decl., ¶ 17. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
|---|---|---|---|---|
| 71. | Upon pulling the trigger of his rifle, Officer Gette realized that the safety was on. He had to temporarily maneuver the rifle to quickly take the safety off with his right thumb. | Gette Decl., ¶ 17. | | Undisputed. |
| 72. | Officer Gette then resumed looking through the passenger window of the truck and could still see the front of the barrel of the rifle moving down to a position where it would be pointing at the area where the other CHP officers, civilians, and Officer Gette were located. | Gette Decl., ¶ 17. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and** |

31

sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | MVARS.  See PUMF Nos. 25, 27. |
| 73. | Officer Gette took aim again and fired rounds from his rifle at the front of the barrel of the rifle that was moving in the truck towards him and others near to him. | | Gette Decl., ¶ 17. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. <br><br>In addition, the facts and evidence show the |

| | | | | |
|---|---|---|---|---|
| | | | | situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
| 74. | Officer Gette's purpose in firing was to protect himself, other officers, and nearby civilians from the immediate threat of being shot by the rifle that he believed was about to fire upon them. | Gette Decl., ¶ 17. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno aiming the rifle, holding the rifle (or even Mr. Magdaleno himself) before he fired), and** bullet trajectory photos |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to

35

| | | | |
|---|---|---|---|
| | | | give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| 75. | While Officer Gette initially believed at the time of the incident that he had fired one volley of rounds, he has since been able to determine from reviewing marker 5:36 through 5:43 of the Gette MVARS that there was a short pause of a second or two in his firing where he temporarily moved back to a semi-cover position and then back into a firing position to fire a second set of rounds. | Gette Decl., ¶ 18; Gette MVARS 5:36 – 5:43 | Undisputed. |
| 76. | However, in taking aim for and firing that second short burst of rounds, Officer Gette could still see through the passenger window of the red truck and saw the front of the barrel of the rifle still pointing in his and the other officers' and civilians' direction. | Gette Decl., ¶ 18. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and** |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

sworn deposition
testimony of Officer
Gette (who said he
never saw Mr.
Magdaleno himself
before he fired), and
bullet trajectory photos
demonstrating he was
underneath the window
line of the red truck.  See
PUMF Nos. 21, 22, 31,
32, 33, 51, 52, 53, 59, 60,
61, 86, 87, 94, 95, 96,
100, 101, 103, 111, 112,
113, 114, 115, 118, 130,
131, 138, 139, 142, 143,
144, 145, 150, 153, 154,
158, 159, 160, 166, 167,
170, 179, 186, 187, 190,
194, 195, 196, 197, 198,
199, 200, 201, 202, 203,
204.

In addition, the facts and
evidence show the
situation was moving too
fast because of the
officers' own actions and
bad tactics, not due to
Mr. Magdaleno posing
any immediate threat;
Defendant Deputy
Thomas fired 3-4 seconds
after pursuit ended and he
stepped foot on the
ground. See PUMF 161.
Officer Gette began firing
seven (7) seconds after
Thomas stopped firing
per Officer Silva's

37

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | MVARS.  See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| | 77. | Between his two sets of shots, Officer Gette fired a total of 11 rounds. | Gette Decl., ¶ 19. | Undisputed. |
| | 78. | The approximate amount of time that lapsed between Officer Gette first taking up a kneeling position behind Officer Perez's vehicle and his last shot was about 20 seconds. | Gette Decl., ¶ 20. | Disputed.  Facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | 199, 200, 201, 202, 203, 204. Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| | 79. | The total time that lapsed between when Officer Gette first maneuvered out from Officer Perez's vehicle to look down field into the passenger window of the red truck and firing his last shot was about 13 seconds. | Gette Decl., ¶ 20. | Disputed. Facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | | | 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.  Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.  Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| 80. | Since Officer Gette immediately began perceiving the suspect's rifle moving into an apparent firing position when he started looking | Gette Decl., ¶ 21. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | |
|---|---|---|---|
| | through the truck's passenger window, he knew at that instant that his life and the lives of the other officers and nearby civilians were in immediate danger.  He did not have time to give any warnings to the suspect before firing his rifle to try to saves life. | | not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27. |
| 81. | | Officer Gette also did not believe there was time to wait for backup by additional officers to arrive before he fired, because he (1) was confronted with a rifle barrel in the red truck that he could clearly see was moved from a vertical position in an arc to a pointing position aimed in his direction and the direction of two nearby CHP officers and several civilians in vehicles in the road; (2) knew that the Sheriff's Deputy was somewhere nearby; and (3) knew that the RV to his right was occupied by one or more people. | Gette Decl., ¶¶ 3, 22. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, |

42

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234.

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 82. | Seeing the rifle moving into this position, Officer Gette knew that it would take less than one second for the suspect to fire that rifle and kill Officer Gette or the other officers and civilians in his immediate vicinity. | Gette Decl., ¶ 21 | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | | | bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 83. | From his training and experience as a CHP Officer, Officer Gette was aware at the time of these events that a rifle is an extremely dangerous and deadly weapon, the rounds of which can penetrate through the metal framing of patrol cars, civilian | Gette Decl., ¶¶ 3, 22. | <u>Disputed.</u> This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| vehicles, officers' body armor, and helmets. | | | testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after |

| | | | | |
|---|---|---|---|---|
| | | | | Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 84. | Officer Gette also knew that rifles are high velocity firearms and that all of the officers and civilians near to his position would be within the deadly range of a rifle. | Gette Decl., ¶ 22. | | <u>Disputed.</u> This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and** bullet trajectory photos |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| | 85. | Officer Gette therefore knew that simply being behind a patrol car and even wearing upper body armor was not sufficient to save his life and the lives of other officers from what he believed was the immediate threat that the suspect was going to fire at them with a rifle. | Gette Decl., ¶ 22. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 86. | Officer Gette also knew that the civilians would not be expected to be wearing even body armor and that their vehicles were just as susceptible to penetration from rifle rounds. | Gette Decl., ¶ 22. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and |

| | | | | |
|---|---|---|---|---|
| | | | | bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 87. | Before firing his rifle, Officer Gette also knew that the suspect had just led police officers on a reckless and dangerous high-speed pursuit for several minutes through the City and had refused to stop despite multiple police vehicles sounding | Gette Decl., ¶ 23. | | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Officer Gette shot and killed Mr. Magdaleno, which is factually untrue and did not exist, based on MVARS of CHP |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | their lights and sirens behind him. | | Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 88. | Officer Gette perceived that the suspect had shown no regard for human life and seemed determined to escape capture. | Gette Decl., ¶ 23. | | Disputed. This fact suggests this was a dangerous felony pursuit, when Mr. Magdaleno was only cited for traffic violations.  Though the chase began due to a call about a domestic disturbance, Mr. Magdaleno never threatened harm to any police officers or other members of the public. See PUMF Nos. 3, 4, 5, 14, 15. Deputy Thomas said in his statement and deposition he never saw a gun during the pursuit. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | See PUMF Nos. 150, 160.  Officer Silva testified he never saw the windows of the red truck go down at any point and never saw anything being pointed out of the windows of the red truck. See PUMF Nos. 138, 139. This fact is also offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF |

| | | | | 227, 228, 229, 230, 231, 232, 233, 234. |
|---|---|---|---|---|
| 89. | Confronted with a fear of imminent deadly use of the rifle by the suspect in the red truck, Officer Gette felt he had to act immediately to stop the deadly threat to officers and civilians. | Gette Decl., ¶ 23. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm when he shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234 |
| 90. | Given the distance between Officer Gette and the suspect in the truck, the knowledge that the suspect was pointing a | | Gette Decl., ¶ 23. | Disputed. This fact is to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time he shot and |

58

| | | |
|---|---|---|
| rifle at Officer Gette and others, and Officer Gette's perception that he could not possibly stop that imminent deadly threat with anything other than deadly force, Officer Gette fired his rifle at the barrel of the rifle that he could see in the truck. | | killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br><br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19 | | | | Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 91. | Prior to Officer Gette firing his rifle in self-defense and defense of others, there was no helicopter on the scene, and he did not believe he had time to wait for one to arrive. | Gette Decl., ¶ 24. | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| 1 | | | | Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | per Officer Silva's MVARS. See PUMF Nos. 25, 27.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 92. | Officer Gette did not believe he had time to try de-escalation techniques. | Gette Decl., ¶ 24. | | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired), and** |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| | | | | bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 93. | Officer Gette had a 12-gauge shotgun in his patrol vehicle, but it was not capable of firing bean bags. | Gette Decl., ¶ 25. | | Undisputed. |
| 94. | Officer Gette kept pepper spray in his patrol vehicle, but he knew that pepper spray would have been ineffective in stopping the immediate threat of the suspect's rifle being pointed at Officer Gette and others, especially given the distance between the red truck and his position. | Gette Decl., ¶ 25. | | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| | 95. | For the same reasons, Officer Gette knew that his taser and his asp would not be effective in stopping the deadly threat from the suspect's rifle. | Gette Decl., ¶ 25. | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | | | 227, 228, 229, 230, 231, 232, 233, 234. |
| 96. | Releasing his canine would not have been effective for an armed suspect in a closed vehicle. Also, the canine could not close that distance before the suspect could start firing, and a canine would not be able to overcome a rifle that was aimed at Officer Gette's and the other people's location. | Gette Decl., ¶ 24. | <u>Disputed</u>. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos demonstrating he was underneath the window line of the red truck. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| | 97. | In the course of his service as a CHP patrol officer, Officer Gette has reviewed numerous MVARS videos and has learned that the | Gette Decl., ¶¶ 5, 26. | Disputed. The MVARS speak for themselves and it is for the trier of fact to determine what is seen or not seen. As |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| MVARS video is of low quality in its resolution and detail. | | | demonstrated in Defendants' own Undisputed Material Fact No. 75, the MVARS clearly provide details and are sufficient enough that Officer Gette could change his story a third time. Further, the MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** all show that the doors of the red truck were closed, the windows were always up, the windows were tinted, and it was difficult to see a person much less anything resembling an immediate danger to anyone at the scene. Further, details of the white pickup truck are clearly visible in Officer Silva's MVARS. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 158, 159, 160, 166, 167, 170, 179. |
|---|---|---|---|---|
| | 98. | As with the MVARS videos in this case, MVARS videos are grainy and seldom allow one to discern features such as license plate numbers, street names, or even the occupants inside of vehicles (even with windows that are not tinted). | Gette Decl., ¶¶ 5, 26. | <u>Disputed.</u> The MVARS speak for themselves and it is for the trier of fact to determine what is seen or not seen. As demonstrated in Defendants' own Undisputed Material Fact No. 75, the MVARS clearly provide details and are sufficient enough that Officer Gette could change his story a third time. Further, the MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** all show that the doors of the red truck were closed, the windows were always up, the windows were tinted, and it was difficult to see a person much less anything resembling an immediate danger to anyone at the scene. Further, details of the white pickup truck are clearly visible in Officer |

| | | | Silva's MVARS. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179. |
|---|---|---|---|
| 99. | MVARS video only captures what is in the immediate view field of the camera, and Officer Gette was seeing the events from a completely different perspective than the MVARS cameras and with the clarity of his own vision. | Gette Decl., ¶ 26 | Disputed. This fact is offered to imply that the MVARS did not capture the full scene of the Incident, when in reality the red truck and/or its surroundings are clearly visible in all three MVARS and the audio is distinct to pick up audio of officers and others on-scene. See Exhibit D, E, and F, and PUMF 19-79. The MVARS speak for themselves and it is for the trier of fact to determine what is seen or not seen. |
| 100. | Despite the tinting on the passenger window of the red truck, Officer Gette was able to clearly see the barrel of the rifle moving in the manner he has described in his declaration because of the angle of the light from the sun, the position of the truck, and Officer Gette's | Gette Decl., ¶ 27. | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and |

| | | | | |
|---|---|---|---|---|
| 1 | | vantage point. | | Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>In addition, the facts and evidence show the situation was moving too |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | | | | |
|---|---|---|---|---|
| 1 | | | | fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 23 | 101. | Every one of the shots that Officer Gette fired at the truck were made at a time when he was seeing the rifle barrel moving inside the truck in a way that it appeared it was imminently likely to be | Gette Decl., ¶ 28. | Disputed. This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| fired at him, the other officers, and/or the nearby civilians. | | | and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS.  See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 102. | When he fired each shot, Officer Gette was in immediate fear for his life, the lives of other officers, and the lives of civilians. | Gette Decl., ¶ 28. | | Disputed.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time |

| | | | | Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed.  See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 199, 200, 201, 202, 203, 204.

In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 103. | When Officer Gette fired his rifle, he had no intent other than to stop the threat posed by the suspect's rifle to human lives. | Gette Decl., ¶ 28. | **Disputed.** This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed. See PUMF Nos. 21, 22, 31, 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, |
|---|---|---|---|

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | |
|---|---|---|---|---|
| 1 | | | | 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204. |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | In addition, the facts and evidence show the situation was moving too fast because of the officers' own actions and bad tactics, not due to Mr. Magdaleno posing any immediate threat; Defendant Deputy Thomas fired 3-4 seconds after pursuit ended and he stepped foot on the ground. See PUMF 161. Officer Gette began firing seven (7) seconds after Thomas stopped firing per Officer Silva's MVARS. See PUMF Nos. 25, 27. |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 227, 228, 229, 230, 231, 232, 233, 234. |
|---|---|---|---|---|
| 104. | During the time he heard shots, witness Ryan Wooten was focused on the rear window of the red truck instead of the passenger window. | Wooten Depo.[1], 118:14- 24; 128:12-21. | | Disputed. Ryan Wooten testified in deposition that from his vantage point it looked to him like the occupant in the red truck did not appear to have their seat belt on, did not have anything in their hands, he could see both the passenger window and the rearview window, and never saw the occupant of the red truck ever point a weapon at anybody.  See PUMF Nos. 94, 95, 96. |
| 105. | During the time he heard shots, witness Ryan Wooten did not spend any amount of time trying to peer into the passenger window of the red truck. | Wooten Depo., 118:25 – 119:3; 128:18 – 129:2. | | Disputed. Ryan Wooten testified in deposition that from his vantage point it looked to him like the occupant in the red truck did not appear to have their seat belt on, did not have anything in their hands, he could see both the passenger window and the rearview window, and never saw the occupant of the red truck ever point a weapon at anybody.  See PUMF Nos. 94, 95, 96. |
| 106. | Between the time the red truck came to a stop and before shots were fired, witness Ryan Wooten did | Wooten Depo., 119:7-12. | | Disputed. Ryan Wooten testified in deposition that from his vantage point it looked to him like the |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | not spend any significant amount of time trying to peer into the passenger side window of the truck. | | occupant in the red truck did not appear to have their seat belt on, did not have anything in their hands, he could see both the passenger window and the rearview window, and never saw the occupant of the red truck ever point a weapon at anybody. See PUMF Nos. 94, 95, 96. |
| 107. | During the entirety of the time that he had the red truck in his view from the time it came to a stop to the time he left his own truck, witness Ryan Wooten did not spend any amount of time trying to look through the passenger side window of the truck. | Wooten Depo., 128:22-129:2. | Disputed. Ryan Wooten testified in deposition that it looked to him like the occupant in the red truck did not appear to have their seat belt on, did not have anything in their hands, and never saw the occupant of the red truck ever point a weapon at anybody. See PUMF Nos. 94, 95, 96. |
| 108. | Deputy Thomas was involved in the pursuit of the suspect in the red truck from the beginning, and from his vantage point at the termination of the pursuit, Deputy Thomas could see inside the rear window of the truck and observed the suspect with a rifle in his hand. He saw what looked like the charging or chambering of a round because he saw the rifle go up and down | Thomas Depo.[2], 39:8-11; 46:3-13; 48:14-50:20. | Disputed. Deputy Thomas said in his statement and in his deposition that he never saw a rifle before or during the pursuit. See PUMF Nos. 150, 160. Deputy Thomas started firing 3-4 seconds after he exited his vehicle. See PUMF No. 161. Though he claims to the contrary, no evidence shows Deputy Thomas gave any warnings or commands to |

| | | | | |
|---|---|---|---|---|
| 1 | | fairly quickly. He also saw the suspect lean towards the north side, where Deputy Thomas knew the CHP officers were, lower the rifle, take a position where he had his head over the top of the rifle looking down the barrel in what appeared to be a firing positioning. | | Javier Magdaleno before he started shooting.  See PUMF Nos. 162, 163, 164.  This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed.  See PUMF Nos. 21, 22, 31, |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | | | 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.<br><br>Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 109. | Officer Perez was involved in the pursuit of the suspect in the red truck, and when Officer Perez exited his vehicle at the termination of the pursuit, he was able to look into the right front passenger window of the red truck and see the barrel of a rifle. | Perez Depo.[3], 29:5-37:14; 38:9-40:1. | Disputed.  Officer Perez did not know what Defendant Officer Gette was shooting at when he fired his rifle, did not see Mr. Magdaleno until he was taken out of the truck, and in any event made the decision to reposition for better cover rather than fire on a target he was not sure was |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

there.  See PUMF 127, 130, 131.

Further, This fact is offered to suggest Mr. Magdaleno posed an objective, immediate threat of harm at the time Office Gette shot and killed Mr. Magdaleno which is factually untrue and did not exist, based on MVARS of CHP Officers Silva, Perez and Gette, multiple witness testimony, testimony of Officers Silva and Perez, **the statement and sworn deposition testimony of Officer Gette (who said he never saw Mr. Magdaleno himself before he fired),** and bullet trajectory photos all of show the doors of the red truck were closed, the windows of the red truck were up the entire time, the windows were all tinted, and only a shadowy shape of a person could be seen (much less a rifle), and Mr. Magdaleno was in actuality underneath the window line of the red truck when he was shot and killed.  See PUMF Nos. 21, 22, 31,

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | | 32, 33, 51, 52, 53, 59, 60, 61, 86, 87, 94, 95, 96, 100, 101, 103, 111, 112, 113, 114, 115, 118, 130, 131, 138, 139, 142, 143, 144, 145, 150, 153, 154, 158, 159, 160, 166, 167, 170, 179, 186, 187, 190, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204.

Plaintiff's police practices expert Roger A. Clark opines that both Deputy Thomas and Officer Gette had time to give commands, give warnings, and employed bad police tactics in sequence of events leading up to and the employment of excessive deadly force upon Mr. Magdaleno. See PUMF 227, 228, 229, 230, 231, 232, 233, 234. |
| 110. | Mark Fajardo, M.D. is a physician board certified in anatomic, clinical, and forensic pathology. | Fajardo Depo.[4], 11:7-20. | Undisputed. |
| 111. | Dr. Fajardo performed the autopsy on Plaintiffs' decedent. | Fajardo Depo., 8:6 – 9:1;27:11-20. | Undisputed. |
| 112. | At the time of his deposition in this case, Dr. Fajardo was the Chief Medical Examiner in | Fajardo Depo., 12:5-16. | Undisputed. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | | | |
|---|---|---|---|
| | Riverside County. | | |
| 113. | Dr. Fajardo determined that the rifle gunshot wound Plaintiffs' decedent suffered to the head was fatal. | Fajardo Depo., 32:13-20; 32:25-33:5; 33:23-34:3; 39:2-11; 51:3-52:1; 66:2-8. | Undisputed. |
| 114. | Dr. Fajardo confirmed that the bullet wound to Plaintiffs' decedent's head was "a non-survivable wound regardless of medical intervention. The extensive kinetic energy effect is incompatible with life." | Fajardo Depo., 54:9-16. | Undisputed. |
| 115. | Dr. Fajardo confirmed that Plaintiffs' decedent would not have had any cognitive function after the bullet injury to his head, as there was no surviving this brain injury. | Fajardo Depo., 66:9-21 | Undisputed. |
| 116. | Dr. Fajardo confirmed that, after this gunshot wound to the head occurred, Plaintiffs' decedent would not have had any consciousness of pain. He was rendered unconscious immediately upon impact with the projectile, with no sensation or cognition occurring in that time. | Fajardo Depo., 66:22 – 67:12. | Undisputed. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

**Plaintiffs, ALMA L. FIGUEROA DE MAGDALENO, individually and as Successor in Interest to JAVIER MAGDALENO GUTIERREZ; JUAN JAVIER MAGDALENO, individually; YOSELIN MAGDALENO, individually; and IVETA MAGDALENO, individually hereby set forth the following, affirmative Plaintiffs' Undisputed Material Facts ("PUMF") and citations to supporting evidence which preclude Summary Judgment in this matter.**

| PLAINTIFF'S UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1.    On January 29, 2021 at approximately 1239 hours, Riverside County Sheriffs were contacted in regards to an incident involving a domestic dispute involving a Hispanic male and Hispanic female, occurring at a Rite Aid on 39155 Washington Street, City of Thousand Palms. | See Exhibit A, Evidence of general facts of the incident. |
| 2.    A unit arrived (operated by Defendant Deputy Derek Thomas), who made contact with the male (later identified as Mr. Javier Magdaleno ("Mr. Magdaleno"). | See Exhibit A, Evidence of general facts of the incident. |
| 3.    Mr. Magdaleno did not comply with Defendant Deputy Thomas, and a chase ensued, of which units from California Highway Patrol later joined (operated by Officers Ramon Perez, Alfredo Silva, and Defendant Officer John Gette). | See Exhibit A, Evidence of general facts of the incident. |
| 4.    The pursuit ended near the intersection of Jefferson Street and Avenue 48 in the City of La Quinta.  A traffic collision occurred between Mr. Magdaleno's vehicle and Mauricio Lopez-Castro. | See Exhibit A, Evidence of general facts of the incident. |
| 5.    The Traffic Collision Report prepared in connection with that Incident found Mr. Magdaleno to be in violation of Vehicle Code Section 21658(a), which states as follows: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic in one direction, the following rules apply: (a) A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved | See Exhibit A, Evidence of general facts of the incident. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| from the lane until such movement can be made with reasonable safety." | |
| 6. On January 29, 2921, Monica Marquez was working at the Rite Aid located at 39155 Washington Street, City of Thousand Palms, when she heard an individual (later identified as Alma Magdaleno) was upset and screaming in Spanish about her husband. | Deposition of Monica Marquez ("Marquez Depo"), Ex. B, 28:10-21; 30:7-10; 40:23-25; 41:1-4; 52:1-4 |
| 7. Ms. Marquez led Ms. Magdaleno to a back-office breakroom where Ms. Magdaleno stayed for some time. | Marquez Depo, Ex. B, 28:10-21; 30:7-10; 40:23-25; 41:1-4; 52:1-4. |
| 8. Ms. Marquez never saw any individual (Javier Magdaleno or otherwise) with a gun on January 29, 2021, and did not see any interaction between Javier Magdaleno and Alma Magdaleno on the date of the Incident. | Marquez Depo, Ex. B, 28:10-21; 30:7-10; 40:23-25; 41:1-4; 52:1-4. |
| 9. Sandra Marroquin worked as a pharmacy technician at the Rite-Aid located at 39155 Washington Street, City of Thousand Palms. | Deposition of Sandra Marroquin ("Marroquin Depo"), Ex. C, 16:12 |
| 10. On January 29, 2021, Marroquin noticed two people in a truck about 10-15 feet away arguing outside the store. | Marroquin Depo, Ex. C, 21:1-6, 9-12, 19-23; 27:21-25; 34:7-14; 35:25; 36:1-9 |
| 11. She could not tell who was in the truck until Mrs. Magdaleno got out of the truck. | Marroquin Depo, Ex. C, 21:1-6, 9-12, 19-23; 27:21-25; 34:7-14; 35:25; 36:1-9 |
| 12. Mrs. Magdaleno then came into the store "upset" and "yelling" about her husband. | Marroquin Depo, Ex. C, 21:1-6, 9-12, 19-23; 27:21-25; 34:7-14; 35:25; 36:1-9 |
| 13. Marroquin recognized Mrs. Magdaleno as a regular customer and estimates Mrs. Magdaleno has been in the store 50 times or more over the course of about 5 years. | Marroquin Depo, Ex. C, 21:1-6, 9-12, 19-23; 27:21-25; 34:7-14; 35:25; 36:1-9 |

| | |
|---|---|
| 14.    Marroquin looked outside and noticed Mr. Magdaleno out his vehicle for "one second", but he got back into his truck without her ever seeing Mr. Magdaleno with or pointing a gun or weapon at anyone. | Marroquin Depo, Ex. C, 28:18-24; 36:14-16; 77:17-23; 78:2-5 |
| 15.    Mr. Magdaleno never threatened anyone else in the store or parking lot. | Marroquin Depo, Ex. C, 28:18-24; 36:14-16; 77:17-23; 78:2-5 |
| 16.    Ms. Marroquin then called 911 and spoke to dispatch for about 2-3 minutes and then saw Mr. Magdaleno leave the parking lot being followed by a California Highway Patrol vehicle. | Marroquin Depo, Ex. C, 49:11-15, 21-25; 50:1 |
| 17.    Ms. Marroquin had seen Mr. Magdaleno before in the store and said he was "calm," and had never seen Mr. Magdaleno violent before, including the date of the incident. | Marroquin Depo, Ex. C, 25:11-15, 22-25; 26:1-4 |
| 18.    On January 29, 2021, CHP Officer Alfredo Silva's police vehicle was equipped with a Mobile Video Audio Recording System ("MVARS'), which was activated and captured driving and arrival to the scene of the Incident near the intersection of Jefferson Street and Avenue 48 and has a runtime of 0:22:02. | Mobile Video Audio Recording System of CHP Officer Alfredo Silva ("Silva MVARS"), Ex. D |
| 19.    As depicted in Officer Silva's MVARS, Officer Silva arrives on the scene of the Incident at 0:03:35 and stops to the right of a white pickup truck at the scene of the Incident at 0:03:45. | Silva MVARS, Ex. D |
| 20.    As depicted in Officer Silva's MVARS, numerous vehicles (police and civilian vehicles) can be seen surrounding a red pickup truck. | Silva MVARS, Ex. D |
| 21.    As depicted in Officer Silva's MVARS, the doors of the red truck are closed, the windows of the red truck are drawn up completely, and the windows of the red truck are dark and tinted. | Silva MVARS, Ex. D |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 22.    As depicted in Officer Silva's MVARS, no shapes of people nor objects can be seen inside the red truck, but the headrests and back of a person's head can be seen at 0:03:50 through the rear, non-tinted window of the white pickup truck hauling a trailer seen in lefthand side of the MVARS. | Silva MVARS, Ex. D |
| 23.    As depicted in Officer Silva's MVARS, the red truck is completely stopped, perpendicular to the street, and there are multiple trees in front of the red truck. | Silva MVARS, Ex. D |
| 24.    As depicted in Officer Silva's MVARS, at 0:03:46 - 0:3:47 two (2) gunshots can be heard. | Silva MVARS, Ex. D |
| 25.    As depicted in Officer Silva's MVARS, at 0:03:51-0:03:54, seven (7) gunshots can be heard. | Silva MVARS, Ex. D |
| 26.    At 0:03:56 – 0:03:58, audio can be heard "shots fired, shots fired." | Silva MVARS, Ex. D |
| 27.    As depicted in Officer Silva's MVARS, at 0:04:01 – 0:04:05, 8-9 gunshots can be heard, and the shots are visibly striking the passenger side door and window of the red truck. | Silva MVARS, Ex. D |
| 28.    As depicted in Officer Silva's MVARS, at 0:04:07 – 0:04:09 2-3 gunshots are heard, and the shots are visibly striking the passenger side door and window of the red truck. | Silva MVARS, Ex. D |
| 29.    As depicted in Officer Silva's MVARS, at 0:04:11 – 0:04:12 a white sedan in the background on Avenue 48 is seen suddenly backing up and away from the path of gunfire. | Silva MVARS, Ex. D |
| 30.    As depicted in Officer Silva's MVARS, at 0:04:15 – 0:04:16 audio can be heard "shots fired." | Silva MVARS, Ex. D |
| 31.    As depicted in Officer Silva's MVARS, throughout this sequence of events and gunfire, the | Silva MVARS, Ex. D |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| doors of the red truck are closed, the windows of the red truck are drawn up completely, and the windows of the red truck are dark and tinted. | |
| 32.    As depicted in Officer Silva's MVARS, throughout this sequence of events and gunfire, no shapes of people or objects can be seen inside the red truck. | Silva MVARS, Ex. D |
| 33.    As depicted in Officer Silva's MVARS, throughout this sequence of events and gunfire, the vehicle is completely stopped and there are multiple trees in front of the red truck. | Silva MVARS, Ex. D |
| 34.    As depicted in Officer Silva's MVARS, at 0:04:25 – 0:04:27, audio can be heard "I can't see him." | Silva MVARS, Ex. D |
| 35.    As depicted in Officer Silva's MVARS, at 0:04:52 – 0:04:53, audio can be heard, "Did he fire?" | Silva MVARS, Ex. D |
| 36.    As depicted in Officer Silva's MVARS, at 0:04:53 – 0:04:54, audio can be heard "I don't know." | Silva MVARS, Ex. D |
| 37.    As depicted in Officer Silva's MVARS, at 0:08:26 - nearly five minutes after the first shots are fired, and over four minutes after the second and third volley of shots are fired - police commands are heard broadcast for the first time: "suspect this is the Riverside County Sheriff's Department…show us your hands." | Silva MVARS, Ex. D |
| 38.    As depicted in Officer Silva's MVARS, at 0:10:15 – 0:10:21, audio is heard: "can you see him? Can you see him?" with a response of "No." | Silva MVARS, Ex. D |
| 39.    As depicted in Officer Silva's MVARS, at 0:20:24, police are seen approaching the red truck. | Silva MVARS, Ex. D |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 40.    On January 29, 2021, Officer Perez's Mobile Video Audio Recording System ("MVARS") was activated and captured Officer Perez's driving and arrival to the scene of the Incident near the intersection of Jefferson Street and Avenue 48. | Mobile Video Audio Recording System of CHP Officer Ramon Perez ("Perez MVARS"), Ex. E |
| 41.    Officer Perez's MVARS has a total run time of 1:09:20. | Perez MVARS, Ex. E |
| 42.    As depicted in Officer Perez's MVARS, at 0:00:38, Officer Perez pulls into the Rite-Aid parking lot. | Perez MVARS, Ex. E |
| 43.    As depicted in Officer Perez's MVARS, at 0:00:38, a police SUV (later identified as being driven by Defendant Riverside County Sheriff Deputy Derek Thomas) is seen leaving the parking lot. | Perez MVARS, Ex. E |
| 44.    As depicted in Officer Perez's MVARS, at at 0:01:03, Officer Perez leaves the Rite Aid parking lot, following the police SUV vehicle, and the audio of the MVARS is activated. | Perez MVARS, Ex. E |
| 45.    As depicted in Officer Perez's MVARS, Officer Perez arrives at the scene of the Incident at 0:08:00. | Perez MVARS, Ex. E |
| 46.    As depicted in Officer Perez's MVARS, at 0:08:03, the red truck comes to rest on the sidewalk, perpendicular to the street. | Perez MVARS, Ex. E |
| 47.    As depicted in Officer Perez's MVARS, a motorhome is seen to the right, and a white truck with trailer is seen on the left side of the screen. | Perez MVARS, Ex. E |
| 48.    As depicted in Officer Perez's MVARS, at 0:08:06 Officer Perez comes to a stop at the scene. | Perez MVARS, Ex. E |
| 49.    As depicted in Officer Perez's MVARS, the motorhome previously seen is no longer in view. | Perez MVARS, Ex. E |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 50. As depicted in Officer Perez's MVARS, numerous vehicles (police and civilian vehicles) can be seen surrounding a red pickup truck. | Perez MVARS, Ex. E |
| 51. As depicted in Officer Perez's MVARS, the doors of the red truck are closed, the windows of the red truck re drawn up completely, and the windows of the red truck are dark and tinted. | Perez MVARS, Ex. E |
| 52. As depicted in Officer Perez's MVARS, no shapes of people nor objects can be seen inside the red truck. | Perez MVARS, Ex. E |
| 53. As depicted in Officer Perez's MVARS, the red truck is completely stopped and there are multiple trees in front of the red truck. | Perez MVARS, Ex. E |
| 54. As depicted in Officer Perez's MVARS, at 0:08:10, a police vehicle is seen pulling up the scene behind the white pickup truck with trailer (later identified as Defendant Riverside County Sheriff Deputy Derek Thomas). | Perez MVARS, Ex. E |
| 55. As depicted in Officer Perez's MVARS, at 0:08:14, a vehicle is seen pulling in and stopping to the left of Officer Perez's vehicle (later identified as CHP Officer Alfredo Silva). | Perez MVARS, Ex. E |
| 56. As depicted in Officer Perez's MVARS, at 0:08:24-0:08:26, audio can be heard "shots fired, shots fired." | Perez MVARS, Ex. E |
| 57. As depicted in Officer Perez's MVARS, at 0:08:29 – 0:08:33, seven (7) to eight (8) gunshots are heard, and the shots are visibly striking the passenger side door and window of the red truck. | Perez MVARS, Ex. E |
| 58. As depicted in Officer Perez's MVARS, at 0:08:35 – 0:08:36, three (3) gunshots are heard, and the shots are visibly striking the passenger side door and window of the red truck. | Perez MVARS, Ex. E |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | |
|---|---|
| 59. As depicted in Officer Perez's MVARS throughout this sequence of events and gunfire, the doors of the red truck are closed, the windows of the red truck are drawn up completely, and the windows of the red truck are dark and tinted. | Perez MVARS, Ex. E |
| 60. As depicted in Officer Perez's MVARS throughout this sequence of events and gunfire, no shapes of people nor objects can be seen inside the red truck. | Perez MVARS, Ex. E |
| 61. As depicted in Officer Perez's MVARS throughout this sequence of events and gunfire, the vehicle is completely stopped and there are multiple trees in front of the red truck. | Perez MVARS, Ex. E |
| 62. On January 29, 2021, Officer Gette's Mobile Video Audio Recording System ("MVARS") was activated and captured Officer Gette's driving and arrival to the scene of the Incident near the intersection of Jefferson Street and Avenue 48. | Mobile Video Audio Recording System of CHP Officer John Gette ("Gette MVARS"), Ex. F |
| 63. Officer Gette's MVARS has a total run time of 0:46:53. | Gette MVARS, Ex. F |
| 64. As depicted in Officer Gette's MVARS, Officer Gette arrives on the scene of the Incident at 0:05:13. | Gette MVARS, Ex. F |
| 65. As depicted in Officer Gette's MVARS, Officer Gette pulls up directly behind another CHP patrol vehicle (later identified as Officer Ramon Perez). | Gette MVARS, Ex. F |
| 66. As depicted in Officer Gette's MVARS, a white truck pulling a trailer can be seen directly ahead, and a police SUV is seen to the left trailer (later identified as Defendant Riverside County Sheriff Deputy Derek Thomas) and slightly behind the white truck pulling a trailer. | Gette MVARS, Ex. F |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 67.   As depicted in Officer Gette's MVARS, at 0:05:14 - 0:05:15, Officer Gette's vehicle stops. | Gette MVARS, Ex. F |
| 68.   As depicted in Officer Gette's MVARS, Officer Gette parked his vehicle directly behind Officer Perez's vehicle, which obstructs the view of the red truck ahead of Officer Perez's vehicle at the scene. | Gette MVARS, Ex. F |
| 69.   As depicted in Officer Gette's MVARS, Officer Perez is seen exiting his vehicle. | Gette MVARS, Ex. F |
| 70.   As depicted in Officer Gette's MVARS, at 0:05:19, another CHP police vehicle is seen arriving at the scene (later identified as Officer Alfredo Silva). | Gette MVARS, Ex. F |
| 71.   As depicted in Officer Gette's MVARS, at 0:05:22, Officer Gette is seen entering the frame from the left, and heading towards Officer Perez's police vehicle. | Gette MVARS, Ex. F |
| 72.   As depicted in Officer Gette's MVARS, at 0:05:24, Officer Gette is seen kneeling behind Officer Perez's police vehicle. | Gette MVARS, Ex. F |
| 73.   As depicted in Officer Gette's MVARS, at 0:05:29, Officer Gette is seen looking around the right side of Officer Perez's vehicle. | Gette MVARS, Ex. F |
| 74.   As depicted in Officer Gette's MVARS, at 0:05:31 – 0:05:32 Officer Gette is seen raising his rifle and taking aim. | Gette MVARS, Ex. F |
| 75.   As depicted in Officer Gette's MVARS, at 0:05:36, Officer Gette begins firing. | Gette MVARS, Ex. F |
| 76.   As depicted in Officer Gette's MVARS, Officer Gette completes the first volley of shots at 0:05:40 (firing a total of 7 (seven) shots) into the right passenger door and window of the red pickup truck. | Gette MVARS, Ex. F |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 77. As depicted in Officer Gette's MVARS, at 0:05:37, Officer Perez reacts to the sound of gunfire, appearing to be surprised that shots are being fired. | Gette MVARS, Ex. F |
| 78. As depicted in Officer Gette's MVARS, one second after competing the first volley at 0:05:40, at 0:05:41, Officer Gette begins firing again, and fires another four (4) shots into the right passenger door and window of the red pickup truck. | Gette MVARS, Ex. F |
| 79. As depicted in Officer Gette's MVARS, at 0:05:43 Officer Gette stops firing. | Gette MVARS, Ex. F |
| 80. Sharon Bailey-Comes is a former probation corrections officer for 16 years who has worked at Maranatha Prison and San Bernardino County Probation. Ms. Bailey Comes had her sworn deposition in this matter taken on March 2, 2023. | Deposition of Sharon Bailey Comes ("Bailey-Comes Depo"), Ex. G, 19:6-11; 20:3-10; 63:22-23. |
| 81. Ms. Bailey-Comes testified that on January 29, 2021 she was driving in an RV with her two children southbound on Jefferson St. when she heard sirens and saw at least six law enforcement vehicles approaching in her rearview and side view mirrors. | Bailey-Comes Depo, Ex. G, 30:14-25; 31:3-7 |
| 82. Ms. Bailey-Comes testified that although she did not know which sheriff's department at the time, she saw officers from CHP and a sheriff's department. | Bailey-Comes Depo, Ex. G, 31:15-21 |
| 83. Ms. Bailey-Comes testified that she pulled her RV over to the side of the road and stopped. | Bailey-Comes Depo, Ex. G, 32:22-24; 33:2-20 |
| 84. Ms. Bailey-Comes testified that she then saw a red truck maneuver through traffic and hit the curb. | Bailey-Comes Depo, Ex. G, 33:2-20 |
| 85. Ms. Bailey-Comes testified that seconds later, she heard the first gunshot. | Bailey-Comes Depo, Ex. G, 47:5-8 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNSPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 86. Ms. Bailey-Comes testified that when the red truck pulled up to the curb, she could see someone in the driver's seat, but she could not see a gun. | Bailey-Comes Depo, Ex. G, 28:9-12, 16-19; 44:19-21; 80:11-12; 82:23-24 |
| 87. Ms. Bailey-Comes testified that the driver did not leave the truck, the doors were closed and the windows were up. | Bailey-Comes Depo, Ex. G, 28:9-12, 16-19; 44:19-21; 80:11-12; 82:23-24 |
| 88. Witness Ryan Wooten had his sworn deposition of what he witnessed in this matter on February 6, 2023. | Deposition of Ryan Wooten ("Wooten Depo"), Ex. H |
| 89. Mr. Wooten testified that on January 29, 2021, he was driving a 2016 Chevrolet Silverado Single Cab truck southbound on Jefferson Avenue in route to Analusia Country Club in La Quinta, CA, in connection with his employment with Coachella Valley Water District. | Wooten Depo, Ex. H, 31:8-17, 38:2-23 |
| 90. Mr. Wooten testified that as he neared the intersection of Jefferson Avenue and Avenue 48, he heard sirens and began to move toward the two left hand turn lanes, when a red truck appeared suddenly and struck Mr. Wooten's front bumper. | Wooten Depo, Ex. H, 42:13-18 |
| 91. Mr. Wooten testified that after the red truck struck his truck, the red truck struck a white Ford F-150 pulling a trailer with a golf cart, and then struck the westside curb of Jefferson Avenue, going airborne 1-2 feet, and coming to an ultimate stop. | Wooten Depo. Ex. H, 43:16-20; 45:22-25; 47:6-9. |
| 92. Mr. Wooten testified that his truck was approximately 100 feet behind the red truck from where it came to a stop. | Wooten Depo. Ex. H, 86:1-3 |
| 93. Mr. Wooten testified that at this point he observed 3-4 Officers exit patrol vehicles and point weapons towards the red truck. | Wooten Depo. Ex. H, 46:20-25 |

| | |
|---|---|
| 94.    Mr. Wooten testified that upon impact with the curb, he could observe the driver of the red truck engage inside the red truck in an "up and down movement, like he wasn't wearing a seatbelt" through the rear window of the truck. | Wooten Depo. Ex. H, 70:18-25; 71:1-10; 72:10-15, 20-24; 107:10-20 |
| 95.    During the time that Mr. Wooten saw the up and down movement of Mr. Magdaleno in the truck, he could not see anything in Mr. Magdaleno's hands. | Wooten Depo. Ex. H, 70:18-25; 71:1-10; 72:10-15, 20-24 |
| 96.    Throughout the time that shots were fired, Mr. Wooten was able to see both the passenger side window and the rear window of the red truck but was unable to tell whether Mr. Magdaleno was pointing a weapon at anybody. | Wooten Depo. Ex. H, 70:18-25; 71:1-10; 72:10-15, 20-24 |
| 97.    Larry Tashman, a former police officer with the Chico Police Department with over 20 years of experience in security, gave his sworn deposition on September 21, 2022. | Deposition of Larry Tashman ("Tashman Depo"), Ex. I, 15:7-9; 16:1-4; 22:7-10, 15-23; 26:2-5; 39:22-25 |
| 98.    Mr. Tashman testified in his deposition that on January 29, 2021, he was driving northbound on Jefferson Avenue approaching a red light when he noticed a red pickup truck on the curb and Riverside Sheriff's Department and California Highway Patrol vehicles behind the truck. | Tashman Depo, Ex. I, 15:7-9; 16:1-4; 22:7-10, 15-23; 26:2-5; 39:22-25 |
| 99.    Tashman testified that he was about 100 yards away from the red truck. He blocked the left-hand turn lanes and directed traffic away from the scene. | Deposition of Larry Tashman ("Tashman Depo"), Ex. I, 15:7-9; 16:1-4; 22:7-10, 15-23; 26:2-5; 39:22-25 |
| 100.   Mr. Tashman testified in his deposition that he could not see inside the truck "at all" and never saw the occupant of the red truck. | Tashman Depo, Ex. I, 40:1-4; 44:2-5 |
| 101.   Mr. Tashman testified in his deposition that the driver's side door on the red truck was closed | Tashman Depo, Ex. I, 42:5-13 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| and Mr. Tashman observed that the driver's side window appeared to be shut. | |
| 102.  Mr. Tashman testified in his deposition that he never heard the police officers issue any commands to the occupant of the red truck before they fired gunshots. | Tashman Depo, Ex. I, 37:17-22 |
| 103.  Mr. Tashman testified in his deposition that the only time he saw a rifle was when the officers removed the rifle from the red truck. | Tashman Depo, Ex. I, 40:5-9 |
| 104.  Mauricio Lopez-Castro, a witness to the events of January 29, 2021, gave his sworn deposition on April 13, 2023. | Deposition of Mauricio Lopez Castro ("Lopez-Castro Depo"), Ex. J. |
| 105.  Mr. Lopez-Castro testified in his deposition that on January 29, 2021, he was driving his work vehicle northbound on Jefferson Street for his employer. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |
| 106.  Mr. Lopez-Castro testified in his deposition that he saw a red truck coming up from behind on his left side, and he also noticed there was a Riverside County Sheriff's department vehicle behind the red truck. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |
| 107.  Mr. Lopez-Castro testified in his deposition red truck came up on his left side and struck the front end of his work vehicle. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |
| 108.  Mr. Lopez-Castro testified in his deposition that he estimates he was going around 50 mph and the red truck was going around 60 mph when it collided with him. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |
| 109.  Mr. Lopez-Castro testified in his deposition that after the red truck struck his vehicle, the red truck went up on the curbside and both his vehicle and the red truck came to a stop. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNSPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 110.  Mr. Lopez-Castro testified in his deposition that he was approximately 10 feet away from the red truck when it went up on the curbside. | Lopez-Castro Depo, Ex. J, 28:13-15; 30:16-19; 31:8-10, 23-25; 32:1-11; 35:6-9; 74:19-21 |
| 111.  Mr. Lopez-Castro testified in his deposition that he noticed the back window of the red truck was tinted. | Lopez-Castro Depo, Ex. J, 43:19-25; 44:1-11; 45:7-25; 46:1-10 |
| 112.  Mr. Lopez-Castro testified in his deposition that the tint on the windows prevented him from identifying details about the figure inside the truck. | Lopez-Castro Depo, Ex. J, 43:19-25; 44:1-11; 45:7-25; 46:1-10 |
| 113.  Mr. Lopez-Castro testified in his deposition that he estimates the tint of the back window was "just under" limousine grade tinting. | Lopez-Castro Depo, Ex. J, 43:19-25; 44:1-11; 45:7-25; 46:1-10 |
| 114.  Mr. Lopez-Castro testified in his deposition that he could see inside through the window, but "not clearly." | Lopez-Castro Depo, Ex. J, 43:19-25; 44:1-11; 45:7-25; 46:1-10 |
| 115.  Mr. Lopez-Castro testified in his deposition that he was not able to see who was driving the red truck, and that he only saw "a shadow" of a person. | Lopez-Castro Depo, Ex. J, 43:11-18 |
| 116.  Mr. Lopez-Castro testified in his deposition that when his vehicle and the red truck came to a stop, the Riverside County Sheriff's Department vehicle stopped right next to his vehicle outside his driver's side door. | Lopez-Castro Depo, Ex. J, 35:6-15; 37:18-20; 38:3-5 |
| 117.  Mr. Lopez-Castro testified in his deposition that he then heard gunshots and ducked down. | Lopez-Castro Depo, Ex. J, 48:15-25; 49:1-15; 52:2-5; 64:6-12, 17-20. |
| 118.  Mr. Lopez-Castro testified in his deposition that he only saw the back of the occupant of the red truck's head and the back of the car seats | Lopez-Castro Depo, Ex. J, 48:15-25; 49:1-15; 52:2-5; 64:6-12, 17-20. |
| 119.  Mr. Lopez-Castro testified in his deposition that he estimates he was able to see inside of the | Lopez-Castro Depo, Ex. J, 48:15-25; 49:1-15; 52:2-5; 64:6-12, 17-20. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| truck for 10 seconds prior to the first gunshots, at which point he ducked for cover. | |
| 120.  CHP Officer Ramon Perez gave his sworn deposition on May 1, 2023. | Deposition of Ramon Perez, ("Perez Depo"), Ex. K |
| 121.  Officer Perez testified in his deposition that on January 29, 2021, he was performing his duties as a CHP Patrol Officer and was assigned road patrol duties when he heard a radio call for a "hysterical" woman who was in a Rite-Aid on Washington and Wildcat saying her husband had a rifle. | Deposition of Ramon Perez, ("Perez Depo"), Ex. K, 9:15-17; 17:1-2; 25:12-20; 26:17-25; 27:1-5; 30:8-11; 36:8-10; 38:9-13 |
| 122.  Officer Perez testified in his deposition that he was on Wildcat waiting to turn left and noticed a red Ford F-150 with a Sheriff's vehicle behind it. | Deposition of Ramon Perez, ("Perez Depo"), Ex. K, 9:15-17; 17:1-2; 25:12-20; 26:17-25; 27:1-5; 30:8-11; 36:8-10; 38:9-13 |
| 123.  Officer Perez testified in his deposition that the red truck left the parking lot and Perez was behind the Sheriff's vehicle which was behind the red truck. | Deposition of Ramon Perez, ("Perez Depo"), Ex. K, 9:15-17; 17:1-2; 25:12-20; 26:17-25; 27:1-5; 30:8-11; 36:8-10; 38:9-13 |
| 124.  Officer Perez testified in his deposition that once the red Ford went up on the curbside of the road, he got out of his vehicle with his pistol and positioned himself where the A-pillar and door hinge meet on the front of his car. | Deposition of Ramon Perez, ("Perez Depo"), Ex. K, 9:15-17; 17:1-2; 25:12-20; 26:17-25; 27:1-5; 30:8-11; 36:8-10; 38:9-13 |
| 125.  Officer Perez testified in his deposition that he looked through the passenger's side window of the red truck and saw what appeared to be the barrel of a rifle. | Perez Depo, Ex. K, 39:1-11; 41:5-9; 60:21-24; 79:10-14; 82:8-13. |
| 126.  Officer Perez testified in his deposition that although he saw what appeared to be a rifle, he did not see any person or target to fire at. | Perez Depo, Ex. K, 39:1-11; 41:5-9; 60:21-24; 79:10-14; 82:8-13. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 127.  Officer Perez testified in his deposition that he did not fire his weapon because he felt it was "more important for the preservation of my life to reposition myself to a different location where I had more cover than the [door panel]." | Perez Depo, Ex. K, 39:1-11; 41:5-9; 60:21-24; 79:10-14; 82:8-13. |
| 128.  Officer Perez testified in his deposition that once he repositioned to the rear of his vehicle, he lost "sight picture" of the passenger's side window. | Perez Depo, Ex. K, 39:1-11; 41:5-9; 60:21-24; 79:10-14; 82:8-13. |
| 129.  Officer Perez testified in his deposition that he observed that the windows of Mr. Magdaleno's truck were never rolled down. | Perez Depo, Ex. K, 39:1-11; 41:5-9; 60:21-24; 79:10-14; 82:8-13. |
| 130.  Officer Perez testified in his deposition that when Gette fired his rifle, he could not see what Gette is shooting at. | Perez Depo, Ex. K, 72:1-2; 75:11-17 |
| 131.  Officer Perez testified in his deposition that he never saw Mr. Magdaleno inside the truck until the other officers pulled Mr. Magdaleno out. | Perez Depo, Ex. K, 72:1-2; 75:11-17 |
| 132.  CHP Officer Alfredo Silva had his sworn deposition taken in this matter on May 1, 2023. | Deposition of Alfredo Silva ("Silva Depo"), Ex. L |
| 133.  Officer Silva testified in his deposition that January 29, 2021, he was employed as a road patrol officer with the California Highway Patrol, and had so been for since 1999, and in January of 2021 was stationed at the Indio CHP offices. | Silva Depo, Ex. L, 10:8-11; 14:5-17, 20-22; 22:20-25; 23:1-25; 24:1-2; 27:9-25; 28:1-23; 29:12-23; 37:2-15; 39:2-25; 40:17-24. |
| 134.  Officer Silva testified in his deposition that he heard a 911 call to CHP dispatch while he was in the parking lot of Indio CHP offices, while exiting the gate to return to patrol. | Silva Depo, Ex. L, 10:8-11; 14:5-17; 20-22; 22:20-25; 23:1-25; 24:1-2; 27:9-25; 28:1-23; 29:12-23; 37:2-15; 39:2-25; 40:17-24. |
| 135.  Officer Silva testified in his deposition that he joined the pursuit of Mr. Magdaleno that included Deputy Thomas, Officer Perez, and Officer Gette, | Silva Depo, Ex. L, 10:8-11; 14:5-17; 20-22; 22:20-25; 23:1-25; 24:1-2; 27:9-25; 28:1-23; |

| | |
|---|---|
| and terminated near the intersection of Avenue 48 and Jefferson. | 29:12-23; 37:2-15; 39:2-25; 40:17-24 |
| 136.  Officer Silva testified in his deposition that on the date of the incident, he did not utilize deadly force or fire a weapon. | Silva Depo, Ex. L, 10:8-11; 14:5-17; 20-22; 22:20-25; 23:1-25; 24:1-2; 27:9-25; 28:1-23; 29:12-23; 37:2-15; 39:2-25; 40:17-24 |
| 137.  Officer Silva testified in his deposition that the only time he saw the occupant of the red truck is when the pursuit made a left turn on 42nd Avenue from Country Club, wherein Officer Silva noticed the man was short. | Silva Depo, Ex. L, 45:22-25; 46:1-2 |
| 138.  Officer Silva testified in his deposition that during the pursuit, he did not see the windows of the red truck go down, and did not see the driver of the vehicle put any objects out of the truck windows. | Silva Depo. Ex. L, 45:15-21; 55:16-24 |
| 139.  Officer Silva testified in his deposition that while at the scene, he did not see the driver of the red truck place any objects out of the truck windows. | Silva Depo. Ex. L, 45:15-21; 55:16-24 |
| 140.  Officer Silva testified in his deposition that he stopped his vehicle at a position between 40 and 45 ft at 4 o'clock behind the red truck, facing in a southwesterly direction. | Silva Depo. Ex. L, 47:10-19; 51:17-25; 53:11-21; 78:1-6 |
| 141.  Officer Silva testified in his deposition that he got out of his car with his AR-15 scoped rifle, got behind the A-pillar of his squad car, faced the red truck, and looked down the scope at the red truck. | Silva Depo. Ex. L, 47:10-19; 51:17-25; 53:11-21; 78:1-6 |
| 142.  Officer Silva testified in his deposition that he was trying his best to look through the tinted windows, but it was an overcast day, so the tint was darker than normal. | Silva Depo. Ex. L, 47:10-19; 51:17-25; 53:11-21; 78:1-6 |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | |
|---|---|
| 143.  Officer Silva testified in his deposition that the only thing he could see was that the truck was rocking a little bit like there was movement inside of it, but he could only see a shadow of movement within the truck. | Silva Depo. Ex. L, 47:10-19; 51:17-25; 53:11-21; 78:1-6 |
| 144.  Officer Silva testified in his deposition that he could not see any kind of rifle in the hands of the occupant of the red truck. | Silva Depo. Ex. L, 47:10-19; 51:17-25; 53:11-21; 78:1-6 |
| 145.  Officer Silva testified in his deposition that he did not utilize deadly force or fire a weapon at the scene because he "did not have a clear shot," because "could not see through the dark tint." | Silva Depo, Ex. L, 37:2-15; 55:25; 56:1-20; 98:10-13; 100:2-16 |
| 146.  Officer Silva testified in his deposition that he did not hear any warnings given before shots were fired. | Silva Depo, Ex. L, 69:8-18 |
| 147.  Defendant Riverside County Sheriff's Department Deputy Derek Thomas gave a statement shortly after the Incident to Investigator Nava of the Riverside County District Attorney's Office on February 2, 2021. | Statement of Derek Thomas ("Thomas Statement"), Ex. M, 7:11-20; 8:21-26 |
| 148.  Defendant Thomas said in his statement that he encountered Mr. Magdaleno at the Rite-Aid and put Mr. Magdaleno at gunpoint. | Thomas Statement, Ex. M, 7:11-20; 8:21-26 |
| 149.  Defendant Thomas said in his statement that Mr. Magdaleno got into his truck and drove away, and Defendant Thomas pursued Mr. Magdaleno from the Rite-Aid to the scene at Avenue 48 and Jefferson Street. | Thomas Statement, Ex. M, 7:11-20; 8:21-26 |
| 150.  Defendant Thomas said in his statement that he did not see a rifle during or before the pursuit. | Thomas Statement, Ex. M, 7:11-20; 8:21-26 |
| 151.  Defendant Thomas said in his statement that at the end of the pursuit, he got out of his vehicle at a position he described as fairly close to the red truck. | Thomas Statement, Ex. M, 7:11-20; 8:21-26 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 152. Defendant Thomas asserts in his statement that the windows were not tinted in the back and he could see Mr. Magdaleno picking up a rifle in the red truck. | Thomas Statement, Ex. M, 8:21-26. |
| 153. Numerous witnesses clearly state that the back window of the red truck was tinted, corroborated by photographic and video evidence. | Tashman Depo, Ex. I, 40:1-4; 42:5-13; Silva Depo, Ex. L, 53:11-21; Lopez-Castro Depo, Ex. J, 44:1; 45:10, 23; 46:1-5, 7, 10; Perez Depo, Ex. K, 39:5-11; 41:5-9; 60:21-24; 79:14; 82:11-13; Ex. A; Ex. D; Ex. E; Ex. F. |
| 154. Defendant Thomas said in his statement that he fired his weapon until he could not see Mr. Magdaleno holding a weapon anymore and he couldn't see Mr. Magdaleno anymore, so he did not see a threat. | Thomas Statement, Ex. M, 16:8-14 |
| 155. Defendant Riverside County Sheriff's Department Deputy Derek Thomas's sworn deposition was taken on January 12, 2023. | Deposition of Derek Thomas ("Thomas Depo"), Ex. N, |
| 156. Defendant Thomas testified in his deposition that he is a Deputy for the Riverside County Sheriff's Department, who was selected and attended the Riverside County Sheriff's Department academy training in 2018 and completed field training as patrol in about October 2020. | Thomas Depo, Ex. N, 17:15-16; 35:17-20; 38:18-20; 72:2-5, 21; 110:20-22 |
| 157. Defendant Thomas dispatched from Palm Desert on the day of the incident and he engaged in a pursuit, which lasted about ten minutes. | Deposition of Derek Thomas ("Thomas Depo"), Ex. N, 17:15-16; 35:17-20; 38:18-20; 72:2-5, 21; 110:20-22 |
| 158. Defendant Thomas testified in his deposition that he did not know one way or the other if the back window of the red truck was tinted. | Thomas Depo, Ex. N, 71:2-5 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| 159. Defendant Thomas agreed that after seeing photographs of the side window, driver's side door window and passenger side door window, all of these windows were tinted. | Thomas Depo, Ex. N, 71:14-18 |
|---|---|
| 160. Defendant Thomas testified in his deposition that he never saw a rifle in Mr. Magdaleno's hands while at the Rite-Aid, and during the pursuit, he did not see Mr. Magdaleno display a rifle or any kind of weapon. | Thomas Depo, Ex. N, 65:2-5; 93:6-9 |
| 161. Defendant Thomas testified in his deposition that shot at Mr. Magdaleno within approximately three to four seconds after the pursuit came to an end and he stepped foot on the ground. | Thomas Depo, Ex. N, 100:17-22 |
| 162. Defendant Thomas testified in his deposition that though he says he gave a command of "Sheriff's Department. Let me see your hands" to the red truck before firing, he agrees those commands are not heard on any of the audio taken at the time of the shooting. | Thomas Depo, Ex. N, 104:5-11, 105:1-7 |
| 163. Defendant Thomas testified in his deposition that no evidence exists demonstrating he gave a warning to the red truck before firing. | Thomas Depo, Ex. N, 105:8-15 |
| 164. Defendant Thomas testified in his deposition that he does not recall telling interviewers that he had no time for verbal commands. | Thomas Depo, Ex. N, 110:7-11, 16-17 |
| 165. Defendant CHP Officer John Gette was an officer with California Highway Patrol on the date of the Incident and used deadly force on Mr. Magdaleno. Defendant Officer Gette was interviewed by Investigator Kelly Nava with the Riverside County District Attorney's office on February 2, 2021. | Statement of John Gette ("Gette Statement"), Ex. O, 1:16-17; 3:19-20; 10:12-14 |
| 166. Defendant Gette never saw Mr. Magdaleno before he shot Mr. Magdaleno in the head. | Gette Statement, Ex. O, 21:32-42 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 167. Defendant Gette never saw Mr. Magdaleno aiming his rifle at anyone when he shot at the red truck. | Gette Statement, Ex. O, 20:38-39; 21:6-7; 21:32-42 |
| 168. Defendant Gette said in his statement that he tried to shoot at the red truck, but the gun didn't fire because the safety was on, so he turned off the safety and then began firing his rifle. | Gette Statement, Ex. O, 10:1-10:15 |
| 169. Defendant Gette said in his statement that he began shooting in the same place in the red truck that he had sighted up previously because he assumed i.e. "knew" that was where Mr. Magdaleno would be. | Gette Statement, Ex. O, 10:1-10:15 |
| 170. Defendant Gette shot the driver of the red truck because he assumed they would lower the rifle and attempt to aim the weapon at him, but he did not actually see the driver of the red truck himself nor how many rounds he fired. | Gette Statement, Ex. O, 10:1-15; 20:38-39; 21:32-42; 22:36-43 |
| 171. Deputy CHP Officer John Gette's sworn deposition was taken on January 30, 2023. | Deposition of John Gette ("Gette Depo"), Ex. P |
| 172. Officer Gette testified in his deposition that on January 29, 2021, he was employed as a K9 Unit Officer with the California Highway Patrol (CHP) since 2009. | Gette Depo, Ex. P, 12:2-13; 88:24-25; 89:3-7, 14-25; 90:1-10; 108:10-19; 110:12-25; 111:1-21 |
| 173. Officer Gette attended and graduated from the CHP Academy in Sacramento, which is POST certified. The program was a total of 27 weeks, and the curriculum included POST learning domains focused in the use of weapons, deadly, non-lethal force, and high-risk vehicle stops. He is also aware of a change in California law regarding the use of deadly force, and in application of such force, would have applied the Graham v. Connor standard on January 29, 2021. | Gette Depo, Ex. P, 12:2-13; 88:24-25; 89:3-7, 14-25; 90:1-10; 108:10-19; 110:12-25; 111:1-21 |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 174.   Officer Gette testified in his deposition that he has been trained that whether an officer can feasibly issue verbal warnings prior to use of force depends on the totality of circumstances. | Gette Depo, Ex. P, 101:20-25; 102:2-3 |
| 175.   Officer Gette testified in his deposition that on January 29, 2021, prior to firing, he did not give any type of verbal warning to the driver of the red truck before firing. | Gette Depo, Ex. P, 101:10-19 |
| 176.   Officer Gette testified in his deposition that on January 29, 2021 he first hears a call put out on CHP radio of a man wielding a rifle sitting in a red truck outside of a Rite Aid, then eventually joined a pursuit of the red truck that included Deputy Thomas, Officer Perez, and Officer Silva, and which ended when the red truck came to a stop near the intersection of Jefferson Street and Avenue 48. | Gette Depo, Ex. P, 116:16-25; 117:1-7, 10-25; 118:14-25 |
| 177.   Officer Gette testified in his deposition that on January 29, 2021, from a position more than 80 feet away and to the right of the passenger side of the red truck, near the intersection of Jefferson and Avenue 48, he fired 2 separate volleys of .223 shots from a rifle style weapon, one of which struck and killed the occupant in the red truck, later identified as Javier Magdaleno. | Gette Depo, Ex. P, 14:8-15; 40:7-14; 174:1-5; 190:13-22; Gette MVARS, Ex. F, 0:05:36 – 0:05:43 |
| 178.   Officer Gette testified in his deposition that he was positioned at the rear of Officer Perez's vehicle, wherein he was kneeling when he fired the shots, and that he fired a total of 11 shots. | Gette Depo, Ex. P, 14:8-15; 190:13-22 |
| 179.   Officer Gette testified in his deposition that during the incident, the passenger side window of Mr. Magdaleno was rolled up the entire time and tinted. | Gette Depo, Ex. P, 19:18-25; 20:1; 190:6-12 |
| 180.   A bullet trajectory analysis was completed by police investigators with the Riverside County Sheriff's Department, showing the trajectory of all | Ex. Q, photographs of bullet trajectory from scene of |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | |
|---|---|
| bullets fired at the red truck occupied by Mr. Magdaleno that were fired upon by Defendant Deputy Thomas and Defendant Officer Gette. | Incident ("Trajectory Photos"). |
| 181.   Photograph 1 of Exhibit Q (denoted with Bates stamp 'COR 000850') shows the passenger side door, front passenger window and rear passenger window of the red truck occupied by Mr. Magdaleno. | Ex. Q, Trajectory Photos |
| 182.   A total of eleven (11) bullet holes can be seen in the side of the vehicle in Photograph 1 of Exhibit Q, and Trajectory Rods can be seen in holes marked 'A,' 'F,' 'H,' 'I,' 'J,' and 'K.' | Ex. Q, Trajectory Photos |
| 183.   Photograph 2 of Exhibit Q (denoted with stamp 'COR 000852') shows a closer view of the passenger side door, front passenger window and rear passenger window of the red truck occupied by Mr. Magdaleno. | Ex. Q, Trajectory Photos |
| 184.   A total of eleven (11) bullet holes can be seen in the side of the vehicle in Photograph 2 of Exhibit Q, and Trajectory Rods can be seen in holes marked 'A,' 'F,' 'H,' 'I,' 'J,' and 'K.' | Ex. Q, Trajectory Photos |
| 185.   Photograph 3 of Exhibit Q (denoted with stamp 'COR 001073') shows a top-down view from the front windshield of the red truck occupied by Mr. Magdaleno. | Ex. Q, Trajectory Photos |
| 186.   Bullet trajectory rods can be seen in Photograph 3 of Exhibit Q, depicting the travel of the bullets from Defendant Deputy Thomas (Rod marked 'O' (which exits the windshield) and another unmarked rod on the right side of the photograph, both of which are travelling from top to bottom), and the bullets fired by Defendant Officer Gette (four rods (letters unclear) travelling from left to right and through the passenger side door). | Ex. Q, Trajectory Photos |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 187.   A substantial yet localized blood splatter can be seen in the center of the photograph in the middle seat of the truck in Photograph 3 of Exhibit Q | Ex. Q, Trajectory Photos |
| 188.   Photograph 4 of Exhibit Q (denoted with stamp 'COR 001074') shows a closer, top-down view from the front windshield of the red truck occupied by Mr. Magdaleno. | Ex. Q, Trajectory Photos |
| 189.   In Photograph 4 of Ex. Q, bullet trajectory rods can be seen in the photograph, depicting the travel of the bullets from Defendant Deputy Thomas (Rod marked 'O' (which exits the windshield) and another unmarked rod on the right side of the photograph, both of which are travelling from top to bottom), and the bullets fired by Defendant Officer Gette (four rods (letters unclear) travelling from left to right and through the passenger side door). | Ex. Q, Trajectory Photos |
| 190.   In Photograph 4 of Ex. Q, a substantial yet localized blood splatter can be seen in the center of the photograph in the middle seat of the truck. | Ex. Q, Trajectory Photos |
| 191.   Photograph 5 of Exhibit Q (denoted with stamp 'COR 001104') depicts a view of the inside cab of the red truck occupied by Mr. Magdaleno. | Ex. Q, Trajectory Photos |
| 192.   Photograph 5 of Exhibit Q is taken from the vantage of the driver's side of the red truck and looking across the inside of the cab. | Ex. Q, Trajectory Photos |
| 193.   In Photograph 5 of Ex. Q, two bullet trajectory rods can be seen travelling left to right in the photograph, and five rods, A,' 'F,' 'H,' 'I,' and 'J,' can be seen travelling from the passenger side door into the cab. | Ex. Q, Trajectory Photos |
| 194.   In Photograph 5 of Ex. Q, a substantial yet localized blood splatter can be seen in the center of the photograph in the middle seat of the truck. | Ex. Q, Trajectory Photos |

PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | |
|---|---|
| 195.   Photograph 5 of Ex. Q depicts Bullet entry points 'F,' 'G' (of which no rod is inserted), 'H,' 'I,' and 'J' that are all directly below the window of the passenger door. | Ex. Q, Trajectory Photos |
| 196.   As depicted in Photograph 5 of Ex. Q, Rod 'I' appears to enter into the bench seat at a downward angle, through the seat and directly contacts the center of the middle seat area, where the blood splatter area can be seen. | Ex. Q, Trajectory Photos |
| 197.   As depicted in Photograph 5 of Ex. Q, Rod 'J' appears to show a bullet trajectory that enters the lower part of the passenger door, travels at a slightly upward angle, enters and exits the right passenger seat, and appears to end in the center area of the substantial yet localized blood splatter that can be seen in the center of the photograph in the middle seat of the truck. | Ex. Q, Trajectory Photos |
| 198.   As depicted in Photograph 5 of Ex. Q, the passenger side windows of the red truck are clearly tinted, as seen in photographs 1, 4, and 5 of Exhibit Q. | Ex. Q, Trajectory Photos |
| 199.   The only blood splatter, as depicted in photographs 3, 4, and 5 of Exhibit Q of the red truck occupied by Mr. Magdaleno is in the center of these respective photographs in the middle seat area. | Ex. Q, Trajectory Photos |
| 200.   Aside from the blood splatter in the center of the middle seat area, as seen in photographs 3, 4, and 5 of Exhibit Q, there is no blood splatter anywhere else in the cab area of the truck. | Ex. Q, Trajectory Photos |
| 201.   Based on the bullet trajectory photographs shown in Exhibit Q, it is clear that the gunshots from Defendant Officer Gette, who fired into the passenger door of the red pickup truck occupied by Mr. Magdaleno, were the fatal shots. | Ex. Q, Trajectory Photos |

112
PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

| | |
|---|---|
| 202. Based on the significant and localized blood splatter seen in photographs 3, 4, and 5 of Exhibit Q, and clear trajectory depicted by Rods I' and 'J,' the fatal shot inflicted by Defendant Officer Gette upon Mr. Magdaleno was clearly fired below the window line upon Mr. Magdaleno when he was hidden from view, posing no threat of immediate harm to any of the officers on-scene nor the public at-large. | Ex. Q, Trajectory Photos |
| 203. Based on the significant and localized blood splatter seen in photographs 3, 4, and 5 of Exhibit Q, and clear trajectory depicted by Rods I' and 'J,' in conjunction with the autopsy conducted by Dr. Mark Fajardo, M.D., the chief medical examiner for the County of Riverside, the fatal shot inflicted by Defendant Officer Gette upon Mr. Magdaleno's head, and based on the trajectory could have only entered that way when Mr. Magdaleno was in a crouched position, head pointed toward the passenger door, and below the passenger window and not visible to Defendant Officer Gette. | Ex. Q, Trajectory Photos; Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 204. Mr. Magdaleno, as demonstrated in the bullet trajectory photographs in Ex. Q, posed no threat of immediate harm to any of the officers on-scene nor the public at-large. | Ex. Q, Trajectory Photos; |
| 205. County of Riverside coroner Dr, Mark Fajardo, M.D. had his sworn deposition taken in this matter on May 25, 2022. | Deposition of Dr. Mark Fajardo, M.D. ("Fajardo Depo"), Exhibit R |
| 206. Dr. Fajardo testified in his deposition that he is a licensed medical doctor and is the chief medical examiner for the County of Riverside, a role he has held since 2016. He has performed over 7,500 autopsies. | Fajardo Depo, Ex. R, 11:16-25; 12:14-16; 13:5 |
| 207. Dr. Fajardo testified in his deposition that he performed the autopsy of Javier Magdaleno on February 11, 2021 at 8:15 a.m. | Fajardo Depo, Ex. R, 27:18-20 |

| | |
|---|---|
| 208. Dr. Fajardo testified in his deposition that he prepared the autopsy report prepared in connection with the autopsy of Javier Magdaleno that he performed, and it contains all findings, opinions, and conclusions pertaining to the cause of death of Mr. Magdaleno. The report was prepared on February 11, 2021. | Fajardo Depo, Ex. R, 8:6-25; 9:1 |
| 209. Dr. Fajardo testified in his deposition that he determined that Javier Magdaleno sustained two gunshot wounds, and these were the only wounds he sustained. | Fajardo Depo, Ex. R, 34-35:24-3 |
| 210. Dr. Fajardo testified in his deposition that he determined Javier Magdaleno sustained a fleshy graze wound to his hand. | Fajardo Depo, Ex. R, 30:21-25; 34:11-13 |
| 211. Dr. Fajardo testified in his deposition that he determined Javier Magdaleno sustained a gunshot wound to his head that completely disrupted the brain, cranium and skull, and was delivered from top to bottom and the shot shattered the top part of the cranium. | Fajardo Depo, Ex. R, 33:11-14; 34:2-3; 57:20-22 |
| 212. Dr. Fajardo testified in his deposition that the gunshot wound to the head was the fatal injury, was delivered by a high powered rifle, the entrance of the shot was to the "vertex of the head, somewhat centrally located, and there was no exit wound. | Fajardo Depo, Ex. R, 33:23-25; 39:2-7; 51:3-7 |
| 213. Dr. Fajardo prepared an autopsy report in connection with his examination of Mr. Magdaleno. Dr. Fajardo conducted the autopsy on February 11, 2021. | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 214. The autopsy report indicates that the fatal injury was a "high powered rifle gunshot wound of the head." | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNSPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| 215.  "There is a gunshot wound to the head…" inflicted by shot to the top of the head | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 216.  The trajectory "travels primarily downward with minimal deviation to the left." | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 217.  A graze wound to Mr. Magdaleno's right hand is also described. | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 218.  Page 8 of the autopsy report shows the gunshot entered the top of Mr. Magdaleno's head. 219. | Autopsy Report of Javier Magdaleno, Ex. S, pages 1, 2, 3, 8. |
| 220.  Plaintiff's designated police practices expert Roger A. Clark is an expert in Police Administration, Police Practices and Procedures, Police Officer Standards and Training, Tactics, Use of Force and other related areas. | Rule 26 Report of Police Practices Expert Roger A. Clark ("Clark Report"), attached as Exhibit T, in general reference, and specifically pages 22-31 in regards to qualifications and experience, and attached Curriculum Vitae of Roger A. Clark included with Ex. T. |
| 221.  Clark served over 27 years with the Los Angeles County Sheriff's Department, retiring in 1993 after 15 years as a Lieutenant, six years as sergeant, and six years as a Deputy Sheriff.  Clark received an Advanced Certification from POST in 1975, Management Certification from POST in 1980, and graduated from POST Command College in 1988. | Rule 26 Report of Police Practices Expert Roger A. Clark ("Clark Report"), attached as Exhibit T, in general reference, and specifically pages 22-31 in regards to qualifications and experience, and attached Curriculum Vitae of Roger A. Clark included with Ex. T. |
| 222.  Clark has been qualified to testify numerous times in numerous State and Federal courts across the country. | Rule 26 Report of Police Practices Expert Roger A. Clark ("Clark Report"), attached as Exhibit T, in |

| | |
|---|---|
| | general reference, and specifically pages 22-31 in regards to qualifications and experience, and attached Curriculum Vitae of Roger A. Clark included with Ex. T. |
| 223.  Plaintiff's designated police practices expert Roger Clark, reviewed the following documents in preparation for his report and opinions: Plaintiff's Second Amended Complaint for Damages; Answer of Defendants County of Riverside and Derek Thomas to Plaintiffs' Second Amended Complaint; Answer by Defendant California Highway Patrol to Second Amended Complaint; Answer by Defendant John Gette to Second Amended Complaint for Damages; Deposition of Witness Larry Tashman with Exhibits; Deposition Transcript of Defendant Deputy Derek Thomas with Exhibits; Deposition Transcript of Defendant CHP Officer John Gette with Exhibits; Deposition Transcript of Witness Ryan Wooten with Exhibits; Deposition Transcript of Mark Fajardo, M.D. with Exhibits; Defendant's Responses – Demand Categories Nos. 1, 5, 9, 1 and 15; Defendant's Supplemental Disclosures; Plaintiff's Second Amended Complaint for Damages; and POST Learning Domain. | Clark Report, Ex. T, pages 2-10. |
| 224.  Plaintiff's designated police practices expert Roger Clark, prepared a Brief Overview of Facts and Commentary in his Rule 26 report. | Clark Report, Ex. T, pages 10-20. |
| 225.   In his report, Mr. Clark discusses the facts and provides an overview of **The Basic Tactical Stops Necessary in this Case**; **The Basic Rules (as trained to all officers) Regarding the use of Deadly/Lethal Force**; and **POST Force Options.** | Clark Report, Ex. T, pages 10-20. |
| 226.  Plaintiff's designated police practices expert Roger Clark arrived at a first opinion that, throughout the country, police departments train on methods that | Clark Report, Ex. T |

| | |
|---|---|
| are well known among police agencies and that have been proven effective for the safety and welfare of both law enforcement officers and the public, which include training officers, who are responsible for their tactical decisions when they resort to lethal force rather than use obvious reasonable alternatives available to them before resorting to lethal force, in safe and accepted ways to contain, assess and arrest subjects in order to avoid lethal or potentially lethal injuries. | |
| 227.   Mr. Clark's <u>first opinion</u> asserts that Deputy Thomas and Officer Gette failed to follow the required training and methods, resulting in them using unnecessarily and excessively inflicted lethal force on Mr. Magdaleno in violation of POST standards and law (as taught by POST). | Clark Report, Ex. T, pages 20-21. |
| 228.   Mr. Clark's <u>second opinion</u> is that, although Law Enforcement Officers are trained that deadly force is a last resort that is only to be used in the direst of circumstances and only in an immediate defense of life (IDOL) situation, and because Mr. Magdaleno was contained in his truck, such that Deputy Thomas and Officer Gette had the time and ability to remain in cover, had Deputy Thomas and Officer Gette simply remained in positions of cover and followed the basic tactical steps, they would have precluded any use of lethal force, making their use of lethal force excessive and unreasonable under the circumstances because any reasonable officer facing those facts and circumstances would not have shot at all, let alone 16 or more times. | Clark Report, Ex. T, Page 21. |
| 229.   Mr. Clark's <u>third opinion</u> is that Officers are trained that when they resort to the use of lethal force they are responsible for every shot they fire and to reassess the threat or danger as they fire, but that Deputy Thomas and Officer Gette did not reassess as required and collectively shot approximately 16 or more times in three separate | Clark Report, Ex. T, Page 21. |

| | |
|---|---|
| volleys. | |
| 230.   Mr. Clark's <u>fourth opinion</u> is that Deputy Thomas and Officer Gette had time to give commands and give a warning that deadly force would be used prior to the three volleys of shots, in accordance with the training that a warning that deadly force is going to be used should be given when feasible. | Clark Report, Ex. T, Page 21. |
| 231.  Mr. Clark's <u>fifth opinion</u> is that all officers in California are trained that they are responsible for their tactical decisions when they resort to the use of lethal force, so the reasonableness of an officer's use of deadly force includes consideration of their tactical conduct and decisions leading up to the use of force, but a significant tactical error was Deputy Thomas' and Officer Gette's unwillingness to remain in cover resulting in their collective failure to coordinate a safe apprehension, which was grossly negligent and showed a reckless indifference to Mr. Magdaleno's rights and life. | Clark Report, Ex. T, Pages 21-22. |
| 232.    Mr. Clark's <u>sixth opinion</u> is that, taking video evidence at true, then Mr. Magdaleno did not aim a firearm at any officer, including Deputy Thomas and Officer Gette or utter any threats to harm any officer, and was not given a single order prior to being shot at. | Clark Report, Ex. T, Page 22. |
| 233.    Mr. Clark's <u>seventh opinion</u> is the video recordings document that Mr. Magdaleno never posed a credible threat to Deputy Thomas or Officer Gette whatsoever when they fired 16 -17 rounds into Mr. Magdaleno's vehicle. | Clark Report, Ex. T, Page 22. |
| 234.    Mr. Clark's <u>eighth opinion</u> is that neither Deputy Thomas nor Officer Gette used the very basic and well-known tactics and methods in their encounter with Mr. Magdaleno, such that their decisions and actions were a direct causal factor in | Clark Report, Ex. T, Page 22. |

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| the sequence of events resulting in Mr. Magdaleno's unnecessary and avoidable death, including their failure to stop and assess their shots before shooting again and Officer Gette's failure to hold his fire because of the innocent civilians in the background. | |

Dated: July 24, 2023

**GUIZAR, HENDERSON, & CARRAZCO, LLP**

/S/ ANGEL CARRAZCO, JR.

_____

KENT M. HENDERSON
ANGEL CARRAZCO, JR.
Attorneys for Plaintiffs

**PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**