# EXHIBIT L

1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ALMA L. FIGUEROA DE MAGDALENO,      )  Case No: 5:21-CV
     Individually, and as Successor in   )  -02027-JGB-SHK
5    Interest to JAVIER MAGDALENO        )
     GUTIERREZ; JUAN JAVIER MAGDALENO,   )
6    Individually YOSELIN MAGDALENO,     )
     Individually and IVETH MAGDALENO,   )
7    Individually,                       )
                                         )
8    Plaintiffs,                         )
                                         )
9                   v.                   )
                                         )
10   COUNTY OF RIVERSIDE, a legal        )
     subdivision of the State of         )
11   California; CALIFORNIA HIGHWAY      )
     PATROL, a governmental agency of the)
12   State of California; DEREK THOMAS;  )
     an individual; DOE CHP OFFICER, an  )
13   individual; and DOES 1 through 10,  )
     inclusive,                          )
14                                       )
     Defendants.                         )
15   _____)

16

17

18              VIDEOCONFERENCE DEPOSITION OF

19                OFFICER ALFREDO SILVA

20                 MONDAY, MAY 1, 2023

21                  INDIO, CALIFORNIA

22

23

24   REPORTED BY:

25   LAURA MATEO, C.S.R. 13410

MAG 000147

1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ALMA L. FIGUEROA DE MAGDALENO,      ) Case No: 5:21-CV
     Individually, and as Successor in  ) -02027-JGB-SHK
5    Interest to JAVIER MAGDALENO        )
     GUTIERREZ; JUAN JAVIER MAGDALENO,   )
6    Individually YOSELIN MAGDALENO,     )
     Individually and IVETH MAGDALENO,   )
7    Individually,                       )
                                          )
8    Plaintiffs,                          )
                                          )
9                    v.                   )
                                          )
10   COUNTY OF RIVERSIDE, a legal         )
     subdivision of the State of         )
11   California; CALIFORNIA HIGHWAY       )
     PATROL, a governmental agency of the)
12   State of California; DEREK THOMAS;   )
     an individual; DOE CHP OFFICER, an  )
13   individual; and DOES 1 through 10,   )
     inclusive,                           )
14                                        )
     Defendants.                          )
15   _____  )

16

17

18

19

20   REMOTE DEPOSITION OF OFFICER ALFREDO SILVA, TAKEN ON

21   BEHALF OF THE PLAINTIFF, AT 10:10 A.M., MONDAY, MAY 1,

22   2023, INDIO, CALIFORNIA, BEFORE LAURA MATEO, C.S.R. NO.

23   13410, PURSUANT TO NOTICE.

24

25

MAG 000148

OFFICER ALFREDO SILVA                    Page 3

```
1    APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFFS:

4         CARRAZCO LAW, INC.
          BY:  KENT HENDERSON, ESQ.
5         18301 IRVINE BLVD
          TUSTIN, CALIFORNIA 92780-3412
6         (949) 303-6232
          HENDOLAW@GMAIL.COM
7

8    FOR THE DEFENDANTS, STATE OF CALIFORNIA; CHP,
     JOHN GETTE, OFFICER ALFREDO SILVA:
9
          CALIFORNIA ATTORNEY GENERAL
10        BY:  DOUGLAS BAXTER, ESQ.
          600 W BROADWAY, SUITE 1800
11        SAN DIEGO, CALIFORNIA 92101-3375
          (619) 738-9567
12        DOUGLAS.BAXTER@DOJ.CA.GOV

13

     FOR THE DEFENDANTS, COUNTY OF RIVERSIDE AND DEREK THOMAS:
14        LEWIS BRISBOIS BISGAARD & SMITH LLP
          BY:  TORI LYN N. BAKKEN, ESQ.
15        633 W 5TH ST, SUITE 4000
          LOS ANGELES, CA 90071-2074
16        (213) 680-5172
          TORI.BAKKEN@LEWISBRISBOIS.COM
17

18

19

20

21

22

23

24

25
```

MAG 000149

```
 1                      I N D E X

 2

 3   WITNESS:   OFFICER ALFREDO SILVA

 4

 5   EXAMINED BY                          PAGE

 6   MR.  HENDERSON                       6, 97

 7   MS.  BAKKEN                          81

 8   MR.  BAXTER                          92, 101

 9

10                  E X H I B I T S

11                  (NONE OFFERED)

12

13

14

15

16           INFORMATION REQUESTED:

17                    (NONE)

18

19       QUESTIONS INSTRUCTED NOT TO ANSWER:

20                    (NONE)

21

22

23

24

25
```

MAG 000150

OFFICER ALFREDO SILVA                    Page 5

```
 1                    APPEARING REMOTELY

 2                   INDIO, CALIFORNIA

 3            MONDAY, MAY 1, 2023; 10:10 A.M.

 4

 5         THE REPORTER:  Pursuant to Federal Rules of

 6   Civil Procedure, I am required to state the following:

 7         My name is Laura Mateo.  I am a Code-compliant

 8   certified shorthand reporter with the State of

 9   California, No. 13410.

10         This is the deposition of Officer Alfredo Silva

11   in the matter of Alma Magdaleno vs. County of Riverside,

12   et al., beginning at 10:10 a.m. on

13   Monday, May 1st, 2023.  This deposition is being held

14   remotely via Zoom.

15

16              OFFICER ALFREDO SILVA,

17         having been first duly placed under

18         oath, was examined and testified

19         as follows:

20

21         MR. HENDERSON:  My name is Kent Henderson of

22   Henderson & Carrazco on behalf of the plaintiffs.

23         MR. BAXTER:  Good morning.  Douglas Baxter on

24   behalf of the CHP and Officer John Gette -- and for

25   purposes of the deposition, Officer Alfredo Silva.
```

```
 1              MS. BAKKEN:   Good morning.   Tori Bakken on
 2    behalf on defendants, County of Riverside and
 3    Deputy Derek Thomas.
 4              THE WITNESS:   Good morning.   Officer Silva of
 5    the California Highway Patrol.
 6
 7                       DIRECT EXAMINATION
 8    BY MR. HENDERSON:
 9        Q.    Officer Silva, thank you for being here today.
10    Can you please state and spell your name for the record.
11        A.    My name is Alfredo Silva.   A-l-f-r-e-d-o and
12    S-i-l-v-a.
13        Q.    Officer Silva, have you ever had your
14    deposition taken before?
15        A.    Yes, sir.
16        Q.    About how many times?
17        A.    Approximately ten times.
18        Q.    What were those in relation to?
19        A.    Mainly traffic collisions.
20        Q.    And have you ever had your deposition taken
21    before in regards to a use of force incident -- even if
22    you were not involved in it?
23        A.    No.
24        Q.    Let me go through some of the ground rules for
25    the deposition just so we have a clear record.   The
```

OFFICER ALFREDO SILVA                    Page 7

```
 1   first thing is that you are under oath and sworn to tell
 2   the truth today.  The oath you took is the same as if it
 3   was administered in a court of law with a judge and a
 4   jury present.  You have the same obligation to tell the
 5   truth.  And the same penalty of perjury applies for not
 6   telling the truth even though we're doing the deposition
 7   over Zoom.  And even though we're not currently in a
 8   court of law, the testimony you give today is sworn
 9   testimony.  Do you understand that?
10       A.    Yes, sir.
11       Q.    The second thing is -- and you're doing a nice
12   job of waiting before I start my question before you
13   give your answer.  Something that you're probably really
14   familiar with is the two-way radio communication that
15   involves pressing the button on a microphone.  And this
16   is very much like that.  We can't have two people
17   speaking at the same time, so please wait until I finish
18   my question before you start your answer.  Okay?
19       A.    I understand.
20       Q.    If I ask you a question and you do not
21   understand my question or you don't hear my question,
22   you're going to need to say "I don't understand your
23   question" or "I didn't hear my question."  Otherwise,
24   if you answer the question, we're going to assume that
25   you heard and understood the question.  If you don't
```

MAG 000153

OFFICER ALFREDO SILVA                Page 10

1    Q.   All right.  Have you had any drugs or alcohol
2  in the last 24 hours that may affect your ability to
3  testify?
4    A.   No, sir.
5    Q.   All right.  Are you feeling well enough to
6  proceed with your deposition?
7    A.   Yes.
8    Q.   By whom are you currently employed?
9    A.   I'm employed by the California Highway Patrol.
10   Q.   And how long have you worked there?
11   A.   I've been an officer for 24 years.
12   Q.   Let me go back in time a little bit.  You
13 graduated from high school at some point in time?
14   A.   I did, sir.
15   Q.   What year?
16   A.   '91.
17   Q.   What's the first thing you did in terms of
18 education or work experience after high school?
19   A.   After high school, I attended College of the
20 Desert, junior college, for two years.  After that, I --
21         THE REPORTER:  I'm sorry.  The audio is cutting
22 out.  This is the reporter.
23         MR. HENDERSON:  Unfortunately, we missed pretty
24 much everything that you said after you attended College
25 of the Desert.  The entire rest of the answer was gone.

1    worth of, you know, accident investigation and being out

2    on the highway-type training?  What did they do?

3        A.   I'm trying to recall.  It was quite a bit of

4    it.  I would say a month -- a month's worth, probably.

5        Q.   All right.  Now, after completion of the

6    academy, you became a sworn California Highway Patrol

7    officer?

8        A.   Yes, sir.

9        Q.   And what year was that?

10       A.   That was January of 1999.

11       Q.   And have you worked in that position ever since

12   then?

13       A.   Yes, sir.

14       Q.   Have you been promoted or demoted or has it

15   been the same position?  How does that work?

16       A.   I've just been a patrol officer for my entire

17   time -- 24 years, I've been a road patrol officer.

18       Q.   Where are the various places or stations that

19   you've been assigned out of?

20       A.   I've been stationed at two offices.  I broke in

21   at East L.A.  I did that and stayed there for about

22   two years.  And then I transferred to Indio, California.

23       Q.   And so you've been out -- and when you say you

24   transferred to -- which place in California?

25       A.   Indio.

MAG 000155

OFFICER ALFREDO SILVA                    Page 22

```
 1        Q.    Sure.   In other words, let's say that you're

 2   doing work where you're doing -- writing traffic

 3   tickets.  Doing enforcement of speed limit.  Doing DUI

 4   check and that kind of thing.  Let's say a call comes

 5   out from another agency -- let's say the Riverside

 6   Sheriff's Department -- what was your responsibility in

 7   that regard?  Would you have a channel that you

 8   monitored?  Were you backup?  How did that work?

 9              MR. BAXTER:  I'm just going to object.

10   Overbroad and incomplete hypothetical.

11   BY MR. HENDERSON:

12        Q.    Go ahead.  You can answer.

13        A.    If another agency asks for help, they go

14   through our dispatch center.

15        Q.    Let's take for instance the date of this

16   particular incident.  Did an agency ask for help?

17        A.    Yes, sir.

18        Q.    And who was that?

19        A.    The Riverside County Sheriff's Department.

20        Q.    And how does that come out -- how does that

21   come out on a call?  Which channel does it come over?

22   How does it come over the radio?

23        A.    Well, in this incident, I'm not sure if the

24   Sheriff's Department asked for help.  I think our

25   dispatcher might have received a 911 call herself or
```

Express Deposition Services - Scheduling@expressnetworkas.com
(888) 232-6077

MAG 000156

OFFICER ALFREDO SILVA                    Page 23

1    himself -- whoever was dispatching.  And they put it

2    over the air as a "Be on the lookout" type of call.

3         Q.    And when they put it over the air -- what do

4    you recall that the call contained?  What was the nature

5    of the call?

6         A.    It was a man armed with a rifle and he -- the

7    wife -- the victim or whoever was calling in -- stating

8    that she was going to be assaulted by a male subject.

9         Q.    Do you know where --

10              (Cross-talk.)

11        A.    He was driving a red pickup truck.  At the

12   time, it came out as a Chevy -- a red Chevy Silverado.

13        Q.    And do you know where they -- where the red

14   Chevy Silverado -- the man in the pickup truck -- the

15   red Silverado was?  What did they say about location?

16        A.    They said the location was at Washington and

17   Varner at the Rite Aid.

18        Q.    Where were you when you received that call?

19        A.    I was at the Indio CHP office in the parking

20   lot about to exit the gates.

21        Q.    About to exit the gates for your shift or for

22   -- had you just returned from a lunch break or how did

23   that work?

24        A.    It was to go back on patrol.  I had just

25   completed a report.  I had gone back to the office to

1    ensure that the report was signed off and it was no

2    longer pending.

3         Q.    When you exited the CHP gates there, how far

4    would you estimate -- being familiar with the area --

5    that you were from where this location -- this truck

6    sounded like from the radio call?

7         A.    From the Indio office, it's just down the

8    street.  It's approximately a mile and a half.  You kind

9    of just have to make a right turn.

10        Q.    When you exited and made a right turn, could

11   you hear any sirens at that point?

12        A.    At that point, I did not make a right turn.  I

13   waited as Officer Perez went on scene.  He observed the

14   sheriff's deputy at gunpoint in front of the Rite Aid.

15   And Officer Perez was putting this out to our dispatch

16   center.

17        Q.    And then when he put it out to the dispatch

18   center, what did you hear?  What was the nature of that

19   call?

20        A.    It sounded like it matched the red pickup truck

21   with the subject with a rifle.

22        Q.    When you said that you heard a call about an

23   officer at gunpoint, do you know who that was?  What

24   officer was at gunpoint?

25        A.    Officer Perez put on the radio that it was a

OFFICER ALFREDO SILVA                    Page 27

1      A.    Well, almost immediately when I was exiting the
2    gate, Officer Perez put out on the radio that the
3    subject from the red pickup truck was fleeing towards
4    Washington Street.  And the deputy was -- had gotten
5    back into his patrol vehicle and was giving chase.
6      Q.    Okay.
7      A.    And at that point, Officer Perez followed the
8    deputy and I could hear lights and sirens at that point.
9      Q.    And then did you join some type of a pursuit
10   with other law enforcement vehicles -- in pursuit of the
11   red pickup truck?
12     A.    Well, they were basically going away for me.
13   They went over Washington Street towards Countrywood.
14   And at that point -- that's kind of away from me.  I
15   wasn't sure if I should wait for it or head towards it.
16   At that point, they went over the freeway.  They made a
17   left turn onto Country Club towards Jefferson Street --
18   which is where I'm at.  I'm at Jefferson Street and
19   Varner.  So I made a left turn because they were going
20   to be coming towards me.  I went over the freeway and
21   headed towards Jefferson Street and Indio Boulevard.  As
22   I made -- as I was approaching Jefferson Street, I made
23   a right turn -- because Officer Perez was putting out
24   that the vehicle was fleeing over 80 miles an hour on
25   Country Club and he was blowing through red lights and

MAG 000159

OFFICER ALFREDO SILVA                    Page 28

1   driving recklessly.  When I made my right turn on
2   Jefferson Street, I looked over to my right and I could
3   see that the vehicle was heading towards me.  At that
4   point, it was at Jefferson and 42nd.  I made a right
5   turn on 42nd Avenue.  The vehicle was heading towards
6   me.  The vehicle made a left turn onto 42nd Avenue
7   towards Jefferson.  They passed my location -- the
8   deputy -- the red pickup truck, the deputy and
9   Officer Perez.  I made a U-turn behind them and
10  initiated -- I also turned on my lights and sirens.
11       Q.   Well, at that point, you were behind whom?
12       A.   Officer Perez.
13       Q.   And --
14       A.   I was in the third --
15       Q.   Exactly what I was going to ask you.  You were
16  the third law enforcement vehicle in line behind the red
17  truck at that point?
18       A.   Yes, sir.
19       Q.   Does it sound like -- thinking back on it now,
20  does it sound like it was the Riverside County unit,
21  then second was Perez, third was you and then behind you
22  was Gette; is that right?
23       A.   No, not at that point.
24       Q.   So how did it --
25       A.   The red pickup truck -- at that point, I see

MAG 000160

OFFICER ALFREDO SILVA                    Page 29

1    that it's Ford F-150 and not a Chevy Silverado.  Makes a
2    right turn through a red light to Jefferson Street going
3    southbound.  At that point, he picked up his speed to
4    over 80 miles an hour and using the fast
5    lane approaching Fred Waring which is about a mile from
6    my initial location.  At that point, I could hear
7    Officer Gette responding to our location.  He was on
8    Fred Waring.  I could tell he was in the area of Fred
9    Waring and Jefferson.  When we approached the
10   intersection, we were at over 80 miles per hour
11   approaching a red light.  And the subject vehicle blew
12   through the red light at over 80 miles per hour.  I saw
13   Officer Gette to my right and he joined the pursuit.  I
14   lowered my left window and I motioned him to go ahead of
15   me because he had a K-9 unit.  At that point, I was
16   behind him.  I would have been at that point the fourth
17   patrol vehicle in pursuit.
18        Q.   When you're the fourth there, how does it go?
19   It's the pickup truck and then -- who do we have --
20   going 1, 2, 3 and 4 all the way back?
21        A.   So it's the red pickup truck -- the red Ford
22   F-150.  And then the sheriff's deputy.  Officer Perez.
23   Officer Gette.  And then myself.
24        Q.   Over the radio, were you able to hear during
25   this period of time -- let's say up to this point in

Express Deposition Services - Scheduling@expressnetworkas.com
(888)232-6077

MAG 000161

OFFICER ALFREDO SILVA                    Page 37

1   BY MR. HENDERSON:

2        Q.    On the date of this incident, you did not

3   utilize deadly force; correct?

4        A.    I did not.

5        Q.    Right.   On the date of this incident, you did

6   not fire any of your weapons; correct?

7        A.    No, sir.

8             MR. BAXTER:   That comes across as a double

9   negative.

10            MR. HENDERSON:   That will come across as a

11  double negative.   Let me rephrase.

12  BY MR. HENDERSON:

13       Q.    On the date of this incident, did you fire any

14  of your weapons?

15       A.    No.

16       Q.    Now, I'm going to ask you some questions about

17  the incident and then we'll take a look at your video in

18  a moment.   I'm going to ask you about your statements.

19  Let me ask you about the incident.   As you're in this

20  pursuit that we talked about with the four vehicles

21  pursuing the red pickup truck -- before the red pickup

22  truck finally came to a complete stop, did any other law

23  enforcement units join the pursuit?

24       A.    No.

25       Q.    When you're --

OFFICER ALFREDO SILVA                    Page 39

1  it's really busy.  It's one of the busiest intersections
2  in our Valley.  As he was approaching Avenue 48 at
3  80 miles per hour, I noticed that the two left-turn
4  pockets were occupied -- including the No. 1, No. 2,
5  No. 3 lanes and the right-turn pocket.  So every lane in
6  that intersection on Jefferson Street at Avenue 48 was
7  occupied.  I believe I -- on my audio, I could hear
8  myself saying, "He's going to crash.  He's going to
9  crash."  He tried to split vehicles that were in the
10  No. 2 left-turn pocket and the No. 1 lane.  He wounded
11  up colliding with, I believe, two vehicles and shearing
12  off to the right and then collided with a white pickup
13  truck that had a trailer.
14       Q.   The two vehicles that he collided with first,
15  what kind of vehicles were those?
16       A.   I don't recall.
17       Q.   How fast can you estimate that his red pickup
18  truck was traveling when it collided with the other
19  two vehicles?
20       A.   He was at 80 initially and he probably slowed
21  -- probably to maybe 65.
22       Q.   And in those collisions, what happened to the
23  other two vehicles?
24       A.   They basically got shoved aside.  The left
25  vehicle got shoved to the left and the right vehicle got

OFFICER ALFREDO SILVA                    Page 40

1    shoved to the right.

2        Q.    And then you said -- I've seen pictures

3    overhead of some of this -- I mean, of the vehicle.  You

4    talked about how he collided with a white pickup truck

5    that was towing -- it was towing a golf cart?

6        A.    I believe so.

7        Q.    Does that sound like the vehicle he collided

8    with?

9        A.    Yes, sir.

10       Q.    What part of the vehicle -- the red pickup

11   truck -- collided with what part of the white pickup

12   truck or the trailer?

13       A.    If I recall, I think the white pickup truck was

14   hit on the left front side and shoved off to the right.

15   So it would have been that the red Ford F-150 probably

16   hit it with his right front.

17       Q.    And I've seen some of this on video.  But it

18   looks like the red pickup truck then went perpendicular

19   to the roadway and up and over the curb that was at the

20   right-hand side of the roadway there.  Does that sound

21   right?

22       A.    Yes, sir.  The truck came to rest facing in the

23   southwesterly direction and its front wheels were over

24   the curb.

25       Q.    When you looked down -- let's say you were

OFFICER ALFREDO SILVA                              Page 45

1   could get ahead of me.  But we caught up to the truck

2   pretty fast.  I would estimate I was 20 car lengths

3   back.

4   BY MR. HENDERSON:

5       Q.   And then could you see up to where the

6   Riverside County deputy was and how far back he was from

7   the bumper, let's say, of the red pickup truck?

8           MS. BAKKEN:  I'll object to vague and

9   ambiguous.

10          MR. BAXTER:  And speculation.

11  BY MR. HENDERSON:

12      Q.   I'm sorry.  What was your answer?

13      A.   I'm not sure how far back.

14      Q.   That's fine.  All right.

15           During the time that you're driving along in

16  this pursuit, did you ever see the driver of the red

17  pickup truck?  Did you ever see him put anything out of

18  the window?

19      A.   No.

20      Q.   Did you ever see him roll down the window?

21      A.   No.

22      Q.   Were you ever able to see inside of the red

23  pickup truck to see what he was doing in there during

24  the pursuit?

25      A.   The only time I saw him was when he made a left

Express Deposition Services - Scheduling@expressnetworkas.com
(888)232-6077

OFFICER ALFREDO SILVA                    Page 46

1      turn on 42nd Avenue from Country Club.  I just noticed

2      that he was short.

3          Q.   Up until the first shot was fired that day, did

4      you know anything about the background or the history of

5      the occupant of the red pickup truck?

6          A.   No, sir.

7          Q.   Had you received any information from any

8      source -- whether mobile digital computer, mobile

9      digital terminal, a radio call or anywhere else -- maybe

10     from your own personal knowledge -- did you recognize

11     him or anything?  Did you have any information that the

12     person in the red pickup truck was a person named

13     Javier Magdaleno?

14         A.   I found after the shooting what his name was.

15         Q.   So you didn't know his name before the

16     shooting?

17         A.   No, sir.

18         Q.   Is it fair to say that -- for instance, you

19     hadn't heard anything broadcasted over your -- about --

20     or on the mobile digital terminal saying, "We're in

21     pursuit of this red pickup truck.  It's registered to a

22     Javier Magdaleno.  Here are some details about his

23     background."  You didn't have any information like that;

24     right?

25         A.   The only thing I heard was that a man was

MAG 000166

OFFICER ALFREDO SILVA                    Page 47

1   possibly going to assault a woman -- maybe his wife.

2   I'm not sure if it was a wife or just a woman.

3        Q.    And by the way, I think he's 60-something years

4   old at the time this happened.  In terms of things like,

5   for instance, the criminal record, if any, of the person

6   in the red pickup truck -- whether he was under the

7   influence of any kind of drugs -- you didn't have any

8   information about that; right?

9        A.    No, sir.

10       Q.    At the time that your vehicle comes to a

11   stop -- let's say you come to a stop.  How did you

12   position your vehicle?

13       A.    Well, like I said, I was at the right rear of

14   his vehicle -- probably at the 4:00 o'clock position, if

15   you look at a clock.  And I was facing a southwesterly

16   direction.

17       Q.    How far away would you say you were from the

18   bumper of his vehicle?

19       A.    I'm going to estimate 40 feet -- 40 or 45 feet.

20       Q.    Was it more than one white pickup truck there?

21       A.    I don't recall.

22       Q.    There was one pulling the golf cart.  Was there

23   another truck there, do you remember?

24       A.    All I remember is the white pickup truck with

25   the trailer and Mr. Magdaleno's truck.

MAG 000167

OFFICER ALFREDO SILVA                    Page 51

1  to the right side when officers were trying to get those

2  people out of the motor home to get them out into a more

3  safe area.

4      Q.   When you say you grabbed the rifle -- there's a

5  rifle and a shotgun.  So you grabbed the rifle that was

6  what?  An AR-15?

7      A.   Yes, sir.

8      Q.   And then how many rounds does that have?

9      A.   It has 20 rounds.

10     Q.   When you grab the AR-15, why -- why did you

11  grab the AR-15?

12     A.   I grabbed the AR-15 because the call came out

13  about a man with a rifle and my duty weapon would have

14  not been enough.

15     Q.   The AR-15 that you had, did it have a scope?

16     A.   Yes.

17     Q.   And when you positioned yourself there at the

18  A-pillar -- let's say that you came to a stop.  You

19  grabbed the AR-15 and then you put your foot on the

20  ground and you were positioning yourself as the A-pillar

21  on the driver's side.  Did you take the safety off of

22  the AR-15?

23     A.   I did.

24     Q.   Why did you do that?

25     A.   Because it was a very dangerous incident.

Express Deposition Services - Scheduling@expressnetworkas.com
(888)232-6077

MAG 000168

OFFICER ALFREDO SILVA                    Page 53

1   Does that sound right?

2       A.    I don't think so because it still had the

3   ability to probably keep on going.

4       Q.    But it looked like at least that the vehicle

5   did come to a stop?

6       A.    Yes.

7       Q.    When you're there with your AR-15 pointed at

8   this red pickup truck, did you look through the scope on

9   the AR-15 rifle?

10      A.    Yes.

11      Q.    When you looked through the scope, what were

12  you -- were you surveying the red pickup truck or were

13  you looking at one spot?  How were you doing it?

14      A.    I was trying my best to -- trying my best to

15  look through the tinted windows.  It was an overcast

16  day, so the tint was darker than normal.  The only thing

17  I could see was that the truck was rocking a little bit

18  -- like there was movement inside of it.  I could see a

19  shadow of -- within the truck -- a movement towards the

20  right side in the direction of Officer Gette and

21  Officer Perez.

22      Q.    When you looked through the scope of the AR-15

23  -- I know that in your statement, you talked about

24  hearing some shots at one point in time.  You heard some

25  shots to your left and you heard some shots to your

OFFICER ALFREDO SILVA                    Page 55

1   did you recognize the voice of the person who was saying

2   that?

3        A.   It wasn't until after the fact but I knew it

4   was Officer Perez.  But hearing "rifle, rifle, rifle,"

5   it gives you chills when you're at a scene like that.

6   It wasn't until after the fact that I realized it was

7   Officer Perez.  It was his voice.  But at that point,

8   I'm not really recognizing who was saying it.  I'm just

9   hearing, "Rifle, rifle, rifle."

10       Q.   Even though you may not have recognized who was

11  saying it, did you hear some appreciation at the time

12  like, "Oh, that's coming" -- that "rifle, riffle, rifle"

13  -- when someone is saying that, it's coming from my

14  right versus coming from my left?

15       A.   Well, I knew it was coming from my right.

16       Q.   Let me ask you:  When you had your rifle

17  pointed at the red pickup truck -- during the time that

18  you had it pointed for about that three seconds or so

19  before you heard shots, did you ever see the occupant of

20  the red pickup truck put the rifle out of the window

21  where you saw the barrel of it sticking out the window?

22       A.   What I saw was a shadow or movement within the

23  vehicle -- the pickup truck.  A movement towards the

24  right side -- toward the right window.

25       Q.   When you say that you saw movement toward the

OFFICER ALFREDO SILVA                    Page 56

```
 1   right side -- and you say it was a shadow -- you weren't
 2   able to make out what it was?  Is that --
 3        A.    No.
 4        Q.    -- fair?
 5        A.    Yes.  It's fair.
 6        Q.    At least upon your assessment looking through a
 7   scope with the rifle -- looking at the occupant of the
 8   pickup truck -- based upon your training, knowledge and
 9   experience as a CHP officer, you did not use deadly
10   force; correct?
11        A.    I didn't have a clear shot.
12             MR. BAXTER:  Objection.  Incomplete
13   hypothetical, calls for a legal conclusion, vague and
14   ambiguous, foundation.  I think he's answered, but --
15   BY MR. HENDERSON:
16        Q.    You said that you did not have a clear shot.
17   Is that what you said?
18        A.    Yes.
19        Q.    What do you mean by that?
20        A.    I couldn't see through the dark tint.
21        Q.    Let me ask you this:  The scope that you had --
22   you probably received some kind of training about that
23   -- how it works.  Is it adjustable?  Can you change the
24   magnification of it?
25        A.    There are two options.  One is for long view
```

OFFICER ALFREDO SILVA

Page 69

1    A.   I believe so.

2    Q.   Do you know who it was -- first, let me ask

3 you:  At the time it happened, do you know it was who

4 said "Shots fired.  Shots fired"?

5    A.   I don't.

6    Q.   Now, let me just go back to something that was

7 in your statement.  In your statement, I think you said

8 -- in your statement, I think you said that you don't

9 recall any warnings.  You didn't hear any warnings given

10 before the first set of shots.  Does that sound right to

11 you?

12   A.   No.  There wasn't any time.

13   Q.   Is it fair to say that -- at least you didn't

14 hear any -- whether there was time or not, you didn't

15 hear anybody say something like, "Put down the gun.

16 Show me your hands"?  You didn't hear anything like

17 that; right?

18   A.   No.  There was no time.

19   Q.   Let me just play it here from 03:54 onwards --

20 strike that.  When you watched this video -- and when

21 you've seen it before on the video you've seen, were you

22 able to see that you could see some glass flying from

23 the back window when you heard this first volley of

24 shots?

25   A.   I can't tell on the video.  I think on

OFFICER ALFREDO SILVA                Page 78

1      Q.   And in terms of Mr. Magdaleno and whether he
2   had any kind of a rifle in his hands -- and if he had it
3   in his hands, where in his hands it was or where
4   otherwise it was located in the vehicle, you didn't see
5   that; right?
6      A.   No, sir.
7      Q.   Besides being interviewed by the Riverside
8   County District Attorney's Office, were you interviewed
9   by anyone else?
10     A.   No, sir.
11     Q.   How long did you stay at the scene after all of
12  the shooting?
13     A.   Probably less than an hour.  Probably
14  50 minutes.
15     Q.   What did you do during that time?
16     A.   We stood away from our patrol cars.  We were
17  basically positioned north of the shooting scene on
18  Jefferson.  We just -- I just sat in the center median
19  -- the very center median.  I tried to -- my blood
20  pressure -- calm down.  Drink some water.
21     Q.   Your rifle -- your AR-15, what is the scope on
22  it?  You carried it with you when you were standing near
23  your driver's side door -- back to when you were
24  standing by the trunk?
25     A.   Was I -- did I carry it with me during the

Express Deposition Services - Scheduling@expressnetworkas.com
(888) 232-6077

OFFICER ALFREDO SILVA                    Page 98

```
 1   BY MR. HENDERSON:
 2       Q.   You were asked some questions about the people
 3   who were in the area where the shooting took place --
 4   the civilians.  Do you recall that?
 5       A.   Yes, sir.
 6       Q.   In your statement -- I'm looking at Page 19.
 7   You were asked a question about the backdrop and then
 8   you said -- it's at Line 23 to Line 24 of Page 19.  Your
 9   statement is, "At that point, I wasn't.  I wasn't so
10   much focused on the backdrop but I just -- I didn't have
11   a clear shot."
12            Do you recall saying that?
13       A.   Yes.
14       Q.   Which I think is consistent with what you said
15   earlier in the deposition today.  Let me just ask you
16   this:  It sounds like -- basically when you were there
17   that day -- strike that.  Let me start over.
18            Is it fair to say that -- we talked a little
19   bit about the fact that you had received training from
20   the California Highway Patrol, including POST and POST
21   learning domains regarding use of deadly force.  I think
22   it's in Learning Domain No. 28 or No. 20.  The number
23   could be wrong.  But basically, the idea is that in
24   order to use deadly force, there either has to be an
25   imminent or immediate threat of death or serious bodily
```

OFFICER ALFREDO SILVA                    Page 100

```
 1        A.    Yes.
 2        Q.    And you had your rifle up and you're looking
 3   through the scope -- and at least in that point in time,
 4   the reason that you didn't fire is that in order to be
 5   able to use deadly force where you have to have a
 6   reverence for human life -- and you only use it if
 7   there's an immediate threat of death or serious bodily
 8   injury to yourself, another officer or a member of the
 9   public -- that it didn't meet the criteria at that point
10   -- at least for you -- based upon your training to pull
11   the trigger; correct?
12             MS. BAKKEN:  Vague, compound.
13             MR. BAXTER:  Calls for legal conclusion, legal
14   and expert analysis.
15             THE WITNESS:  In the situation, I just didn't
16   see -- I couldn't see through the back window enough.
17             MR. HENDERSON:  Fair enough.  I don't have any
18   other questions.
19             MS. BAKKEN:  I don't have anything.
20             MR. BAXTER:  I have one question.
21   ///
22   ///
23   ///
24   ///
25   ///
```

OFFICER ALFREDO SILVA                    Page 102

1           MR. BAXTER:  I just always like to -- even

2    though we're going by Code -- that we still stipulate to

3    what happens if for some reason the original is lost.

4    Because even going by Code, that can always happen.  So

5    if the original is lost, destroyed, not signed or

6    otherwise unavailable for any reason, we can use the

7    certified copy in lieu of the original for any and all

8    purposes.

9           MR. HENDERSON:  So stipulated.

10          MS. BAKKEN:  Yes.  So stipulated.

11          THE REPORTER:  Would anyone here like to order

12   a copy?

13          MS. BAKKEN:  Yes, please.

14          MR. BAXTER:  Yes.  This is Doug.  I'd like a

15   paper certified copy and the electronic version.

16

17          (Whereupon, at 1:04 p.m., the deposition

18   of OFFICER ALFREDO SILVA was concluded.)

19                      ---o0o---

20

21

22

23

24

25

MAG 000176

1                    PENALTY OF PERJURY

2

3

4          I, OFFICER ALFREDO SILVA, hereby certify under

5     penalty of perjury under the laws of the State of

6     California that the foregoing is true and correct.

7          Executed this _____ day of _____, 20__,

8     at _____, California.

9

10

11

12                              _____
                                OFFICER ALFREDO SILVA
13

14

15

16

17

18

19

20

21

22

23

24

25

MAG 000177

OFFICER ALFREDO SILVA                    Page 105

1                REPORTER'S CERTIFICATION

2

3          I, LAURA MATEO, Certified Shorthand Reporter

4     in and for the State of California, do hereby certify:

5              That the foregoing witness was by me duly

6     sworn; that the deposition was then taken before me

7     at the time and place herein set forth; that the

8     testimony and proceedings were reported

9     stenographically by me and later transcribed into

10    typewriting under my direction; that the foregoing

11    is a true record of the testimony and proceedings

12    taken at that time.

13         I further certify that pursuant to FRCP Rule

14    30(e)(1), before completion of the deposition, review of

15    the transcript was requested.

16         I further certify I am neither financially interested

17    in the action nor a relative or employee of any attorney or

18    party to this action.

19         IN WITNESS WHEREOF, I have subscribed my name on

20    this date: May 1, 2023 .

21

22

23

24    _____

25         LAURA MATEO, CSR NO. 13410

# EXHIBIT M

Exhibit 1

## INCIDENT REPORT

DATE PREPARED: 08/03/2021   RIVERSIDE COUNTY SHERIFF CA0330000   ☐ INITIAL   ☒ SUPPLEMENTAL

| 1. FILE NUMBER O21-029-0015 | 2. DATE/TIME REPORTED 012921  1239 | 3. DATE/TIME ASSIGNED | 4. DATE/TIME INV. START | 5. DATE/TIME INV. FINAL | 6. ADULT ARR | 7. JUV ARR |
|---|---|---|---|---|---|---|
| 8 OFFENSES – CODE SECTION OIS Fatal | | CRIME | | COUNTS | | 9 BDP CODE |
| 10  OFFENSES – CODE SECTION (Add or Change to) | | CRIME | | COUNTS | | 11  BDP CODE |
| 12. OFFENSES – CODE SECTION (Add or Change to) | | CRIME | | COUNTS | | 13. BDP CODE |
| 14  LOCATION OF OCCURRENCE | | 15  REP. DIST | 16. OCCURRED ON- 012921 | DATE/TIME 1239 | 17 OR BETWEEN | DATE/TIME |
| 18. BUSINESS NAME | | | 19  BUSINESS PHONE | | 20. CASE STATUS/ CLEARANCE Open/CMB-2 | |

21. WAS THIS INCIDENT RELATED TO MARIJUANA?  ☐ YES  ☒ NO   (If yes, briefly include in narrative or additional details how it was related)

22. BWC VIDEO (CAPTURED BY YOU OR ANY OTHER DEPARTMENT MEMBER)  ☐ YES  ☒ NO

### VICTIM -- REPORTING PARTY -- WITNESS -- OTHERS:   ☐ SEE ADDITIONAL PERSONS REPORT

| 23. INVL. | 24. NAME (Last, First, Middle) | | 25. SEX | 26. RACE | 27 DOB | 28. AGE | 29. HT | 30. WT | 31. HAIR | 32. EYES | 33. SKIN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 34. RESIDENCE ADDRESS | | CITY | | ZIP | | 35. EMAIL ADDRESS | | | | 36. RES. PHONE | |
| 37. BUSINESS ADDRESS | | CITY | | ZIP | | 38. EMAIL ADDRESS | | | | 39. BUS PHONE | |
| 40. INVL. | 41. NAME (Last, First, Middle) | | 42. SEX | 43. RACE | 44. DOB | 45. AGE | 45. HT | 47. WT | 48. HAIR | 49. EYES | 50. SKIN |
| 51. RESIDENCE ADDRESS | | CITY | | ZIP | | 52. EMAIL ADDRESS | | | | 53. RES. PHONE | |
| 54. BUSINESS ADDRESS | | CITY | | ZIP | | 55. EMAIL ADDRESS | | | | 56. BUS PHONE | |

### SUSPECT:   ☐ ADULT ☐ JUVENILE      ☐ PAROLE ☐ PROBATION      ☐ SEE ADDITIONAL PERSONS REPORT  ☐ ARRESTED

| 57. INVL. | 58. NAME (Last, First, Middle) Magdaleno, Javier Gutierrez | | 59 SEX M | 60 RACE H | 61. DOB 032860 | 62. AGE | 63. HT | 64. WT | 65. HAIR | 66. EYES | 67. SKIN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68. DRIVER'S LICENSE NUMBER / ID NUMBER | | IN POSSESSION yes ☐ no ☐ | 69. STATE | 70. SOCIAL SECURITY NUMBER | | 71. MNI NUMBER | | | 72 CII NUMBER | | |
| 73. RESIDENCE ADDRESS | | CITY | | ZIP | | 74 EMAIL ADDRESS | | | | 75. RES. PHONE | |
| 76. BUSINESS ADDRESS | | CITY | | ZIP | | 77. EMAIL ADDRESS | | | | 78. BUS. PHONE | |

| 79. JUVENILE DISPOSITION ☐ OTHER JURIS.   ☐ JUV. CRT. PROB. | ☐ WITHIN DEPT.   ☐ DETAINED   ☐ NOT DETAINED |
|---|---|

80. GANG DATA

GANG NAME(S):

☐ Member   ☐ Associate   ☐ Self-Admit   ☐ Prior Knowledge
TATTOOS / SCARS / MARKS
☐ Face ☐ Neck ☐ R. Arm ☐ L. Arm ☐ Hands ☐ Torso ☐ Back ☐ Legs

81. TATTOOS/SCARS/MARKS/CLOTHING DESCRIPTION
Transcripts for Deputy Thomas (RSO) interview on 2/03/2021

3654 3152

### VEHICLE:   ☐ REFER TO CHP 180 FORM FOR STOLEN, RECOVERED, TOWED OR IMPOUNDED

| 82. INVL. | 83. LICENSE | 84. STATE | 85. YEAR | 86. MAKE | 87 MODEL | 88  BODY STYLE | 89. BLT/RG Code: | AUTO VALUE $ |
|---|---|---|---|---|---|---|---|---|
| 90. COLOR/COLOR | 91. VIN # | | | | 92 OTHER IDENTIFIERS | | 93. DISPOSITION OF VEHICLE | |
| 94. REGISTERED OWNER | | 95 ADDRESS | | CITY | STATE | ZIP | 96. PHONE | |

☐ PROPERTY REPORT ATTACHED FOR STOLEN, RECOVERED OR DAMAGED PROPERTY    | 97. DAMAGED PROPERTY VALUE $ |

| REPORTING OFFICER DA Inv. Kelly Nava | OFFICER I.D DA190 | REVIEWED BY/DATE SGT. THURM #2806 | ENTERED BY/DATE | ENTERED BY/DATE |
|---|---|---|---|---|
| COMMENTS | | | | |

Riverside County Sheriff-Incident Report Form A 435 (Revised 08-19-2010)

CONFIDENTIAL

COR 001507

## RIVERSIDE COUNTY SHERIFF'S DEPARTMENT
### CENTRAL HOMICIDE UNIT
#### REPORT NARRATIVE

Investigator Kelly Nava KN190
Case # O21 029 0015                                           Page  2

1   <u>Attachments:</u>

2   #1 Corrected Transcripts

3

4   <u>Details:</u>

5   This purpose of this supplemental report is to document the incorporation of a corrected

6   copy of the transcripts pertaining to Deputy Derek Thomas' interview.  I digitally

7   recorded this interview with Deputy Thomas on 2/03/2021 at 1400 hours.  The audio file

8   was sent for transcription through FileZilla (a transcription provider), via an electronic

9   portal.  Once completed I accessed the transcripts through the portal and downloaded a

10  copy.  I reviewed and compared the recording and the transcripts for any inaccuracies and

11  made corrections as needed.  The original audio files were later booked into evidence on

12  digital media.

13

14  <u>Case Status:</u>

15  OPN/CR2

CONFIDENTIAL

COR 001508

MAG 000180

# Attachment #1
## Corrected Transcripts

O210290015

CONFIDENTIAL

COR 001509

MAG 000181

INTERVIEW WITH OFC. DEREK THOMAS

DAR2021-029-001
February 2, 2021
Riverside County District Attorney's Office -- Force Investigation Team
THOMAS=Ofc. Derek Thomas
MOODY=Inv. Dan Moody
NAVA=Inv. Kelly Nava
WILLIAMSON=Atty. Michael Williamson
HIGHTOWER=Rob Hightower, DDA
REID=Inv. Tom Reid

NAVA:       I'm good.

MOODY:      It is February 3, 2021.  We will be at the Palm Desert Station in the conference room.  Reference file number O, Ocean 210290015.  This is the officer/deputy-involved shooting that occurred on Friday January 29th of 2021, so just last Friday.  Uh, this will be the interview with, uh, Deputy Derek Thomas, D-E-R-E-K T-H-O-M-A-S.  Uh, I'm Dan Moody.  I'm an investigator with the Riverside County Sheriff's Department.  We'll go around and introduce ourselves.

NAVA:       Investigator Kelly Nava, Riverside County DA.

THOMAS:     Deputy Derrick Thomas with, uh, Riverside Sheriff's Department, Palm Desert Station.

WILLIAMSON: Michael Williamson.  I'm the attorney for the deputy.

HIGHTOWER:  Rob Hightower, Deputy District Attorney.

MOODY:      Okay, uh, Deputy Thomas, just, just so you're aware, um, myself and my partner here, Investigator Nava, we're criminal investigators.  We are handling the criminal side of this investigation, this officer-involved shooting/deputy-involved shooting.  I want to ask you if you coming in here today, uh, providing a

Interview with: Derek Thomas
Interview Date: February 2, 2021
Page 1

MICHAEL A. HESTRIN
DISTRICT ATTORNEY
County of Riverside
State of California

| 1 | | statement, is this a voluntary statement? |
| 2 | | |
| 3 | THOMAS: | Yes it is. |
| 4 | | |
| 5 | MOODY: | Okay. Has anybody ordered you, told you, or forced you to come in this room to |
| 6 | | talk to us? |
| 7 | | |
| 8 | THOMAS: | No, they have not. |
| 9 | | |
| 10 | MOODY: | Okay. Uh, with that being said, uh, my partner is going to go through the |
| 11 | | interview. We're going to start off with kind of your history of law enforcement, |
| 12 | | military, and then we'll go into the events that occurred on Friday, January 29th. |
| 13 | | |
| 14 | THOMAS: | Okay. |
| 15 | | |
| 16 | NAVA: | So go ahead with your law enforcement experience. |
| 17 | | |
| 18 | THOMAS: | So, my law enforcement experience started on November 13th. I believe it was |
| 19 | | 2019 was my Academy start date, um, so I'm fairly new. I did the six months at |
| 20 | | the Academy. From there, I had, um, the, um, correctional training directly after |
| 21 | | that. After that, I had my indoctrination. From there, sometime in June, I |
| 22 | | reported to Indio jail as a sheriff's deputy at Indio jail. I was there for |
| 23 | | approximately a year. Um, I reported in Palm Desert station. I believe it's |
| 24 | | sometime in early May of 2020, I've started my FTO training. I- before I |
| 25 | | reported to Palm Desert Station, I had transitional school at BCTC. I believe that |
| 26 | | was in February. |
| 27 | | |
| 28 | NAVA: | What is that? |
| 29 | | |
| 30 | THOMAS: | That's just when they want to get you ready for the tran- from the transition from |
| 31 | | Indio Jail from as a deputy in a jail to a deputy working on the streets. |
| 32 | | |
| 33 | NAVA: | Okay. |
| 34 | | |
| 35 | THOMAS: | - patrol. So, I showed up in- sometime in May. I don't know the exact date in |
| 36 | | |

Interview with: Derek Thomas
Interview Date: February 2, 2021
Page 2

CONFIDENTIAL

I'm sorry, interviewing the victim. Right when I pull into the parking lot at the 3-4 corner of the parking lot, I see a red Ford truck parked, um, and I look at the license plate. The license plate looks familiar. I look at the MDC. It matches. I see somebody in front of the truck, kind of a view of somebody outside the vehicle. I put my car in park immediately and exit the vehicle because I don't want to be at target inside my vehicle. I put myself out with the vehicle. I broadcast the license plate, and then I broadcast, I believe I said the subject is in front of me, and he, he was um, when I first pulled up, I didn't have view of him until I got out of my vehicle, and then I had view of the subject. I knew because of the text of the call and the broadcast of the call that the subject was said to be armed with a rifle. I'm out of the vehicle. I don't have my rifle with me. I pull out my firearm. I put him at gunpoint because he may have a rifle, and I announce "Sheriff's Department. Let me see your hands. Show me your hands." He stares at me. Most time when I've put someone at gunpoint, they comply or they have some sort of fear. He had no fear whatsoever. He stared at me, ignored my calls. I was extremely loud when I identified myself. He opened the vehicle, got in the vehicle, put it reverse, extremely fast went right past my vehicle. Um, I decided that I needed to pursue this man. He was a suspect to a possible assault with a deadly weapon and a domestic violence. I had, I felt that I had to pursue this, this suspect. Um, I got in my vehicle. I put the car in drive. I announced that he's leaving. I don't know if I announced he was leaving when I was standing up, but I announced he was leaving, got in the vehicle, got behind him, put on my lights immediately. As we were exiting the Rite Aid, I hit my sirens. I announced I was in pursuit. He ig- he ignored my lights. He accelerated in speed. He turned south on Washington and headed directly towards the intersection of Washington and Varner. I do not recall at this time if it was a red light or not. I know that he ran many red lights and he was very reckless as far as not caring for the safety of others. Um, he went past Varner. When he was passing Varner, I do remember him acting like he was trying to fake me out, and he acted like he was going to turn left onto Varner and swerved at the last second and went straight, continued south on Varner approached Country Club. As he got the Country Club, he passed vehicles on the right side, went through the intersection, and went east on Country Club. I continued to follow him, um, called my pursuit out. As we were on Country Club, I feel that the speeds got up close to 100, 90 to 100. I can't recall exactly,

MICHAEL A. HESTRIN
DISTRICT ATTORNEY
County of Riverside
State of California

1   but we definitely had a straight-away there, and he, um, continued to try to speed

2   away from me at a very high rate of speed.  I was pretty familiar with the, with

3   that street.  As we came across - he took Varner all the way to the curve right

4   before 42nd.  I believe he ran, I think he ran that light.  I can't remember for sure,

5   but he recklessly went through that intersection at 42nd and continued east to

6   Jefferson, went through the intersection at Jefferson, turned right on, on

7   Jefferson, which was bringing him south.  He was driving at a high rate of

8   speed.  He was passing vehicles.  He was attempting to lose me.  Um, he was

9   swerving on the road.  As, uh, as we went through Fred Waring and 111, I know

10   he ran one of those lights at least, and then we came to 48th, which brought the

11   biggest concern to me, as we approached the 48th, the cars were stacked up at

12   that light and it was a red light, and in an attempt to get away from me, he

13   decided he wanted to split lanes of cars that were stopped at the light, which was

14   extremely reckless, and decided to try to make his own lane and T-C'd into a

15   vehicle, to push it out of the way.  When that happened, he swerved, he lost

16   control of his vehicle, and the vehicle went up against the curb.  It left an

17   opening for me to come up behind him.  I came up behind him.  As soon as I was

18   behind him, his car was stopped.  I exited in my vehicle as fast as I could,

19   knowing that he is possibly armed with a rifle.  I had not seen a rifle at this

20   point.  I got out of my vehicle.  I feel I was fairly close.  I didn't go and measure

21   it.  I'm not sure exactly how close, but I had a very good view of him inside the

22   vehicle.  The windows were not tinted in the back, so I had a really good view.

23   Um, I put them at gunpoint, and when I had him at gunpoint, I thought maybe he

24   would run.  I, I was thinking he was gonna run.  I saw him pick up the rifle.

25   When I saw him pick up the rifle, I could clearly see a rifle.  I could even see the

26   front sight on that rifle.  That's how clear I could see it.  I saw him leaning

27   towards the passenger door.  At that point, I realized I'm out of my vehicle with

28   my handgun only, he has a superior weapon.  I have my handgun.  Um, my

29   thought, my thought at that time was he was getting out of that vehicle, he was,

30   he was going to attempt to shoot, shoot me and kill me.  In fear and to defend my

31   life, I was not going to let him out of that vehicle.  Um, he picked up his gun.

32   The only reason you're picking up a gun after you've been chased by a police

33   officer is to, is to shoot at that police officer.  Um, I shot at him until I did not see

34   him holding the weapon anymore and I can't see him anymore, and then after

35   that, that, that's, that was pretty much everything that happened.

36

Interview with: Derek Thomas

Interview Date: February 2, 2021

Page 8

MICHAEL A. HESTRIN
DISTRICT ATTORNEY
County of Riverside
State of California

CONFIDENTIAL

COR 001517

MAG 000185

| | | |
|---|---|---|
| 1 | NAVA: | And as far as you know, you've never come in contact with him - ? |
| 2 | THOMAS: | No. |
| 3 | | |
| 4 | NAVA: | - or had any past calls with him? |
| 5 | | |
| 6 | THOMAS: | No. |
| 7 | | |
| 8 | NAVA: | Okay. Um, so after you shot, then what happened? |
| 9 | | |
| 10 | THOMAS: | After I shot and I saw there was no threat anymore, I couldn't see him anymore - |
| 11 | | |
| 12 | NAVA: | Mm-hmm. |
| 13 | | |
| 14 | THOMAS: | Um, I immediately ceased fire, I put out shots fired on my HT, I asked for them |
| 15 | | to stage medical, I said I believe that he's hit. I wasn't sure if he was hit. Um, I |
| 16 | | didn't feel safe to approach. Somebody asked on the air to approach the vehicle |
| 17 | | if I felt safe to approach a vehicle for life-saving measures. Uh, the last time I |
| 18 | | saw the suspect, he had a rifle in his hand. I couldn't confirm if he was hit or |
| 19 | | not. I thought he probably was. I wasn't sure if he was still capable of shooting |
| 20 | | me, so I didn't feel it was safe at the time for- to approach the vehicle until my |
| 21 | | backup arrived, until we could do it correctly. |
| 22 | | |
| 23 | NAVA: | Okay. So having all this together, in the pursuit and knowing what you know at |
| 24 | | the call and you pull up there and get out and you see that rifle, what was going |
| 25 | | through your mind? |
| 26 | | |
| 27 | THOMAS: | I'm sorry, can you repeat that? |
| 28 | | |
| 29 | NAVA: | Starting from you know what he's got at the call, you know what happened at the |
| 30 | | call, this big pursuit, this failure to comply with anything that you've been trying, |
| 31 | | and he gets to the position that he's in and you pull in behind and the rifle comes |
| 32 | | up, and what's going through your mind? |
| 33 | | |
| 34 | THOMAS: | He's going to shoot me with it. |
| 35 | | |
| 36 | | |

MICHAEL A. HESTRIN
DISTRICT ATTORNEY
County of Riverside
State of California

Interview with: Derek Thomas
Interview Date: February 2, 2021
Page 16

| | | |
|---|---|---|
| 1 | NAVA: | Okay. |
| 2 | THOMAS: | He's determined to shoot me with it to get away, and I need to, to defend myself. |
| 3 | | |
| 4 | NAVA: | Okay. And at any point where there any other options you could have used?  I |
| 5 | | mean, would have been reasonable to go up to the car and extract him or use any |
| 6 | | other sort of pepper spray or anything else you might have had access to? |
| 7 | | |
| 8 | THOMAS: | The only option I had due to the fact that he had lethal force and I believed he |
| 9 | | was going to use it on me, um, was for lethal force. I had, I had no other |
| 10 | | options. He already had a rifle which is superior to my pistol. I did not have |
| 11 | | time to to grab my rifle at that time. I, I wish I had a better option at the time |
| 12 | | when I saw the rifle than what I had. |
| 13 | | |
| 14 | NAVA: | Thank you. |
| 15 | | |
| 16 | MOODY: | Okay, so um, and I just want to go over a few things.  I'm picturing myself like |
| 17 | | sitting in your patrol unit, you're going to the call, there's - when you say MDC, |
| 18 | | that's the computer that's - |
| 19 | | |
| 20 | THOMAS: | Yes. |
| 21 | | |
| 22 | MOODY: | - in the car, right? |
| 23 | | |
| 24 | THOMAS: | Yes. |
| 25 | | |
| 26 | MOODY: | Okay and so there's information that comes up on that in the call, which you're |
| 27 | | reading, plus you're hearing stuff through the dispatcher, and so you're hearing |
| 28 | | it's a subject at the Rite Aid, there's some sort of a, uh, disturbance or a domestic, |
| 29 | | or is it something else? |
| 30 | | |
| 31 | THOMAS: | It said domestic violence, threatened to kill, threatened to kill her and he is armed |
| 32 | | with a rifle. |
| 33 | | |
| 34 | MOODY: | Okay, so you have the domestic situation, you have it's at the Rite Aid, uh, |
| 35 | | there's a, a vehicle description, and armed with a rifle - |
| 36 | | |

Interview with: Derek Thomas
Interview Date: February 2, 2021
Page 17

CONFIDENTIAL

COR 001526

MAG 000187



| | | |
|---|---|---|
| 1 | NAVA: | Not familiar to you? |
| 2 | THOMAS: | No. |
| 3 | | |
| 4 | NAVA: | Thank you. That was It. Okay, we're concluding the interview at 1520. |
| 5 | END OF RECORDING | |

Interview with: Derek Thomas
Interview Date: February 2, 2021
Page 38

MICHAEL A. HESTRIN
DISTRICT ATTORNEY
County of Riverside
State of California

CONFIDENTIAL

# EXHIBIT N

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ALMA L. FIGUEROA DE MAGDALENO,    ) Case No.
Individually, and as Successor    ) 5:21-CV-02027-JGB-SHK
in Interest to JAVIER MAGDALENO   )
GUTIERREZ; JUAN JAVIER            )
MAGDALENO, Individually, YOSELIN )
MAGDALENO, Individually, and      )
IVETH MAGDALENO, Individually,    )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )
                                  )
COUNTY OF RIVERSIDE, a legal      )
subdivision of the State of       )
California; CALIFORNIA HIGHWAY    )
PATROL, a governmental agency of )
the State of California; DEREK    )
THOMAS, an individual; DOE CHP    )
OFFICER, an individual; and       )
DOES 1 through 10, inclusive,     )
                                  )
        Defendants.               )
------------------------------------

Deposition Of DEREK THOMAS

January 12, 2023

Cheryl L. Marquis, CSR No. 6731
489692





barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine        (866) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas     (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson     (516) 277-9494 Garden City
(212) 808-9500 New York City  (347) 821-4611 Brooklyn         (818) 489-1910 Albany        (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

1        UNITED STATES DISTRICT COURT

2      FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   ALMA L. FIGUEROA DE MAGDALENO,  ) Case No.
    Individually, and as Successor  ) 5:21-CV-02027-JGB-SHK
5   in Interest to JAVIER MAGDALENO )
    GUTIERREZ; JUAN JAVIER          )
6   MAGDALENO, Individually, YOSELIN)
    MAGDALENO, Individually, and    )
7   IVETH MAGDALENO, Individually,  )
                                    )
8          Plaintiffs,              )
                                    )
9      vs.                          )
                                    )
10  COUNTY OF RIVERSIDE, a legal    )
    subdivision of the State of     )
11  California; CALIFORNIA HIGHWAY  )
    PATROL, a governmental agency of)
12  the State of California; DEREK  )
    THOMAS, an individual; DOE CHP  )
13  OFFICER, an individual; and     )
    DOES 1 through 10, inclusive,   )
14                                  )
           Defendants.              )
15  - - - - - - - - - - - - - - - - - -

16

17        Deposition Of DEREK THOMAS, taken on

18  behalf of the Plaintiffs, via Zoom Videoconferencing,

19  at 10:06 A.M. on Thursday, January 12, 2023, before

20  Cheryl L. Marquis, Certified Shorthand Reporter No.

21  6731.

22

23

24

25

                        2

BARKLEY
Court Reporters

```
 1   APPEARANCES:

 2

     For Plaintiffs:
 3
             GUIZAR, HENDERSON & CARRAZCO, L.L.P.
 4           BY:   KENT M. HENDERSON
                   CHRISTIAN CONTRERAS
 5                 HUMBERTO GUIZAR
             Attorneys at Law
 6           18301 Irvine Boulevard
             Tustin, California 92780
 7           (714) 541-8600
             hendolaw@gmail.com
 8           ccontreras@ghc.com
             hguizar@ghclegal.com
 9

10   For Defendant DEREK THOMAS:

11           LEWIS BRISBOIS BISGAARD & SMITH LLP
             BY:   TONY M. SAIN
12           Attorney at Law
             633 West Fifth Street
13           Suite 4000
             Los Angeles, California 90071
14           (213) 250-1800
             Tony.Sain@lewisbrisbois.com
15

16   For Defendants STATE OF CALIFORNIA CHP and JOHN GETTE:

17           ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA
             BY: DOUGLAS E. BAXTER
18           Deputy Attorney General
             600 W. Broadway, Suite 1800
19           San Diego, California 92101-3375
             (619) 738-9567
20           Douglas.Baxter@doj.ca.gov

21

22

23

24

25
```

3

DEREK THOMAS

BARKLEY
Court Reporters

```
 1      VIA ZOOM VIDEOCONFERENCING, THURSDAY, JANUARY 12, 2023

 2                          10:06 A.M.

 3                            -0-

 4          MR. SAIN:  Pursuant to our Rule 29 stipulation,

 5    parties may attend a deposition by means, including

 6    Zoom, as CHP is doing in this case.  We also had an

 7    off-record discussion.  The parties have agreed that

 8    hard copy exhibits that Mr. Henderson may be showing to

 9    the witness today will be sent to the court reporter at

10    the end of today's session to be attached to the

11    deposition.

12          MR. BAXTER:  Understood.

13          MR. HENDERSON:  So that is so stipulated.  And

14    after you swear in the witness, I have one other thing

15    there, too.

16          THE REPORTER:  Mr. Thomas, I'm going to place

17    you under oath.

18              The witness, DEREK THOMAS,

19              was placed under oath by the Reporter

20                      as follows:

21          THE REPORTER:  Do you solemnly state, under the

22    penalty of perjury, that the testimony you will give in

23    this matter will be the truth, the whole truth, and

24    nothing but the truth?

25          MR. THOMAS:  Yes.
```

5

DEREK THOMAS

1    A    After that you take a written test, physical

2    test, interviews, backgrounds, psychological evaluation,

3    and then after about a six-month to a one-year vetting

4    cycle, then you are selected.

5    Q    Okay.  And then when you were selected, by that

6    time was this in 2018?

7    A    Yes.

8    Q    Okay.  Did you receive some kind of a letter or

9    something of a written notice about being selected?

10   A    Yes.

11   Q    All right.  And then were you then slated to

12   attend some sort of academy, a training academy?

13   A    Yes.

14   Q    And which training academy did you attend?

15   A    I attended the Riverside County Sheriff's

16   Office training academy in 2018.

17   Q    Okay.  All right, and how long did that last?

18   A    About six months.

19   Q    Okay.  And where was that located?

20   A    It was located at Riverside County Sheriff's

21   Ben Clark Training Center.

22   Q    In which city?

23   A    I believe that's the city of Riverside.

24   Q    And what was it, eight hours a day, or what was

25   the -- what were the hours?

17

MAG 000193
BARKLEY
Court Reporters

```
 1      A     Correct.

 2      Q     And would you receive critiques or pointers

 3   from your field training officer regarding how you were

 4   performing in the field?

 5      A     Yes.

 6      Q     Okay.  And then after you completed that, and

 7   again, I don't know that we followed up on that, did you

 8   continue to work, after your field training program, out

 9   of the Palm Desert station?

10      A     Yes.

11      Q     Okay.

12          MR. SAIN:  Do you want when he completed the

13   field training program?

14          MR. HENDERSON:  Sure.

15      Q     BY MR. HENDERSON:  When did you complete the

16   field training program?

17      A     I believe I completed the field training

18   program in the month of October 2021.

19      Q     You mean 2020?

20      A     Correct.

21      Q     Okay, yeah.  Because this incident was in

22   January of 2021.

23      A     Right.

24      Q     Okay, all right.  So you completed the field

25   training program -- I'm terrible at math, but if it's
```

35

DEREK THOMAS

MAG 000194

BARKLEY
Court Reporters

1    A    On patrol, the use of force was not deadly

2    force.  It was a wrist lock and then handcuffing.

3    Q    Okay.  And up until January 29, 2021, had you

4    ever done a use of force report of any kind that

5    involved the use of deadly force?

6    A    No.

7    Q    Did you complete a use of force report for this

8    incident, for the January 29, 2021 report?

9    A    No.

10   Q    And I'm sorry, I said report.  The January 29,

11   2021 shooting incident?

12   A    No.

13   Q    Okay, and why is that?  Why didn't you do a use

14   of force report?

15   A    I believe that when there is deadly force used

16   a deputy-involved, the District Attorney and Homicide

17   complete those reports.

18   Q    Okay.  All right.  Okay.  So on January 29th,

19   2021, were you still working at the Palm Desert station?

20   A    Right.

21   Q    What type of vehicle were you operating on

22   patrol?

23   A    I operated a Ford Explorer SUV.

24   Q    Okay.  And how long had you been -- and let me

25   ask you this.  Were you always assigned to the same

38

DEREK THOMAS

MAG 000195
BARKLEY
Court Reporters

```
 1    A    No.

 2    Q    Did you see him armed with any other kind of

 3  weapon that you could see, a handgun, a knife, anything

 4  when he was at the Rite-Aid?

 5    A    No.

 6    Q    Okay.  Now, how did you know that the person

 7  who was standing outside the red truck was the person

 8  that the call was about?

 9    A    Well, I drove up behind the red truck, I gave

10  the license plate number, plus I knew the license plate

11  number at the time of the truck, which confirmed that

12  was the vehicle.  And Mr. Magdaleno, at the time, met a

13  description of the description given.

14    Q    Did you prompt anybody there at the scene at

15  the parking lot of the Rite-Aid, for instance, anyone

16  who made the call, or anyone who had any contact with

17  Mr. Magdaleno?

18    A    When I was at the Rite-Aid, after I gave the

19  commands, Mr. Magdaleno left in such a rapid, dangerous

20  manner, like I said he almost hit me and my vehicle, he

21  was armed with a rifle, reportedly armed with a rifle,

22  reportedly threatened to kill his wife, I did not know

23  if Mr. Magdaleno was going to come back, if he was going

24  to try to kill his wife elsewhere, so I determined that

25  I had to follow Mr. Magdaleno.
```

65

DEREK THOMAS

MAG 000196
BARKLEY
Court Reporters

1    tinted, it was -- it would be light -- lightly tinted.

2    I had a very good view through the back window.

3        Q    Okay.  Do you know whether it was, one way or

4    another, whether the back window had any tint on it?

5        A    No.

6        Q    Okay.  Then the side windows, it sounds like --

7    and I'm talking about the driver's side door window and

8    the passenger side door window, those appeared to have

9    tint on them, correct?

10       A    During the time of the pursuit, I didn't have a

11   visual of the side or the sides, passenger window, the

12   driver side window.  The only time I have seen those

13   windows were in evidence.

14       Q    Okay.  And afterwards, you could see in

15   evidence on the photographs, that the side door windows,

16   the driver side door window and the passenger side door

17   window had tint on them, right?

18       A    It appears so from the evidence pictures.

19       Q    When Mr. Magdaleno, when he leaves the parking

20   lot of the Rite-Aid and starts to drive away, did you

21   then begin a pursuit of him?

22       A    Yes.

23       Q    Okay.  Tell me how did you that.  What

24   procedure did you follow?  Did you call it in first?

25   Did you turn on your lights and siren?  What was the

DEREK THOMAS

MAG 000197
BARKLEY
Court Reporters

```
 1   first thing you did?
 2       A    First thing I did was get on my radio, let
 3   dispatch and my watch commander know that Mr. Magdaleno
 4   was evading, that he was leaving the scene, and then I
 5   informed them that I would be in pursuit.  And then I
 6   turned my lights and sirens on and proceeded to follow
 7   Mr. Magdaleno.
 8       Q    I will ask you some follow-up questions too,
 9   but let's just start from here, okay, the pursuit
10   begins, okay?  You turn on your lights and siren, you
11   are now in pursuit of Mr. Magdaleno.  When you first
12   began pursuing Mr. Magdaleno's red pickup truck, were
13   you the only vehicle behind Mr. Magdaleno, any law
14   enforcement vehicle behind Mr. Magdaleno's pickup truck?
15       A    Yes.
16       Q    Okay.  And then if we wanted to go with the
17   total time, let's say from when you first turned on your
18   lights and siren, until your vehicle came to a stop,
19   okay, until your vehicle next came to a stop, how long
20   was that?
21       A    Possibly maybe ten minutes.
22       Q    And in those ten minutes, did you continue to
23   pursue Mr. Magdaleno's vehicle until his vehicle came to
24   a stop?
25       A    Yes.
```

72

DEREK THOMAS

MAG 000198
**BARKLEY**
Court Reporters

1  clarity.  There is two areas actually.  One area is

2  where I say in my statement that I can't tell where CHP

3  is, and the description should -- what I meant to say is

4  I couldn't see them.  I knew their general area because

5  they were directly behind me in the pursuit, and I saw

6  them veer off to a spot, which would have been to the

7  right and the north of me.  So I knew their general

8  area, however, I couldn't see them.  The other

9  correction I would like to make for clarity is during

10  the actual shooting itself, I said that Mr. Magdaleno --

11  that the gun was lowering, and I didn't go into enough

12  detail as to he had lowered the rifle all the way down.

13  After much time to recollect and to visualize the actual

14  scene the incident happened, Mr. Magdaleno lowered his

15  rifle completely, pointing it to the north.  I was -- I

16  can even recall his body language, which I did not put

17  in clear detail in my statement.  His body language was

18  -- his shoulder was in, he was hunched over a little bit

19  with his arm tucked, he had an arm forward on the rifle,

20  and he had his chin down to the butt of the rifle

21  looking over the barrel of the rifle in the direction of

22  -- the general direction of where CHP was.

23      Q    Okay.  Any other corrections?

24      A    No.

25      Q    Okay.  The words that you used to answer the

82

DEREK THOMAS

```
 1      Q     BY MR. HENDERSON:  Now, when you were in

 2   pursuit, okay, you remained in the vehicle that was

 3   immediately behind Mr. Magdaleno, if you will, the first

 4   vehicle in the pursuit at all times, right?

 5      A     Correct.

 6      Q     During that pursuit, did you ever see

 7   Mr. Magdaleno pick up a rifle or display a rifle or

 8   display any kind of weapon during the pursuit?

 9      A     No.

10      Q     Okay.  Did you have any knowledge at the time

11   -- let's say you had come to a complete stop, okay, at

12   the conclusion of the pursuit, did you have any

13   knowledge of where -- if Mr. Magdaleno actually did have

14   a rifle where it was located?  Was it in the pickup

15   truck?  Was it in the pickup bed?  Had he left it at the

16   Rite-Aid?  Did you know where it was?

17           MR. SAIN:  This is vague as to time and

18   somewhat unintelligible.

19           MR. HENDERSON:  I will withdraw it.

20           MR. SAIN:  Okay.

21      Q     BY MR. HENDERSON:  So you come to a complete

22   stop, okay, and you have this report that Mr. Magdaleno

23   has a rifle, is that correct?

24      A     Yes.

25      Q     Okay.  But during the entire time that you were
```

93

1    comes to a stop, and then I stopped after him.

2        Q    Okay.  All right.  About how long was it after

3    he had come into a stop, where he's kind of nosed in

4    perpendicular to the lanes of travel at the curb of this

5    roadway, how long after he comes to a stop there is it

6    that you come to a stop?  Is it a few seconds?

7        A    It's a couple seconds, yes.

8        Q    Okay.  All right.  Your vehicle, did your

9    vehicle have any kind of a dash cam video system?

10       A    No.

11       Q    Okay.  Did you have any type of a body-worn

12   video on you at the time of the incident?

13       A    Yes.

14       Q    Okay.  Why didn't you act -- or did you

15   activate your body-worn video?

16       A    I did not have the opportunity to activate the

17   body-worn video once the incident started because it was

18   unsafe.  We were in a pursuit, and then we terminated

19   the pursuit, and then it was -- it just wasn't practical

20   to turn it on at that point.  I was unable to do so.

21       Q    What was the procedure for turning it on?

22   Didn't you just press a button?

23       A    You have to remove your hands from other things

24   you are doing, and you have to push down on the

25   body-worn camera.

                              95

DEREK THOMAS

```
 1    that if you believed there was the potential for a use
 2    of force, to turn on your body-worn video?
 3            MR. SAIN:  Same objections.  Incomplete
 4    hypothetical.  Asked and answered.
 5            Go ahead.
 6            MR. BAXTER:  Join.
 7            THE WITNESS:  I was trained to turn on my
 8    body-worn as soon as practical.
 9       Q    BY MR. HENDERSON:  And when you came to a
10    complete stop, and you no longer had your hand on --
11    strike that.  Let me start over.
12            Are you saying that during the ten minutes of
13    the pursuit that you had your radio mic in your hand,
14    out of its cradle, and you were driving with one hand on
15    the steering wheel and one hand on the mic the entire
16    ten minutes?
17       A    No.  The entire ten minutes I'm driving with
18    mic in hand, two hands on steering wheel with my mic in
19    hand to my face, to my mouth, mic back on the steering
20    wheel, with my hand the entire pursuit.
21       Q    Are you saying when it's on the steering wheel,
22    is it in a cradle?
23       A    No.
24       Q    Okay.
25       A    It's in my hand.
```

DEREK THOMAS

MAG 000202
BARKLEY
Court Reporters

```
 1            MR. SAIN:  Argumentative.
 2            THE WITNESS:  The way we are trained,
 3    especially when we believe somebody is a threat with a
 4    rifle, is the number one priority is to get out of the
 5    vehicle as fast as you possibly can.  After you get out
 6    of the vehicle, my next priority is to unholster my
 7    weapon, because I believed that Mr. Magdaleno is armed.
 8    He is reportedly armed.  After I unholster my weapon, I
 9    have one hand on my weapon, and the only other time my
10    other hand leaves my weapon is to make a radio
11    broadcast.
12       Q    BY MR. HENDERSON:  What radio broadcast did you
13    make?
14       A    I let my partners know where I was at, that
15    there was a traffic collision, and that I had one at
16    gunpoint.
17       Q    Okay.  And how many seconds went by from when
18    you exited your vehicle?  You say you got out, you put
19    your foot on the ground getting out of your vehicle.  So
20    from when you put your foot on the ground to when you
21    fired your first shot, how much time was that?
22       A    Approximately three or four seconds.
23       Q    And you didn't have time to turn on the
24    body-worn video in those three or four seconds?
25       A    In those three or four seconds, I had time to
```

100

DEREK THOMAS

1    Q    Okay.  Now, I thought I heard earlier in your
2    longer answer that you say that you gave Mr. Magdaleno
3    some commands.  Is that true?
4         MR. SAIN:  Vague as to time.
5    Q    BY MR. HENDERSON:  Between the time you exited
6    your vehicle and the time you fired the first shot, in
7    those three to four seconds, is it your sworn testimony
8    that you gave Mr. Magdaleno a verbal command?
9    A    Yes.
10   Q    What was the verbal command?
11   A    "Sheriff's Department.  Let me see your hands."
12   Q    Okay.  Any other verbal command that you gave
13   him?
14        MR. SAIN:  Vague as to time.
15   Q    BY MR. HENDERSON:  Okay, and between the time
16   you got out of the seat of your vehicle and the time you
17   fired the first shot.
18   A    I may have said "Sheriff's Department" one more
19   time.
20   Q    Okay.  And when you said, "Show me your hands,"
21   is that because you didn't yet see his hands?
22   A    Correct.
23   Q    And when you said, "show me your hands," is
24   this before you say that you saw him raise up a rifle?
25   A    Yes.

DEREK THOMAS

```
 1        Q    Okay.  In any of the audio, or anything else

 2   that you have listened to, do you ever hear your voice

 3   on any of that audio taken at the time of the shooting

 4   say -- you say, oh yeah, I hear my voice there saying

 5   "Show me your hands," do you ever hear that on the

 6   audio?

 7        A    My voice is not in the audio.

 8        Q    Is there any evidence that you have seen

 9   anywhere, you know, a statement by another witness,

10   statement by another deputy, audio, the video taken from

11   the dash cam of Officer Silva, anything, in which it

12   shows that you actually did give Mr. Magdaleno any type

13   of verbal command between the time that you got out of

14   your vehicle and you fired the first shot?

15        A    No.

16        Q    Okay.  Were you trained to give verbal

17   commands, if feasible, before the use of force?

18             MR. BAXTER:  Overbroad.  Incomplete

19   hypothetical.  Vague and ambiguous.  Speculation.

20   Foundation.

21             MR. HENDERSON:  Okay.  You know what, I'm going

22   to restate it.  It's not a hypothetical.

23        Q    BY MR. HENDERSON:  Did you receive some

24   training from the Riverside County Sheriff's Department?

25             MR. SAIN:  Asked and answered.
```

DEREK THOMAS

MAG 000205
BARKLEY
Court Reporters

```
 1    A    Yes.
 2    Q    "Deputy Thomas believed that suspect Magdaleno
 3         grabbed the rifle to exit the vehicle and shoot him,
 4         the CHP officers or whoever he needed to get away."
 5         Do you recall telling the interviewers that?
 6    A    Yes.
 7    Q    "Deputy Thomas had no time for verbal commands
 8         and fired at least five rounds from his duty
 9         weapon."
10         Is that what you told them, that you had no
11    time for verbal commands?
12         MR. SAIN:  Vague as to time.
13    Q    BY MR. HENDERSON:  At the time right before you
14    shot at Mr. Magdaleno?
15         MR. SAIN:  The document speaks for itself.
16         THE WITNESS:  I don't recall that part of the
17    interview.
18    Q    BY MR. HENDERSON:  Okay.  Did you fire five
19    rounds?
20    A    I believe that at the time it felt like that it
21    was five rounds, but I later found in a report that I
22    believe it was nine rounds.
23    Q    Okay.  The weapon that you had, what type of
24    weapon was it?
25    A    It was a Glock.
```

110

DEREK THOMAS

BARKLEY
Court Reporters

MAG 000206

1    description there of what you have said in this

2    deposition of him racking the action on the rifle or

3    putting his head down to look down the sights of the

4    rifle or aiming it at someone.  Did you tell the

5    interviewers any of that?

6        MR. SAIN:  Asked and answered.  Asked and

7    answered, cumulative.  The document speaks for itself.

8    This is the very last time I'm going to allow to him to

9    answer this very same question.

10       THE WITNESS:  I believe that I said that the

11   rifle jumped up and down, however, I did not tell them

12   that -- I'm sorry.  I didn't understand the question.

13       Q    BY MR. HENDERSON:  You didn't tell them the

14   part about that he racked the action on the rifle or

15   that he looked down the sights of the rifle, or that he

16   appeared to take it and aim it at someone?

17       A    Correct.  I made a correction for that.

18       Q    In this deposition?

19       A    Yes, I did.

20       Q    All right.  Now, I know, in looking at your

21   statement, and let me just ask you -- strike that.

22            This is on a different page.  It's on page 27,

23   it says you gave this answer, you said,

24            "If he's adjusting, I don't know if he was

25        adjusting his butt, if he was charging his weapon,

                              120

                          DEREK THOMAS

```
 1          Is that what you told the interviewers?

 2     A    Yes.

 3     Q    And then,

 4          "He picked up his gun.  The only reason you're

 5     picking up a gun after you have been chased by a

 6     police officer is to" -- "is to shoot at that police

 7     officer."

 8          Did you tell the interviewers that?

 9     A    Yes.

10     Q    "I shot at him until I did not see him holding

11     the weapon anymore and I can't see him anymore, and

12     then after that, that, that's" -- "that was pretty

13     much everything that happened."

14          Did you tell the interviewers that?

15     A    Yes.  I also corrected it.  I had seen more and

16     I recollected more in detail than just that.

17     Q    You corrected that where?

18     A    When I made my correction at the beginning of

19     our -- of our statement, of our interview.

20     Q    You are talking about in this deposition?

21     A    Yes.

22     Q    Okay.  But in the statement, you never said the

23     things that you said in this deposition, right?

24          MR. SAIN:  Asked and answered.  Document speaks

25     for itself.
```

DEREK THOMAS

MAG 000208
BARKLEY
Court Reporters

1                    DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA    )
                            )  ss.
4    COUNTY OF LOS ANGELES  )

5

6            I,  CHERYL L. MARQUIS, hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 6731 issued by the Court

10   Reporters Board of California, and which is in full

11   force and effect; (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties nor am I a relative or

19   financially interested in this action.  (Fed. R. Civ. P.

20   28).

21           I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition and the foregoing transcript is a true record

24   of the testimony given by the witness.  (Fed R. Civ. P.

25   30(f)(1)).


                              185

BARKLEY

1              Before completion of the deposition, review of

2     the transcript [XX] was [  ] was not requested.  If

3     requested, any changes made by the deponent

4     (and provided to the reporter) during the review period

5     allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

6

7     Dated: Janaury 26, 2023

8

9

10

11                        *Cheryl L. Margino*

12              _____

13

14

15

16

17

18

19

20

21

22

23

24

25

186

BARKLEY
Court Reporters
MAG 000210

# EXHIBIT O

EXHIBIT 1 1-30-23 

# INCIDENT REPORT

DATE PREPARED: 04/06/2021 RIVERSIDE COUNTY SHERIFF CA0330000 ☐ INITIAL ☒ SUPPLEMENTAL

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. FILE NUMBER: O210290015 | 2. DATE/TIME REPORTED | 3. DATE/TIME ASSIGNED | 4. DATE/TIME INV. START | 5. DATE/TIME INV. TERM | 6. ADULT ARR | 7. JUV ARR |
| 8. OFFENSES - CODE SECTION: No Change | CRIME | | COUNTS | | | 9. BOP CODE |
| 10. OFFENSES - CODE SECTION (Add or Change to) | CRIME | | COUNTS | | | 11. BOP CODE |
| 12. OFFENSES - CODE SECTION (Add or Change to) | CRIME | | COUNTS | | | 13. BOP CODE |
| 14. LOCATION OF OCCURRENCE: Jefferson St. X Avenue 48 La Quinta | 15. REP DIST. | 16. OCCURRED ON: 1-29-21 | DATE/TIME: 1239 | 17. OR BETWEEN | DATE/TIME | |
| 18. BUSINESS NAME | | 19. BUSINESS PHONE | | 20. CASE STATUS/CLEARANCE: OPN/ CMB-2 | | |

21. WAS THIS INCIDENT RELATED TO MARIJUANA? ☐ YES ☒ NO (If yes, briefly include in narrative or additional details how it was related)

22. BWC VIDEO (CAPTURED BY YOU OR ANY OTHER DEPARTMENT MEMBER) ☒ YES ☐ NO

## VICTIM – REPORTING PARTY – WITNESS – OTHERS: ☐ SEE ADDITIONAL PERSONS REPORT

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 23. INVL | 24. NAME (Last, First, Middle) | 25. SEX | 26. RACE | 27. DOB | 28. AGE | 29. HT | 30. WT | 31. HAIR | 32. EYES | 33. SKIN |
| 34. RESIDENCE ADDRESS | CITY | ZIP | | | 35. EMAIL ADDRESS | | | 36. RES. PHONE | | |
| 37. BUSINESS ADDRESS | CITY | ZIP | | | 38. EMAIL ADDRESS | | | 39. BUS. PHONE | | |
| 40. INVL | 41. NAME (Last, First, Middle) | 42. SEX | 43. RACE | 44. DOB | 45. AGE | 46. HT | 47. WT | 48. HAIR | 49. EYES | 50. SKIN |
| 51. RESIDENCE ADDRESS | CITY | ZIP | | | 52. EMAIL ADDRESS | | | 53. RES. PHONE | | |
| 54. BUSINESS ADDRESS | CITY | ZIP | | | 55. EMAIL ADDRESS | | | 56. BUS. PHONE | | |

## SUSPECT: ☐ ADULT ☐ JUVENILE ☐ PAROLE ☐ PROBATION ☐ SEE ADDITIONAL PERSONS REPORT ☐ ARRESTED

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 57. SUSP | 58. NAME (Last, First, Middle) | 59. SEX | 60. RACE | 61. DOB | 62. AGE | 63. HT | 64. WT | 65. HAIR | 66. EYES | 67. SKIN |
| 68. DRIVER'S LICENSE NUMBER / ID NUMBER | IN POSSESSION YES ☐ NO ☐ | 69. STATE | 70. SOCIAL SECURITY NUMBER | | 71. MNI NUMBER | | | 72. CII NUMBER | | |
| 73. RESIDENCE ADDRESS | CITY | ZIP | | | 74. EMAIL ADDRESS | | | 75. RES. PHONE | | |
| 76. BUSINESS ADDRESS | CITY | ZIP | | | 77. EMAIL ADDRESS | | | 78. BUS. PHONE | | |

79. ☐ JUVENILE DISPOSITION ☐ OTHER JURIS. ☐ JUV. CRT. PROB. ☐ WITHIN DEPT. ☐ DETAINED ☐ NOT DETAINED

80. GANG DATA

GANG NAME(S):

☐ Member ☐ Associate ☐ Self-Admit ☐ Prior Knowledge

TATTOOS / SCARS / MARKS

☐ Face ☐ Neck ☐ R. Arm ☐ L. Arm ☐ Hands ☐ Torso ☐ Back ☐ Legs

81. TATTOOS/SCARS/MARKS/CLOTHING DESCRIPTION

Transcripts for Officer Gelle (CHP) Interview from 2-2-21

365429934

## VEHICLE: ☐ REFER TO CHP 180 FORM FOR STOLEN, RECOVERED, TOWED OR IMPOUNDED

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 82. INVL | 83. LICENSE | 84. STATE | 85. YEAR | 86. MAKE | 87. MODEL | 88. BODY STYLE | 89. SR/R/O Code: AUTO VALUE $ |
| 90. COLOR/COLOR | 91. VIN# | | | | 92. OTHER IDENTIFIERS | | 93. DISPOSITION OF VEHICLE |
| 94. REGISTERED OWNER | 95. ADDRESS | | | | CITY / STATE / ZIP | | 96. PHONE |

☐ PROPERTY REPORT ATTACHED FOR STOLEN, RECOVERED OR DAMAGED PROPERTY | 97. DAMAGED PROPERTY VALUE $

| | | | | |
|---|---|---|---|---|
| REPORTING OFFICER: Moody | OFFICER I.D.: 3654 | REVIEWER ID/DATE: BER 2343 04-05-21 | APPROVED BY/DATE | ENTERED BY/DATE |
| COPIES TO: CHU | | APR SENT | APR CANCELLED | DOJ-NCIC ENTERED / DOJ-NCIC CANCELLED |

N5991 05/13/21

022 05.10.21 Riverside County Sheriff-Incident Report Form A 435 (Revised 08-10-2019)

CONFIDENTIAL

| FILE NUMBER | | |
|---|---|---|
| 0210290015 | **CONTINUATION PAGE** | Page Number:  2 |

1   **Attachment:**
2
3   #1 Corrected Transcripts
4
5   **Law Enforcement Other:**
6
7   Inv. Nava DA's Office
8
9   **Details:**
10
11   This is a supplemental report in reference to the officer/ deputy involved shooting that occurred in the city
12   of La Quinta on Friday January 29, 2021.
13
14   I digitally recorded this interview with Officer Getto on 2-2-21 at 1200 hours at the CHP Office in Indio.
15   A digital copy of this interview was sent off to be transcribed.  The transcript for this interview was sent to
16   me electronically.  I reviewed and compared the recording and transcripts for any inaccuracies and made
17   corrections as needed.  The original audio files will be put on the digital media DVD that will be booked
18   into evidence.
19
20   **Case Status:**
21
22   OPN/ CMB-2

CONFIDENTIAL

# Attachment #1
# Corrected Transcripts

# O210290015

CONFIDENTIAL

COR 000049

MAG 000213

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                    Page 1

1   INTERVIEWERS:              INVESTIGATOR DAN MOODY
2                              INVESTIGATOR KELLY NAVA
3   DATE/TIME:                 02/02/2021    1200 HOURS
4   INTERVIEW WITH:            OFFICER JOHN GETTE
5                              OFFICER GUILLERMO MENDEZ
6                              DDA ROB HIGHTOWER
7   FILE NUMBER:               O 21 029 0015
8
9
10      INVESTIGATOR MOODY: It is February 2nd, 2021, at 1200 hours -- or noon. Hmmmm,
11  we are here at the, ahhh, CHP office in Indio -- ahhh, reference the officer-slash-deputy-involved
12  shooting that occurred on January 29th, 2021 -- which would be last Friday -- under file Number
13  O-Ocean-21-029-0015. Hmmmm, this is the interview with Officer Gette. I am Investigator Dan
14  Moody with the Riverside County Sheriff's Department, and to my left is --
15
16      INVESTIGATOR NAVA:  Investigator Kelly Nava with the Riverside County District
17  Attorney.
18
19      DDA ROB HIGHTOWER: Deputy District Attorney Rob Hightower.
20
21      OFFICER GUILLERMO MENDEZ: Guillermo Mendez, CHP officer out of San Deigo,
22  and -- ID 14692, and I am Officer Gette's union representative.
23
24      OFFICER JOHN GETTE:    John Gette, ID 19163, with the California Highway Patrol.
25
26      INVESTIGATOR MOODY: And you're an officer?
27
28      OFFICER JOHN GETTE:    Yes.
29
30      INVESTIGATOR MOODY: Okay. So just so you know that my partner and I --
31  Investigator Nava -- we're criminal investigators. We're the ones that are handling the criminal
32  investigation of this officer-slash-deputy-involved shooting that occurred last Friday.
33
34      Hmmmm, I want you to be aware of that, because I want to ask you -- you coming into this
35  room -- is this a voluntary statement?
36
37      OFFICER JOHN GETTE:    Yes.
38
39      INVESTIGATOR MOODY: Okay. Has anybody ordered you or told you that you have to
40  come in here and talk to us? Or forced you to come in here and sit down at the table and talk to us?
41
42      OFFICER JOHN GETTE:    No.
43

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM C (0/81)

CONFIDENTIAL

COR 000050

MAG 000214

**RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST**                    **Page 2**

1    INVESTIGATOR MOODY: Okay. And you had a chance to talk to your rep about this
2    being a voluntary statement?
3
4    OFFICER JOHN GETTE:    Yes.
5
6    INVESTIGATOR MOODY: Okay. So, with that being said, I am also under the idea that
7    prior to this interview, you had the opportunity to review your MVARS?
8
9    OFFICER JOHN GETTE:    That's correct. Yeah.
10
11   INVESTIGATOR MOODY: Which is mobile video re -- audio --
12
13   OFFICER JOHN GETTE:    Audio recording.
14
15   INVESTIGATOR MOODY: -- recording system. Am I getting that acronym right?
16
17   OFFICER JOHN GETTE:    Yes.
18
19   INVESTIGATOR MOODY: Okay. Hmmmm, what else did you have a chance to review?
20   Was it the dispatch audio as well?
21
22   OFFICER JOHN GETTE:    I did.
23
24   INVESTIGATOR MOODY: Okay.
25
26   OFFICER JOHN GETTE:    And then --
27
28   INVESTIGATOR MOODY: So --
29
30   OFFICER JOHN GETTE:    -- the -- also, the initial call from RSO to our dispatch center.
31
32   INVESTIGATOR MOODY: Okay. And you reviewed all that prior to this --
33
34   OFFICER JOHN GETTE:    Yes.
35
36   INVESTIGATOR MOODY: -- interview? Okay. Hmmmm, one thing I want to ask of
37   you, is, ahhh, during this interview as you're telling us what you remember about it -- if there's
38   anything specific in the interview that you don't remember --
39
40   (clearing throat)
41
42   -- but watching the MVARS -- listening to the dispatch, ahhh, triggered your memory when
43   it came that -- can you at least let us know that?

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                    Page 3

1
2          For example, hey, ahhh, you know, I remember driving down the road, and the guy made a
3   right turn here.  I don't remember that, but in watching the MVARS, I now remember.  If you can
4   just distinguish between that -- that's -- that's all I ask.
5
6          OFFICER JOHN GETTE:     Yes.
7
8          INVESTIGATOR MOODY:  Okay.  So let me start out with on the day of Friday, the
9   29th -- which was last Friday -- you were, ahhh, were dressed in -- well, you're sitting before us in a
10  blue, like, a navy blue uniform.  Is that your uniform of the day?
11
12         OFFICER JOHN GETTE:     Yes, it is.
13
14         INVESTIGATOR MOODY:  Okay.  And that's what you were he wearing on Friday, the
15  29th?
16
17         OFFICER JOHN GETTE:     Yes.
18
19         INVESTIGATOR MOODY:  And you're driving a black-and-white CHP unit with a light
20  bar on it?
21
22         OFFICER JOHN GETTE:     Yes.
23
24         INVESTIGATOR MOODY:  Okay.  And it's my understanding at that you're a K-9 unit?
25
26         OFFICER JOHN GETTE:     Correct.  Yes.
27
28         INVESTIGATOR MOODY:  So that means you have a dog that goes out and works patrol
29  with you.
30
31         OFFICER JOHN GETTE:     Correct.  He's a patrol-slash-narcotic K-9.
32
33         INVESTIGATOR MOODY:  Okay.  And what is your K-9's name?
34
35         OFFICER JOHN GETTE:     His name's Bolt.
36
37         INVESTIGATOR MOODY:  Bolt?  Okay.  So on Friday, the 29th, ahhh, it was you and
38  Bolt working patrol in your unit?
39
40         OFFICER JOHN GETTE:     Yes.
41
42         INVESTIGATOR MOODY:  Nobody else was in your unit?
43

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                    Page 10

1        OFFICER JOHN GETTE:    So as I was sit -- ahhh, I kneeled down behind Officer Perez's,
2    hmmmm, patrol car, and I could -- I had a very clear vantage point of the truck, and at that point, I
3    began thinking -- like, I was waiting, like, to get shot.
4
5        I don't -- I don't know, I -- I thought that this was it.
6
7        (short pause)
8
9        And -- so -- I aimed at the truck.  I looked through my aperture, and I pulled the trigger, and
10   nothing happened, and then I remember rounds started going off.
11
12       And then I looked at the gun, and I hadn't taken it off safety.  So I took it off safety, and
13   began shooting right where I saw the gun, because I knew that where the gun was -- that's where the
14   suspect would be.
15
16       (typing on computer)
17
18       (short pause)
19
20       Now, I thought it was all one fluid --
21
22       (clearing throat)
23
24       Sorry -- just one shoot.  When I watched the MVARS -- at some point, I came back into,
25   hmmmm, cover, I came back out and started shooting again.  I don't remember doing that.
26
27       Also -- listening to the dispatch tapes -- I don't remember putting out that he had a gun.
28
29       At some point, I yelled over dispatch that he has a gun.  He has a gun, and I heard that when
30   I listened to my dispatch tapes.
31
32       (sniffing)
33
34       (short pause)
35
36       I -- I also put out at some point, "Shots fired.  Shots fired."
37
38       I remembered doing it at the end, but there was two instances where I said it, and I only
39   remember once.
40
41       Then the shooting stopped, and I remember thinking -- there was a motor home right next
42   us, and we needed to get those people out of there, because I didn't know if there was still a threat in
43   the truck or not that could potentially take us out.

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM C (9/81)

CONFIDENTIAL
                                                                        COR 000059


                                                                        MAG 000217

**RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST**                     **Page 20**

1
2      INVESTIGATOR MOODY:  Okay.  And that's where you're locked on the vehicle.  What
3  do you see going on inside the vehicle?  Or do you -- what do you see the vehicle doing at that
4  point?
5
6      OFFICER JOHN GETTE:     So I see the barrel of a rifle, kind of, bouncing around as I'm
7  approaching.  So I could see the barrel through the passenger side window, and I remember I could
8  see probably -- I don't know -- that much of it through the window.
9
10     INVESTIGATOR MOODY:  When you say, "That much," you're holding up your hands,
11  and I'm -- I'm looking --
12
13     OFFICER JOHN GETTE:     So that's probably --
14
15     INVESTIGATOR MOODY:  -- at, maybe, 18 inches?
16
17     OFFICER JOHN GETTE:     Yeah.
18
19     INVESTIGATOR MOODY:  Okay.
20
21     OFFICER JOHN GETTE:     12 -- probably 12 to 18 inches.
22
23     INVESTIGATOR MOODY:  Seeing that much of it, hmmmm, I don't want to say -- I don't
24  want to put words in your mouth, but, you know, gun expert -- or you know about guns, hmmmm,
25  could you tell what kind of a rifle that was?  I mean, it wasn't a handgun.
26
27     OFFICER JOHN GETTE:     Right.  I couldn't tell exactly if it was, like, a hunting rifle or
28  an AR-style rifle.  I -- I couldn't tell.  I just knew it was a rifle.
29
30     INVESTIGATOR MOODY:  You knew it was a rifle.  You could -- what you could see of
31  the 18 inches, it -- he -- he's -- he's trying to get away.  I've been told he has a rifle.  Now, it's
32  confirmed.  I see the rifle.
33
34     OFFICER JOHN GETTE:     Yes.
35
36     INVESTIGATOR MOODY:  Okay.  And then what -- what other movement do you see?
37
38     OFFICER JOHN GETTE:     Hmmmm, from there, I just remember then aiming in my
39  sights and, ahhh, putting rounds towards that rifle.
40
41     (sighing)
42

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                    Page 21

1    INVESTIGATOR MOODY: Can you tell me, hmmmm, do you remember where the barrel
2    of that rifle inside the car -- so you could see it through the front, passenger window. Can you tell
3    me, kind of, what direction -- if you remember? Or was it just waving around towards a certain
4    general direction?
5
6    OFFICER JOHN GETTE:   So I just remember it, kind of, moving around in that window
7    area, and -- so my thought was -- is that he was just going to drop it down and start firing.
8
9    INVESTIGATOR MOODY: And is that towards where you were?
10
11   OFFICER JOHN GETTE:   Yes.
12
13   INVESTIGATOR MOODY: Behind or towards the front?
14
15   OFFICER JOHN GETTE:   Towards where I was.
16
17   INVESTIGATOR MOODY: So the rifle was in a direction towards where the R -- where --
18   because you're, kind of, next to that RV. The RV is in that general area.
19
20   OFFICER JOHN GETTE:   Yes.
21
22   INVESTIGATOR MOODY: The RV, your unit, Perez -- you're all, kind of, right there.
23
24   OFFICER JOHN GETTE:   Yes.
25
26   INVESTIGATOR MOODY: Okay. Could you see --
27
28   UNKNOWN FEMALE: Uh-huh. Go ahead.
29
30   (inaudible background conversation)
31
32   INVESTIGATOR MOODY: Could you see the, ahhh -- the subject inside the vehicle?
33
34   OFFICER JOHN GETTE:   No, I could not.
35
36   INVESTIGATOR MOODY: At any time, ahhh, during the pursuit or when you first got in
37   the pursuit, could you see the subject inside the vehicle?
38
39   OFFICER JOHN GETTE:   No. Even when they passed, I didn't see him.
40
41   INVESTIGATOR MOODY: Okay. So you don't know how many people were in the
42   vehicle?
43

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM C (9/81)

CONFIDENTIAL

COR 000070

MAG 000219

RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST                    Page 22

1    OFFICER JOHN GETTE:     No, I don't.
2
3    INVESTIGATOR MOODY: Okay. So -- so now you see this, ahhh -- this rifle, ahhh,
4    waving around -- pointing in the direction that you're pointing -- and you're set up to the rear,
5    passenger side of Perez's CHP patrol unit?
6
7    OFFICER JOHN GETTE:     Yes.
8
9    INVESTIGATOR MOODY: Correct?  And you see -- and -- so what's going through your
10   mind either right prior to you shooting or at the point where you're shooting?
11
12   OFFICER JOHN GETTE:     So I'm thinking that we are about to start taking rounds, and
13   before that happens -- and I -- or my partners, or somebody else gets injured or killed, I -- I wanted
14   to --
15
16   (sighing)
17
18   Essentially, I just wanted to stop it --
19
20   INVESTIGATOR MOODY:  Okay.
21
22   OFFICER JOHN GETTE:     -- from happening.
23
24   INVESTIGATOR MOODY: In your experience in law enforcement, have you seen what a
25   rifle can do?
26
27   OFFICER JOHN GETTE:     Yes.  So I was, hmmmm, very quickly on scene of the PSPD
28   officers being killed in the line of duty, and I was right up on the house.  I was standing in one of
29   the pools of their blood, and I saw firsthand that that rifle killed both of them that day.
30
31   INVESTIGATOR MOODY: Okay.  So, hmmmm -- and I believe you said you -- seeing
32   that rifle, you started to pull the trigger -- because you were afraid he was going to start shooting
33   at -- or whoever was in that vehicle holding that thing was going to shoot it, but it wasn't going off,
34   and then you realized that the safety was on, and then you took the safety off, and you fired.
35
36   Do you remember firing -- if I was to ask you -- do you remember how many rounds you
37   fired?
38
39   OFFICER JOHN GETTE:     So I thought I had fired between three and four.
40
41   INVESTIGATOR MOODY: All right.
42
43   OFFICER JOHN GETTE:     Later on, I realized that it was actually 11.

**RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST**                    **Page 23**

1
2          INVESTIGATOR MOODY:  Okay.
3
4          OFFICER JOHN GETTE:     And -- and that was after the, ahhh -- the charting.
5
6          INVESTIGATOR MOODY:  Okay.
7
8          OFFICER JOHN GETTE:     Ahhh, -- even at the scene, somebody -- I remember
9    somebody asking me.
10
11         And I'm, like -- I told them, "I don't know.  Three or four."
12
13         And I remember Perez saying, "Yeah, I think he only shot three or four times."
14
15         INVESTIGATOR MOODY:  Okay.  After you fired from your rifle, do you remember
16   seeing any movement in the car?  Do you remember seeing the rifle in the car -- that you saw
17   moving around?
18
19         OFFICER JOHN GETTE:     No.
20
21         And that's one of the reasons I asked Officer Perez, "Can you see him?  Can you see him at
22   all?  Do you have any vantage point?"
23
24         And we had none.  We couldn't see anything after that.
25
26         INVESTIGATOR MOODY:  Okay.  Do you -- while you're standing there shooting -- prior
27   to shooting -- after -- do you remember hearing any other gunshots?
28
29         OFFICER JOHN GETTE:     Ahhh, I -- from -- I believe the -- the deputy shot.
30
31         INVESTIGATOR MOODY:  Okay.
32
33         OFFICER JOHN GETTE:     Hmmmm, or I heard gunshots.  I don't know if it was him or
34   not, but I remember hearing gunshots.
35
36         INVESTIGATOR MOODY:  Do you remember if it was, ahhh -- and this might be hard,
37   because I -- I know, kind of, where your position is by the RV, so there might have been, like, an
38   echo, but do -- do you know if it's coming from your right side or your left side?
39
40         OFFICER JOHN GETTE:     I don't.
41
42         INVESTIGATOR MOODY:  Okay.  And do you know were those all simultaneous?  Or do
43   you remember hearing those first?  Or second?  Or is it just -- it was everything just went so quick?

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM C (9/81)

CONFIDENTIAL                                              COR 000072

MAG 000221

`( ', .`

## RIVERSIDE SHERIFF DEPARTMENT/CHU-EAST        Page 28

1       INVESTIGATOR MOODY: Okay. That will conclude, uhhh, our interview with Officer
2   Gette at 1302 hours.
3
4       (recording ends)
5
6   REPORTING OFFICER: INVESTIGATOR DAN MOODY
7
8   D: 02/02/2021   T: 03/27/2021    Job: 984.DSS.68   DM:da

RIVERSIDE COUNTY- LAW ENFORCEMENT AGENCIES
FORM C (9/81)

CONFIDENTIAL

# EXHIBIT P

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~       CASE NO.:
ALMA L. FIGUEROA DE MAGDALENO,            5:21-CV-02027-JGB
Individually, and as Successor in         -SHK
Interest to JAVIER MAGDALENO
GUTIERREZ; et al.,

                    Plaintiffs,

     vs.

COUNT OF RIVERSIDE, a legal
subdivision of the State of
California; et al.,

                    Defendant(s).
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF
JOHN GETTE

JANUARY 30, 2023
10:06 A.M. TO 3:06 P.M.

3500 W. BEVERLY BOULEVARD
MONTEBELLO, CALIFORNIA 90640

Deidre Young, RPR, CSR No. 11461
MAGNA LEGAL SERVICES
866.624.6221
www.MagnaLS.com



MAG 000223

Page 2

1                      APPEARANCES OF COUNSEL
2
3    FOR THE DEFENDANTS STATE OF CALIFORNIA; CHP and JOHN
     GETTE:
4
         Department of Justice
5        By:  Douglas E. Baxter, Esq.
         600 W. Broadway, Suite 1800
6        San Diego, California 92101
         619.738.9567
7        Douglas.Baxter@doj.ca.gov
8
     FOR DEFENDANTS COUNTY OF RIVERSIDE AND DEREK THOMAS:
9
10       Lewis Brisbois Bisgaard & Smith, LLP
         By: Tony M. Sain, Esq.
11       633 West 5th Street, Suite 4000
         Los Angeles, California 90071
12       213.250.1800
         tony.sain@lewisbrisbois.com
13
14
     FOR THE PLAINTIFFS:
15
         Guizar, Henderson & Carrazco, LLP
16       By:  Kent M. Henderson, Esq.
         3500 W. Beverly Boulevard
17       Montebello, California 90640
         323.725.1151
18       Hendolaw@gmail.com
19
20
21
22
23
24
25



Page 3

```
1                    INDEX OF EXAMINATION
2
3     WITNESS:
      JOHN GETTE
4
5
6     EXAMINATION BY:                      PAGE
      BY MR. HENDERSON                       5
7     BY MR. SAIN                          153
      BY MR. HENDERSON                     184
8     BY MR. SAIN                          198
      BY MR. BAXTER                        199
9     BY MR. HENDERSON                     205
10
11
12
                  INFORMATION REQUESTED
13
                          NONE
14
15
16
               INSTRUCTION NOT TO ANSWER
17
                          NONE
18
19
20
21
22
23
24
25
```



MAG 000225

Page 4

1                           INDEX OF EXHIBITS

2

3     NO.              DESCRIPTION                    PAGE

4     EXHIBIT 1    Statement of Officer Gette              65

5     EXHIBIT 2    Aerial photographs, Bates              73
                   numbers COR000507, COR000528,
6                  COR000673, and COR000708

7     EXHIBIT 3    Photographs, numbers 850, 852,         78
                   1073, and 1074

8
      EXHIBIT 4    Photographs, COR 962, 1101, 1098       78
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



MAG 000226

Page 5

```
 1                DEPOSITION OF JOHN GETTE

 2                MONDAY, JANUARY 30, 2023

 3

 4

 5

 6                     JOHN GETTE,

 7      having been duly administered an oath by the Court

 8        Reporter, was examined and testified as follows:

 9

10                       EXAMINATION

11   BY MR. HENDERSON:

12        Q    Could you please state and spell your name for

13   the record.

14        A    John Gette.  J-o-h-n, G-e-t-t-e.

15        Q    Officer Gette, have you ever had your

16   deposition taken before?

17        A    Yes.

18        Q    About how many times?

19        A    It's been several, all because of traffic

20   collisions.  I can't remember exactly how many.

21        Q    All right.  Have you ever been a party to a

22   lawsuit before?

23        A    Yes.

24        Q    Okay.  When was that?

25        A    It would have been around 2018, I believe.
```



MAGNA
LEGAL SERVICES

MAG 000227

Page 12

1      A     Yes.

2      Q     Okay.  So on the date of the incident, you were

3   working for the California Highway Patrol?

4      A     Yes.

5      Q     What was your position?

6      A     I'm a patrol officer that's assigned with a K9

7   unit.

8      Q     Okay.  And I'll ask you some more about it

9   later, but how long had you been doing that?

10      A     With the K9 unit?

11      Q     How long had you been a patrol officer with the

12   CHP at the time of the January 29, 2021, shooting?

13      A     I believe it's 12 years.

14      Q     Okay.  And about how long up until now?

15      A     Up until then with the highway patrol?

16      Q     Yeah.  Let's say it was 12 years up until 2021.

17   And now, how long has it been --

18      A     14 years.

19      Q     14.  Okay.  Fair enough.  All right.

20            Are you -- at the time, what was your rank,

21   January 29, 2021?

22      A     Officer.

23      Q     Okay.  And what's your rank now?

24      A     Officer.

25      Q     All right.  I'll tell you what, I'm going to



MAG 000228

Page 14

```
1        A    Yes.

2        Q    Where were you when those shots were fired?

3        A    My best recollection is I was to the rear of

4   Officer Perez's patrol vehicle at that time.

5        Q    Did you already have a weapon with you at that

6   point?

7        A    Yes.

8        Q    When we hear those shots fired from 3:47 until

9   about 3:54, that first volley of shots, you had a rifle

10  with you?

11       A    Yes.

12       Q    What type of rifle was it?

13       A    It is an AR-15-style rifle.

14       Q    Okay.

15       A    It shoots a .223 round.

16       Q    All right.  And that AR-15-style rifle, how did

17  you have it positioned?  Let's say at 3:47 when we first

18  hear that first shot being fired, did you already have

19  the rifle up and aimed in the direction of the red

20  pickup truck?

21            MR. BAXTER:  Let me just -- just put an

22  objection on the record.

23            As to the correlation of the counter time

24  versus real time, I'm just going to object that it calls

25  for speculation and expert analysis of video.
```



MAG 000229

Page 19

```
 1              MR. SAIN:  Hold on.  Vague as to time.

 2     Overbroad.

 3     BY MR. HENDERSON:

 4         Q      The time is, at any time before that you hear

 5     that first shot, just as I said in my question.  But I

 6     can say that again, if necessary, so you hear -- what

 7     are the words that you heard just before that first shot

 8     was fired?

 9         A      "He has a rifle.  He has a rifle.  He has a

10     rifle."

11         Q      Did you recognize who it was said that?

12         A      Officer Perez.

13         Q      How close were you to Officer Perez?

14         A      I would estimate 3 to 5 feet.

15         Q      Okay.  All right.  And are you saying that you

16     were able to see through the passenger side window?

17         A      Yes, sir.

18         Q      You're aware that the passenger side window --

19     I'm sure you've seen this -- that they talk about how it

20     had some tint on it, that it was a tinted window.

21         Have you seen that?

22         A      Yes, sir.

23         Q      Okay.  And are you saying that you were able to

24     see through that tinted window, the passenger side

25     driver -- the passenger side door window?
```



Page 20

1       A     Yes, sir.

2       Q     Okay.  Now, are you saying that when you see

3    this barrel -- right before you hear that first shot

4    that was at 3:47 on Officer Silva's video, are you

5    saying that when you see that barrel that the barrel is

6    pointed in your direction?

7       A     When I first initially see the barrel, it's

8    bouncing around within the vehicle.

9       Q     Okay.  And when you say "it's bouncing around,"

10   bouncing up and down, bouncing side to side, bouncing

11   both, how?

12      A     It's moving around.  I remember seeing the

13   barrel moving up and down, just moving around within the

14   vehicle.

15      Q     How far would you estimate, in feet or yards,

16   you can use either, were you when we -- from the side of

17   the pickup truck -- from the passenger side of the

18   pickup truck when we hear that first shot?

19           MR. BAXTER:  Speculation and expert analysis.

20           But go ahead.

21           THE WITNESS:  So during my -- when I was

22   looking things up to prepare for this case, I saw that

23   it's 80 feet.

24   BY MR. HENDERSON:

25      Q     Okay.



```
                                                           Page 40
 1    pickup truck?

 2         A    So initially, I thought that it was; however,

 3    when I went back and looked at my dash cam, that's where

 4    I could see that my initial volley happens, I go back to

 5    cover, then I come back out and conduct another volley.

 6    And I do not remember doing that.

 7         Q    Let's go through that.

 8              You're saying -- we already talked about where

 9.   you fired -- what we hear is it's a second volley of

10    shots but it's your first volley of shots.  We already

11    talked about that.  You were near the -- well, strike

12    that.

13              Where were you at that point?

14         A    The rear of Officer Perez's patrol vehicle.

15              MR. BAXTER:  And then as premised on it being

16    the second, expert analysis.  Speculation.

17              MR. HENDERSON:  Okay.

18    BY MR. HENDERSON:

19         Q    And then the third and final volley of shots,

20    where were you positioned when you fired those?

21              MR. BAXTER:  Same objection.

22              Go ahead.

23              THE WITNESS:  To the rear of Officer Perez's

24    patrol vehicle.

25    ///
```



Page 88

1      A     Carlsbad.

2      Q     Carlsbad.  Okay.  And you did that for how

3  long?

4      A     Six years.  I believe it was six years.

5      Q     Okay.  Private vehicles or something else?

6      A     No.  It was bottle-filling equipment.  I worked

7  on all the machines that would put liquid in this

8  bottle, put a cap on it, put a label on it.

9      Q     Gotcha.

10     A     It was a food manufacturing facility.

11     Q     And then what was your reason for leaving

12  there?

13     A     To join the highway patrol.

14     Q     And you applied to the highway patrol when?

15     A     I believe it was 2006.

16     Q     Okay.  In terms of education, do you have any

17  further education up to that point?

18     A     No.

19     Q     How about up until now?

20     A     No.  Just what I've gotten on the job.

21     Q     Understood.  Okay.  And so highway patrol, when

22  you applied to them were you hired?

23     A     Yes.

24     Q     Okay.  And had you attended an academy?

25     A     Yes.



Page 89

```
 1        Q     Did the CHP pay for that?

 2        A     Yes.

 3        Q     Which academy did you go to?

 4        A     The one in Sacramento that everyone in the

 5   highway patrol goes through.

 6        Q     Okay.  How long did that last?

 7        A     27 weeks.

 8        Q     Okay.  And you passed that through the first

 9   time?

10        A     Yes.

11        Q     Do you know what your class rank was one way or

12   another?

13        A     I do not.

14        Q     Okay.  And you -- when you went to that

15   California Highway Patrol Academy, was that a POST

16   certified academy?

17        A     Yes.

18        Q     You understand POST being "police officer

19   standards and training"?

20        A     Yes.

21        Q     And the things that you learned at the academy,

22   did you learn some of the POST learning domains?

23        A     Yes.

24        Q     Did you learn the -- were you taught the POST

25   learning domains regarding use of force?
```



Page 90

1        A     Yes.

2        Q     And the POST learning domains regarding use of

3    deadly force?

4        A     Yes.

5        Q     Did you have some training in using weapons,

6    including deadly weapons?

7        A     Yes.

8        Q     Okay.  Did you have some training using

9    nonlethal force?

10       A     Yes.

11       Q     Were you taught some concepts back then

12   regarding de-escalation?

13       A     I don't remember being taught that back then.

14   That came later, a couple years ago.

15       Q     Understood.  Okay.  And then after you

16   completed your training at the academy, what did you do

17   next?

18       A     I went to the -- I was assigned to the Indio

19   area, and I went through an FTEP program with an FTO.

20       Q     Okay.  A field training officer?

21       A     Yes.

22       Q     Did you have more than one field training

23   officer?

24       A     Yes, I did.

25       Q     How many did you have?



Page 94

```
1        A     The first one would have been where I had to --
2    I got into a slight scuffle with a driver that was under
3    the influence and his wife tried to attack me.  And I
4    had to take both of them down and get them cuffed.
5        Q     What year was that?
6        A     That would have been either 2009 or 2010.
7        Q     And were you in the CHP vehicle on your own?
8        A     Yes.
9        Q     And where was this?
10       A     This would have been in the unincorporated area
11   of Thermal.
12       Q     All right.  So you were out there on the
13   highway, just you and these two people?
14       A     Yeah.  There was another unit quite a ways away
15   that ended up showing up.
16       Q     But by the time the backup showed up, you had
17   already cuffed the two of them?
18       A     Yes.
19       Q     Okay.  All right.  And did you use some force
20   in that incident?
21       A     Yes.
22       Q     What kind of force did you use?
23       A     It would have been nondeadly force, minimal,
24   like a tackle to the ground.
25       Q     Right.
```



Page 96

1    He was just taken to the ground, got him to calm down

2    just by using verbal judo, gave him the calm down, and

3    took him to the jail and booked him.

4         Q    Okay.  What's the next one after that?

5         A    I'm trying to go in order here.  There was one

6    where I asked the guy to get out of the car; he was kind

7    of refusing to get out.  He had a warrant out of Kansas,

8    I believe, or somewhere back east.

9              So when I came around the front of the car --

10   there was another, like, a Palm Springs PD officer

11   backing me up -- and the guy kind of swung his legs out

12   weird.  It was very awkward.  And when I got to the car

13   and asked him to get out, he stood up and a gun fell out

14   of his shorts and began bouncing in front of us.  So I

15   grabbed him immediately and pinned him up against the

16   car so that he could not get to the gun and then took

17   him into custody.

18        Q    Okay.  How about after that?  What's the next

19   one after that?

20        A    There was another one where I made a traffic

21   stop on a car, and I ended up finding, like, 26,000

22   fentanyl pills.

23             And I looked at my partner and told him to

24   basically put handcuffs on the guy and the guy took off

25   running.  So I chased him down the block, around a



MAG 000237

Page 97

1    Starbucks.  And as he went to go over some trees, he
2    kind of tripped and I tackled him to the ground and then
3    put handcuffs on him.
4        Q    What's the next one after that?
5        A    Those are the ones that stick out in my mind.
6        Q    Let me ask you this:  Is -- even if you weren't
7    the one who used deadly force, okay -- because I was
8    looking at your statement and I know there was -- it
9    looked to me like there was an incident that you were at
10   the scene of it -- I don't know if this is just after it
11   happened or during it happening -- but it was an
12   incident that sounded like it involved the Palm Springs
13   Police Department?
14       A    Yes.
15       Q    Okay.  And there was -- there was deadly force
16   used I think in that incident?
17       A    So the suspect was never killed, but he killed
18   two officers that day.
19       Q    Right.  And tell me about that.  Were you there
20   when the suspect was shooting at the two officers?
21       A    No.  I got there -- I don't know how long
22   after.  There was an ambulance there, they were starting
23   to load them up.  But I was there very quickly and to
24   the point where there was a lot of blood on the ground
25   where I was standing and a lot of shell casings.  And we



Page 101

1   BY MR. HENDERSON:

2        Q    You actually did have him with you?

3        A    Yes, I did.

4        Q    Okay.  All right.  And the Remington shotgun

5   that you had, was that also one that could fire a bean

6   bag?

7        A    No, it was not.

8        Q    Okay.  All right.  It was 12-gauge?

9        A    Yes.

10       Q    All right.  Okay.  And then before you fired

11  the first shots you fired that day, did you give any

12  type of a verbal warning to the occupant of the vehicle

13  that you were going to fire?

14       A    No, I did not.

15       Q    Okay.  Why not?

16       A    I did not have time.  Knowing that he's armed

17  with a rifle and how fast things were beginning to

18  happen, there was no way I had a chance to give him some

19  kind of an audible warning.

20       Q    Were you trained that, when feasible -- were

21  you trained before that day that, when feasible, that

22  you should give an audible warning before the use of

23  deadly force?

24            MR. BAXTER:  Overbroad.  Incomplete

25  hypothetical.  Foundation.  Speculation.  Vague and



Page 102

1  ambiguous.  Calls for expert testimony.

2         THE WITNESS:  It always depends on the totality

3  of the circumstances, whether we can or not.

4  BY MR. HENDERSON:

5     Q    How long would you say it was from the time

6  that you first put your foot on the ground as you're

7  getting out of your vehicle that day on January 29,

8  2021, until you fired the first shot?  How much time

9  went by?

10        MR. BAXTER:  Speculation.  Expert analysis.

11        Go ahead.

12        THE WITNESS:  My best estimate is three to

13  five seconds.

14  BY MR. HENDERSON:

15    Q    Okay.  Had you already made up your mind during

16  the pursuit that when we get to the conclusion of this

17  pursuit, "I'm going to get out of the vehicle with my

18  rifle and I'm going to shoot the guy who's driving that

19  truck"?

20    A    No, sir.

21    Q    Okay.  Why did you select the AR-15-style rifle

22  rather than some other type of weapon to use in the

23  incident that day?

24    A    Due to the fact that he's armed with a rifle, I

25  was going to be armed with a rifle.



Page 108

1    various learning domains?

2        A    Yes.

3        Q    And some of those learning domains, we already

4    talked about one was the one regarding use of deadly

5    force, correct?

6        A    Yes.

7        Q    And some of those learning domains they have,

8    do you recall that they have examples?

9        A    Yes, I believe so.

10       Q    Okay.  And then there's another learning

11   domain.  I think that has to do with -- in the old days

12   they called it a felony stop -- a felony vehicle stop,

13   but I think more modernly they call it a high-risk

14   vehicle stop.

15            Do you know what I'm talking about?

16       A    Yes.

17       Q    And did you study that learning domain as well

18   for POST?

19       A    Yes.

20       Q    And did that have some examples, do you

21   remember that?

22       A    It's been a long time since I've been in the

23   academy.  So I would think so because that's part of it,

24   but I can't say for sure if that was in there.  I'm sure

25   it was though.



Page 110

```
 1    either direction, necessary force or unnecessary force.
 2              Does that sound familiar to you?
 3              MR. BAXTER:  Calls for a legal analysis and
 4    conclusion.
 5              MR. SAIN:  Objection.  Calls for a legal
 6    conclusion.  Misstates the law.  Argumentative.  Lacks
 7    foundation.
 8              MR. BAXTER:  Join.
 9              THE WITNESS:  I can't remember exactly what it
10    says verbatim.
11    BY MR. HENDERSON:
12         Q    Well, let me just ask you this:  Did you
13    receive some additional training at some point between
14    2019 and the time of this incident from the California
15    Highway Patrol regarding a change in the law in
16    California about when deadly force could be used?
17         A    I did.  I can't remember exactly when they
18    pushed it out, because it went into effect January 1 of
19    2021.  So I can't remember if they had us do it before
20    or during that quarter of training.  I can't remember
21    the exact date.  But yeah, I did receive some training.
22    I just can't give you an exact date.
23         Q    And did you receive some training on there
24    having been a change in California law regarding what
25    the standard was for use of deadly force between 2019
```



Page 111

1     and before this January 29, 2021, incident?

2            MR. SAIN:  Objection.  Calls for a legal

3     conclusion that there was a substantive change.

4     Argumentative.  Calls for speculation.  Lacks

5     foundation.

6            MR. BAXTER:  Join.  And expert opinion.  And

7     analysis.

8            Go ahead.

9            THE WITNESS:  They did push out some training

10    involving this, so I would have.

11    BY MR. HENDERSON:

12     Q     And you got that before this incident?

13     A     I don't remember.

14     Q     Okay.  All right.  I mean, at the time of this

15    incident for use of deadly force, what was the standard

16    that you were using in order for you to use deadly

17    force?

18            MR. BAXTER:  Calls for a legal analysis and

19    expert conclusions.

20            Go ahead.

21            THE WITNESS:  Graham versus Connor.

22            (Reporter clarification.)

23            THE WITNESS:  Graham versus Connor.

24    BY MR. HENDERSON:

25     Q     So you're using a standard of that if the



MAG 000243

Page 116

1    gets out of the truck, unarmed, foot bails into an area,

2    maybe he's trying to get into a house.  There's all

3    these various things that could be going on where I

4    could potentially use my K9 to help apprehend the

5    suspect.

6         Q    Okay.  When you heard the call -- strike that.

7    Let me just start over.

8              It sounds like you've reviewed some of the

9    radio traffic that was involved in the incident; is that

10   true?

11        A    Yes.

12        Q    Okay.  I think you said you even looked at --

13   you either listened to it or looked at some of the

14   transcripts in preparation for your deposition, right?

15        A    Yes.

16        Q    Okay.  So when you first hear the call, what is

17   it put out as?

18        A    A man armed with a rifle.  A female had ran

19   into the Rite Aid frantically stating that her -- I

20   can't remember if it's her husband or ex-husband -- was

21   armed with a rifle sitting in the truck outside.

22        Q    Okay.  And when you first heard that call, was

23   it -- what channel were you monitoring?

24        A    The CHP channel.

25        Q    Okay.  And when you heard the call, at any time



MAG 000244

Page 117

1    before -- between then and the time you fired the shots,

2    did you switch channels or were you listening to the

3    same channel the whole time?

4         A    No.  Same channel the whole time.

5         Q    Okay.  And then in the CHP area that was --

6    that you were patrolling, how many other kinds of CHP

7    units are there to respond?

8              MR. BAXTER:  Speculation.

9    BY MR. HENDERSON:

10        Q    On your shift.

11             Let's say at any time during your shift, you

12   know, do you have six CHP units out there in that

13   geographical area you described, or ten?  How many are

14   there during your shift?

15        A    It's always different because people call in

16   sick, people go on vacation.  So I don't know how many

17   were actually working that day.

18        Q    Okay.  Can you give me an estimate of what it

19   ranges between?

20        A    Four to six.  It used to be more, but we're

21   short-staffed.

22        Q    All right.  And then when you got the call, how

23   far away were you from the location that was described

24   in the call?

25        A    Approximately three to four miles.



MAG 000245

Page 118

1    Q    And did you respond as fast as you could to

2    that location?

3    A    No.

4    Q    Why not?

5    A    Because I was waiting for updates.  I didn't

6    know who was going en route to that location.  I didn't

7    start responding until they were in pursuit.

8    Q    Okay.  And when they're in pursuit, did you

9    join the pursuit at some point?

10   A    Yes.

11   Q    Right before you joined the pursuit, were you

12   under lights and sirens?

13   A    Yes.

14   Q    And then when you joined the pursuit, let's say

15   that there is the subject vehicle, the red pickup truck,

16   and if I understand it, there's a Riverside County

17   Sheriff's deputy, Derek Thomas, who is the vehicle

18   directly behind the red pickup truck; is that right?

19   A    Yes.

20   Q    Where were you?  How many vehicles back were

21   you?

22   A    It would have been Officer Perez, and then

23   Officer Silva, and then I would have joined in.  And

24   Officer Silva waved me on and pulled over to the side to

25   then become the number two CHP unit.



Page 121

```
 1    that.
 2    BY MR. HENDERSON:
 3        Q    Okay.  All right.  And then did the red pickup
 4    truck hit any pedestrians that you know of?
 5        A    No, not that I know of.
 6        Q    Okay.  The person who was driving the red
 7    pickup truck, did you know his name before you fired the
 8    shots you fired that day?
 9        A    No.
10        Q    Did you know -- did you know whether the person
11    who was driving the red pickup truck, whether he had any
12    type of criminal record before you fired the shots that
13    day?
14        A    No, I didn't know.
15        Q    Okay.  Do you know whether the man in the red
16    pickup truck had any type of illegal drugs circulating
17    in his system at the time that you fired the shots?
18        A    No, I did not know.
19        Q    Did you ever get close enough to the man in the
20    red pickup truck to see what his eyes looked like?
21        A    No.
22        Q    Okay.  Did you ever get close enough to the man
23    in the red pickup truck to do any kind of a field
24    sobriety test?
25        A    No.
```



MAG 000247

Page 174

1    How far from Perez's car was the red truck?

2    A    So I know based off of my preparation for this,

3    that it was 80 feet, or approximately 80 feet.

4    Q    8, 0 feet?

5    A    Yes, sir.

6    Q    And then your car was behind Perez's car?

7    A    Yes.

8    Q    And then you were behind -- you were also

9    behind Perez's car?  You weren't behind your car when

10   you were shooting, right?

11   A    Correct.  I was behind Officer Perez's car.

12   Q    And the dash camera in Perez's car, where is

13   that located in the car at the time?

14   A    It would be mounted -- I believe those are

15   mounted off of the roof and they point through the

16   windshield on the right-hand side of the -- of the rear

17   view mirror.

18   Q    So if the front of Perez's car was about

19   80 feet from the passenger side of the red truck, then

20   the camera itself would have been a few more feet

21   farther away from the red truck, the camera that shot

22   the video we saw from Officer Perez; is that right?

23   A    The camera would have been in the front

24   windshield of the patrol car.  So it would have been a

25   little bit closer than myself and Officer Perez were, by



MAG 000248

Page 190

1    before you started firing, right?

2             MR. BAXTER:  Speculation.  Foundation.  Expert

3    analysis.

4             THE WITNESS:  Yeah, I don't think so.

5    BY MR. HENDERSON:

6       Q    Mr. Magdaleno never rolled down the window and

7    stuck the rifle out the window, right?

8       A    Yeah, the window never got rolled down.

9       Q    The windows in the truck remained rolled up the

10   entire time, right?

11      A    I know for sure the passenger side did.  I

12   don't know about the driver's side.

13      Q    How many shots did you fire total?

14      A    So --

15           MR. BAXTER:  From his perception or his after

16   knowledge?

17           MR. HENDERSON:  From any source.

18           MR. BAXTER:  Speculation as to perception at

19   the scene.

20           THE WITNESS:  Initially, I thought I shot three

21   or four.  It wasn't until later that I realized later

22   that it was 11.

23   BY MR. HENDERSON:

24      Q    And as to those 11, how do they break down?

25   When we hear you fire the first set of shots that you



Page 211

1      DEPOSITION ERRATA SHEET

2

3

4      Our Assignment No. 926555

5      Case Caption: ALMA L. FIGUEROA DE MAGDALENO, et al.,

6      vs. COUNTY OF RIVERSIDE, et al.,

7

8              DECLARATION UNDER PENALTY OF PERJURY

9

10             I declare under penalty of perjury that I

11     have read the entire transcript of my Deposition taken

12     in the above captioned matter or the same has been read

13     to me, and the same is true and accurate, save and

14     except for changes and/or corrections, if any, as

15     indicated by me on the DEPOSITION ERRATA SHEET hereof,

16     with the understanding that I offer these changes as if

17     still under oath.

18             Signed on the _____ day of _____, 20___,

19

20     _____

21             JOHN GETTE

22

23

24

25



# EXHIBIT Q



COR 000850

CONFIDENTIAL

MAG 000251



COR 000852

CONFIDENTIAL

MAG 000252



CONFIDENTIAL



CONFIDENTIAL

COR 001074

MAG 000254



Exhibit 6

CONFIDENTIAL

COR 001104

MAG 000255

# EXHIBIT R

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| ALMA L. FIGUEROA DE MAGDALENO, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO JAVIER MAGDALENO GUTIERREZ; JUAN JAVIER MAGDALENO, INDIVIDUALLY; YOSELIN MAGDALENO, INDIVIDUALLY; AND IVETA MAGDALENO, INDIVIDUALLY,<br><br>PLAINTIFFS,<br><br>VS.<br><br>COUNTY OF RIVERSIDE, A LEGAL SUBDIVISION OF THE STATE OF CALIFORNIA; CALIFORNIA HIGHWAY PATROL, A GOVERNMENTAL AGENCY OF THE STATE OF CALIFORNIA; DEREK THOMAS, AN INDIVIDUAL; DOE CHP OFFICER, AN INDIVIDUAL; AND DOES 1 THROUGH 10, INCLUSIVE,<br><br>DEFENDANTS. | CASE NO. 5:21-CV-02027-JGB-SHK |

DEPOSITION OF MARK FAJARDO, M.D.

TAKEN ON

WEDNESDAY, MAY 25, 2022

MELINDA S. WOMELSDORF, C.S.R. NO. 13124

MAG 000256

1             UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

3

4

5 ALMA L. FIGUEROA DE MAGDALENO,  )
INDIVIDUALLY AND AS SUCCESSOR IN )
INTEREST TO JAVIER MAGDALENO )

6 GUTIERREZ; JUAN JAVIER MAGDALENO, )
INDIVIDUALLY; YOSELIN MAGDALENO, )

7 INDIVIDUALLY; AND IVETA MAGDALENO, )
INDIVIDUALLY, )

8                          )

9          PLAINTIFFS,    )
                         )

       VS.            )  CASE NO. 5:21-CV-02027-

10                          )        JGB-SHK
COUNTY OF RIVERSIDE, A LEGAL )

11 SUBDIVISION OF THE STATE OF )
CALIFORNIA; CALIFORNIA HIGHWAY )

12 PATROL, A GOVERNMENTAL AGENCY OF )
THE STATE OF CALIFORNIA; DEREK )

13 THOMAS, AN INDIVIDUAL; DOE CHP )
OFFICER, AN INDIVIDUAL; AND DOES 1 )

14 THROUGH 10, INCLUSIVE, )
                         )

15         DEFENDANTS.    )

16 _____)

17

18

19        DEPOSITION OF MARK FAJARDO, M.D., taken on behalf

20 of the Defendants, at 800 S. Redlands Avenue, Perris, CA,

21 commencing at 1:10 P.M., Wednesday, May 25, 2022, before

22 Melinda S. Womelsdorf, Certified Shorthand Reporter, License

23 No. 13124, for the State of California, pursuant to Notice.

24

25

                                              2

1    APPEARANCES:

2

3    For the Plaintiffs, ALMA L. FIGUEROA DE MAGDALENO, ET
     AL:
4
          GUIZAR, HENDERSON & CARRAZCO
5         BY:   ANGEL CARRAZCO, ESQ.
          3500 W. Beverly Boulevard
6         Montebello, California 90640
          (323) 725-1151
7         angel@carrazcolawapc.com
          (Appearing via ZOOM Video Conference)
8
     For the Defendants, COUNTY OF RIVERSIDE, DEREK THOMAS:
9
          LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
10        BY:   TORI BAKKEN, ESQ.
          633 West 5th Street, Suite 4000
11        Los Angeles, California 90071
          (213) 250-1800
12        Tori.Bakken@lewisbrisbois.com

13   For the Defendants, CALIFORNIA HIGHWAY PATROL:

14        CA ATTORNEY GENERAL
          BY:   DOUGLAS BAXTER, ESQ.
15        600 West Broadway, Suite 1800
          San Diego, California 92101
16        (619) 738-9567
          douglas.baxter@doj.ca.gov
17        (Appearing via ZOOM Video Conference)

18

19

20

21

22

23

24

25
                                                          3

1                          I N D E X

2     WITNESS

3     MARK FAJARDO, M.D.
                                                    PAGE
4
              Examination by Ms. Bakken              5
5
              Examination by Mr. Baxter             53
6
              Examination by Mr. Carrazco           54
7
              Examination by Mr. Baxter             65
8
              Examination by Mr. Carrazco           68
9
              Examination by Mr. Baxter             69
10

11

12                         E X H I B I T S

13    NUMBER           DESCRIPTION                  PAGE

14    1  - Amended Notice of Deposition of           6
             Pathologist Mark Fajardo, M.D. with
15           Request for Production of Documents

16    2  - Curriculum Vitae of Mark Fajardo, M.D.    7

17    3  - Autopsy Protocol, dated 03/29/2021        8

18    4A1- - Photographs of exterior of decedent       9
      4A126
19
      5  - Photographs of internal examination      10
20    A127-  of the decedent
      A156
21
      6 - Photographs of projectile, clothing and   11
22    A157-  whiteboard
      A177
23

24

25
                                                        4

```
 1                    PERRIS, CALIFORNIA

 2              WEDNESDAY, MAY 25, 2022

 3                    AT 1:10 PM

 4

 5              MARK FAJARDO, M.D.,

 6         Having been first duly sworn, was

 7         examined and testified as follows:

 8

 9                    EXAMINATION

10

11   BY MS. BAKKEN:

12        Q    Good afternoon, Doctor.  My name is Tori

13   Bakken, as I've said off the record, and I will be

14   conducting your deposition on behalf of defendants,

15   County of Riverside.

16             If everyone else wanted to go ahead and make

17   their appearances at this point?

18        MR. BAXTER:   This is Doug Baxter -- go ahead, I'm

19   sorry.

20        MR. CARRAZCO:   Angel Carrazco for plaintiffs.

21        MR. BAXTER:   This is Doug Baxter for the CHP

22   defense.

23   BY MS. BAKKEN:

24        Q    Okay.  All right.  And, Dr. Fajardo, have you

25   had your deposition taken many times previously?
```

                                                          5

```
1        A     My curriculum vitae, my resume detailing my

2    education, training and experience.

3        Q     Okay.  And it fairly and accurately summarizes

4    all of your educational and work experience?

5        A     Yes.

6        Q     All right.  What we'll mark as Exhibit 3, do

7    you recognize that document?

8              (Exhibit 3 was marked for identification

9              by the Certified Shorthand Reporter and

10             a copy is attached hereto.)

11             THE WITNESS:  Yes.

12   BY MS. BAKKEN:

13       Q     What do you recognize that document to be?

14       A     This is my autopsy protocol including the

15   worksheet and inventory, basically my rough draft notes,

16   and then the diagrams that I made at the time of the

17   autopsy.

18       Q     Okay.  And was that autopsy report pack

19   prepared by you in the regular course of your business

20   as a medical examiner?

21       A     Yes.

22       Q     And does it fairly and accurately document and

23   contain all of your findings, opinions and conclusions

24   as they pertain to the decedent, Javier Magdaleno, and

25   your autopsy thereof?
```

8

1    A    Yes.

2    Q    And then before we started today, you were

3    kind enough to briefly flip through a large stack of

4    photographs that I brought with me today.  I don't need

5    you to go through them each individually at this time,

6    but if you could just look at how they are broken up

7    into three stacks.  And generally tell me what's

8    depicted in each stack of photographs?

9    A    The first stack of pictures that you handed me

10   is, I'm sorry, are pictures that were taken at the time

11   of the autopsy throughout our process which includes

12   taking pictures of the decedent as received with

13   clothing and dried blood and debris.  It also includes

14   photos of the decedent after we have removed the

15   clothing and washed the dried blood and debris off of

16   the body allowing for clarity in the pictures taken, and

17   then also pictures demonstrating the trajectory of the

18   projectile as it went through the body.

19   Q    Okay.  So would it be accurate to say that

20   that stack of photographs which is labeled A-1 through

21   A-126 depicts the exterior of decedent at the time of

22   your autopsy?

23   A    Correct.

24   Q    Okay.  And we'll mark that as Exhibit 4.

25        (Exhibit 4 was marked for identification

                                                    9

1       Q      Thank you.  We'll mark that as Exhibit 6.

2  It's marked A-157 through A-177.

3               (Exhibit 6 was marked for identification

4               by the Certified Shorthand Reporter and

5               a copy is attached hereto.)

6  BY MS. BAKKEN:

7       Q      All right.  Doctor, just to briefly recap on

8  your CV.  You graduated from UC Davis Medical School in

9  1993; is that correct?

10      A      Yes.

11      Q      Okay.  And you obtained your medical license

12 in 1995?

13      A      Correct.

14      Q      And what board certifications do you currently

15 have?

16      A      I have board certifications in anatomic,

17 clinical and forensic pathology.

18      Q      Are you still board certified in each of

19 those?

20      A      Yes.

21      Q      What year did you become board certified in

22 those?

23      A      I think -- I think also in -- oh, my goodness.

24 Let's see.  It would be '99 that I became board

25 certified in forensics, and then '98 would be for

                                                    11

MAG 000263

1   anatomic and clinical.

2        Q    And what year did you begin working as a

3   medical examiner?

4        A    That would be in 1995.

5        Q    If you could briefly tell me all of the

6   medical or pathology positions you've held from when you

7   graduated medical school up until present?

8        A    Sure.  I took a six-month stint, if you will,

9   in Scotts Bluff, Nebraska.  It's actually not even

10  reflected, I don't think, in my CV.  Because it was just

11  a short period of time and then I was employed in

12  Riverside County starting in February of 2000.  I

13  remained here as a staff pathologist becoming the chief

14  in 2009, and then became the chief medical examiner of

15  Los Angeles in 2013.  I then returned to Riverside

16  County in 2016 where I'm still the chief here.

17       Q    And since obtaining your medical license, have

18  you ever treated living patients?

19       A    Yes.  So I ran the student clinics at UC Davis

20  and I continued to participate in treating those living

21  patients for a period of time.

22       Q    And generally speaking, what is the job of a

23  medical examiner?

24       A    Our job is primarily to determine the cause of

25  death in individuals who fall under our jurisdiction,

                                                        12

1    which is basically anybody who has died from unnatural

2    causes or unexplained causes or violent causes.

3         Q    How many autopsies have you performed in your

4    medical career?

5         A    Over 7500.

6         Q    Have you ever been a police officer patrolling

7    in the field?

8         A    Well, I am technically a peace officer, not a

9    police officer.  I have 830.35 under the penal code, I'm

10   considered a deputy coroner.  So a peace officer but,

11   no, I've not been in the field.

12        Q    Would it be accurate to say, then, that you've

13   never made an arrest, restrained a subject or used any

14   force on a suspect?

15        A    That is correct.

16        Q    Are you an expert in police practices,

17   training, policies or procedures?

18        A    No.

19        Q    Are you a board-certified cardiologist?

20        A    No.

21        Q    Are you board-certified pulmonologist?

22        A    No.

23        Q    Are you a board-certified neurologist?

24        A    No.

25        Q    Are you board certified in neuropathology?

13

1  cause, we usually do not.

2      Q    And according to your understanding of

3  forensic pathology in general, how does a coroner

4  determine the manner of death for a decedent?

5      A    So again, can we categorize it in the five

6  categories that I've already outlined.  In the sheriff

7  coroner arena, the doctor does not actually give that

8  determination.  It is the deputy coroner who makes that

9  determination and reflects that on the death

10  certificate.

11      Q    Regarding these procedures that you've just

12  testified to, are those the procedures that you followed

13  and that were followed in the case of Javier Magdaleno

14  in his autopsy?

15      A    Yes.

16      Q    When did you perform your autopsy of decedent

17  Javier Magdaleno?

18      A    Referring to my report, I performed the

19  autopsy on the 11th day of February 2021, at 8:15 in the

20  morning here at this facility.

21      Q    According to the information provided to you,

22  on what date did the incident occur?

23      A    I do not know.

24      Q    According to the information provided to you,

25  what was decedent's date of death?

27

1    autopsy report for decedent you had received information

2    that the decedent led law enforcement on a traffic

3    pursuit?

4        A    Yes.

5        Q    Did you in any way rely upon those reports or

6    the reported information about what happened during the

7    incident involving decedent and the officers in forming

8    any of your autopsy conclusions or findings?

9        A    Again, it provides context into why somebody

10   ended up where they ended up and I take that into

11   consideration, but ultimately the cause of death stands

12   by itself.

13       Q    During your autopsy exam of decedent, did you

14   observe or discover any defects, injuries, abnormalities

15   or other pertinent physical features on the exterior of

16   decedent Javier Magdaleno?

17       A    Yes, absolutely.

18       Q    Can you please list for me all of those

19   defects, injuries and abnormalities that you observed

20   and documented on the exterior of decedent?

21       A    Well, there is two main ones that are of most

22   concern.  The number one being there was a large gunshot

23   wound involving the very top of the head, and there was

24   a -- what appeared to be a somewhat grazed component to

25   the right hand.

                                                          30

NORMAN SCHALL & ASSOCIATES
(800) 734-8838

MAG 000267

1   can you tell whether it was an entrance wound or an exit

2   wound?

3       A    It was an entrance wound.

4       Q    Did that gunshot wound have an exit wound?

5       A    No.

6       Q    And for that first gunshot wound to the head,

7   could you tell the trajectory of that wound?

8       A    Yes.

9       Q    What was the trajectory for gunshot wound

10  number one as we'll call it?

11      A    Referring to my report, it was pretty much

12  this straight from the top of the head to the bottom.

13  It travels primarily downward with minimal deviation to

14  the left.

15      Q    Could you assign a degree or an angle of that

16  trajectory from the top of the head slightly downward?

17      A    I could not, and the reason being is that

18  high-powered rifles, which is what this bullet was,

19  produced tremendous kinetic affect, damage to the head,

20  skull and brain.  The bullet came to reside in a

21  particular location but it's difficult for me to be

22  certain of the path.  I can't give you a degree.

23      Q    And was gunshot wound number one, the shot to

24  the head, was that a fatal injury?

25      A    Absolutely.

33

1      Q      And why is that?

2      A      It completely disrupted the brain, the

3   cranium, the skull itself.

4      Q      And for gunshot wound number two, the grazed

5   wound to the hand, there would not be an entrance or

6   exit wound associated with that; correct?

7      A      That is correct.

8      Q      And are you able to identify any kind of

9   trajectory associated with that wound?

10     A      No.

11     Q      And was gunshot wound number two a fatal

12  injury?

13     A      No, not at all.

14     Q      Why not?

15     A      Again, just superficial injury.  It would have

16  hurt and bled, but not caused death.

17     Q      Other than what you've testified to on the

18  record here today, did you observe or discover any other

19  wounds, defects or injuries that you believe were caused

20  by any gunshots or bullets?

21     A      Again, there's several injuries to the body

22  including small tears, that are probably the result of

23  shrapnel going through the body.  Yeah.

24     Q      With the exception of those minute small tears

25  due to shrapnel, did you identify any other wounds,

34

1    defects or injuries that you believe were caused by any

2    gunshots or bullets?

3        A    No.

4        Q    For any of the gunshot wounds that you've

5    identified on the record or in your autopsy report, did

6    you observe any soot or stippling on the decedent?

7        A    No, not at all.

8        Q    Did your lack of observation of any soot or

9    stippling on decedent's body have any significance to

10   you?

11       A    Yes.

12       Q    What does that mean to you?

13       A    That this bullet that impacted the decedent

14   was fired at what we call a distant range.  What does

15   that mean?  At least two feet away, so not a whole major

16   distance, but again, that's the rule of thumb.  At least

17   two feet away.

18       Q    Okay.  So is it correct that, then based upon

19   the lack of soot and stippling, it's your understanding

20   that the shooter or the firearm that caused this bullet

21   wound on decedent was at least two feet away from

22   decedent?

23       A    Correct.

24       Q    Based solely on the lack of soot or stippling

25   on decedent's body that you've just testified to, can

                                                    35

1    the back of the left arm.

2        Q    Of the exterior injuries that you identified

3    for decedent Javier Magdaleno, which, if any, did you

4    find to have played a causal role in decedent's death?

5        A    The one to his head, obviously.

6        Q    Is that the only one?

7        A    Yes.

8        Q    And how did that injury cause decedent's

9    death?

10       A    Again, just completely disrupted his brain,

11   incompatible with life.

12       Q    Of the exterior injuries that you identified

13   for decedent, which, if any, did you find to have played

14   only a contributory role to decedent's death?

15       A    None of the other injuries were contributory.

16       Q    During your autopsy exam of decedent, did you

17   observe any tattoos anywhere on his body?

18       A    Referring to my report, none.

19       Q    During your autopsy exam of decedent, did you

20   observe any wounds or injuries that appeared to have

21   been self-inflicted by decedent?

22       A    No.

23       Q    During your autopsy exam of the decedent, did

24   you observe any wounds or injuries that appeared to have

25   been consistent with medical intervention or lifesaving

                                                          39

MAG 000271

```
 1   death for decedent Javier Magdaleno?

 2        A    Yes.

 3        Q    And can you please tell me all of the

 4   opinions, conclusions and related findings you reached

 5   from your autopsy regarding the cause of death for

 6   decedent?

 7        A    High-powered rifle gunshot wound of head.

 8        Q    And you had previously stated that there were

 9   no contributing factors or related findings regarding

10   contributing factors for the death of decedent; correct?

11        A    Correct.

12        Q    Other than what you've testified to on the

13   record today, and what's stated in your autopsy report,

14   have you made any findings or formed any conclusions or

15   opinions regarding the death or autopsy of decedent

16   Javier Magdaleno?  Other than what you've already

17   testified to today and in your report.

18             I'm sorry, that was a --

19        A    No.

20        Q    Regarding the findings and conclusions related

21   to the injuries, and conditions that you've observed for

22   decedent, during the autopsy and what you've testified

23   to here today, were all of those findings and

24   conclusions reached to a reasonable degree of medical

25   probability or certainty?
```

<div align="right">51</div>

```
 1      A      Let me qualify my answer by referring to my

 2  report.

 3      Q      Sure.

 4             And perhaps the toxicology report may be a

 5  guidance to see when the blood was drawn.

 6      A      So the blood that was submitted for toxicology

 7  evaluation was actually obtained by Deputy Anderson at

 8  the time that she did her investigation of our decedent.

 9  It is our routine when possible for the deputy coroner

10  to obtain blood samples as well as performing nail

11  clippings and gunshot residue examinations at that time

12  so that there is no delay.  That was done in this case.

13  So the blood was collected on the 29th of January.

14      Q      Do you know at what time after death?

15      A      At 2041 hours is what it says.

16      Q      Do you know when the decedent expired?

17      A      I do not have that information in front of me.

18      Q      Can you please go to page three?

19      A      Yes.

20      Q      We determined that the entry was at the vertex

21  of the head; is that true?

22      A      Correct.

23      Q      When we say vertex of the head, it's right at

24  the top.  Was it more to the right or more to the left

25  or right in the center, if you know?
```

57

```
 1  State of California     )
                            )  SS.
 2  County of San Bernardino)

 3

 4          I, MELINDA WOMELSDORF, Certified Shorthand

 5  Reporter, License No. 13124, for the State of

 6  California, do hereby certify:

 7          That, prior to being examined, the witness

 8  named in the foregoing deposition, to wit, Mark Fajardo,

 9  M.D., was by me duly sworn to testify the truth, the

10  whole truth and nothing but the truth;

11          That said deposition was taken down by me

12  in shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription under

14  my direction;

15          That the foregoing transcript, as typed, is

16  a true record of the said proceedings.

17          I further certify that I am not interested

18  in the event of the action.

19          Witness my hand this 7th day of June, 2022.

20

21

            MELINDA WOMELSDORF, CSR. NO. 13124
22

23

24

25
                                                    71
```

MAG 000274

# EXHIBIT S



## Riverside County Sheriff's Department
*Chad Bianco, Sheriff-Coroner-Public Administrator*

### Coroner–Public Administrator
800 South Redlands Avenue • Perris • California • 92570
www.riversidesheriff.org

Mark A. Fajardo, M.D.
Chief Forensic Pathologist

AUTOPSY PROTOCOL

SHERIFF-CORONER
APR 2 '21 at 10:16

**NAME OF DECEDENT:** MAGDALENO, JAVIER        **FILE NUMBER:** 2021-02444

**FINAL DIAGNOSES:**

I.  Decedent is status post a high-powered rifle gunshot wound of the head through the vertex in a primarily downward fashion with subtotal disruption of the brain in its entirety and transection of the brainstem:
  A.  Markedly deformed high-caliber projectile recovered from the left posterior cranial fossa/hemisphere of the brain.

II. Please refer to formal toxicology report.

III. Atherosclerotic cardiovascular disease:
  A.  Marked aortic valve atherosclerosis.
  B.  Moderate coronary artery atherosclerosis.
  C.  Moderate aortic atherosclerosis.

**CAUSE OF DEATH:**        **HIGH-POWERED RIFLE GUNSHOT WOUND OF HEAD**

"I hereby certify that I, Mark A. Fajardo, M.D., Chief Forensic Pathologist, have performed an autopsy on the body of Javier Magdaleno, on the 11th day of February 2021, commencing at 8:15 a.m., in the mortuary of the Perris Office of the Riverside County Sheriff-Coroner."

**External Examination:** The body is received in a sealed body bag bearing the seal number 36541 which is subsequentially broken at 8:15 in the morning. Upon opening the body bag, the body is found to be that of a well-developed, well-nourished, Hispanic appearing male measuring 64" in length and weighing 150 pounds. The subject's general appearance is consistent with the stated age. The decedent is clothed in the following garments: Present within the body bag is a pair of blue "Puma" tennis shoes, size 8. White socks are also present within the shoes. Present about the lower torso is a pair of blue jeans, Levi brand, Style 505, size 33 x 30. There is a black belt normally positioned through the belt loops. Present within the left rear pocket of the blue jeans is a "live round", .22 caliber bullet. Present beneath the pants is a pair of white briefs, Kirkland brand, size 33. Present about the upper torso is a "George" polo shirt, red stripped, size large. The garments are



EXHIBIT

3

Do Not Release

MAG 000275

MAGDALENO, JAVIER/2021-02444 (2)

submitted to the investigating agency.  The body has been refrigerated and is cool to the touch. Rigor mortis is 2+ in the jaws, neck, and upper and lower extremities.  Livor mortis is present in a posterior dependent distribution, with relative sparing of the weight-bearing areas, and does not blanch to palpation.  The body is unembalmed.  The decedent is identified by a Coroner's tag affixed to the right great toe bearing the decedent's name.

The subject is normocephalic.  There is a gunshot wound to the head to be described further below. The scalp hair is normally distributed, primarily gray, measuring ½" in length.  There is facial hair in a normal mustache and beard distribution, measuring ¼" in length.  The facial features appear symmetrical and normally formed.  The corneae are clear.  The irides are brown.  The pupils are round and regular measuring 0.4 cm bilaterally.  The conjunctivae are pink and moist and there are no conjunctival petechial hemorrhages.  There is no scleral icterus.  Moderate arcus senilis is seen upon the eyes bilaterally.  The nose is normally formed and has an intact bony and cartilaginous structure.  The nostrils are patent and are free of hemorrhage or discharge.  The ears are symmetrical and show no hemorrhage or discharge.  The decedent has dentures in place.  The oral mucous membranes are pink and moist and show no evidence of trauma or petechial hemorrhage.  No foreign material or blood is present in the mouth.  The neck is symmetrical, normally formed and atraumatic. There is no palpable crepitus or hypermobility of the neck.

The chest is symmetrical and normally formed.  There is no visible external chest trauma.  No palpable crepitus or bony deformity is present over the chest wall.  The abdomen is flat.  No abdominal trauma is noted externally.  No masses are palpated.  The external genitalia are those of a normally developed apparently uncircumcised adult male.  Both testicles are present within the scrotal sac.  The pubic hair pattern is normal.  The anus is closed and atraumatic.

The upper extremities are symmetrical, normally formed and involved with a graze-type injury to the right hand as well as scattered abrasions to be described further below.  No needle tracks or needle marks are noted.  Upon receipt of the body, the hands are not enclosed in paper or plastic bags. Examination of the fingernails reveal them to be foreshortened consistent with processing of the hands prior to autopsy.

The lower extremities are symmetrical, normally formed, and are atraumatic.  The toenails are slightly thickened but otherwise neatly trimmed and closely kept.  The soles of the feet are moderately callused.

The posterior trunk shows a normal symmetrical external contour.  No visible trauma is present.

SCARS AND DISTINGUISHING MARKS:  None.

EVIDENCE OF THERAPEUTIC INTERVENTION:  None.

Do Not Release

MAGDALENO, JAVIER/2021-02444 (3)

EVIDENCE OF EXTERNAL TRAUMA:

Gunshot Wound:

Entrance: Present to the vertex of the head, somewhat centrally located is a large stellate entrance gunshot wound. The injury proper measures 3" in coronal orientation by 8" in sagittal orientation and upon reapproximating the edges, a central defect measuring up to ¾" is identified. No carbonaceous debris or soot-like material is present around or within the depths of the injury.

Exit: On gross and radiographic assessment this is a penetrating gunshot wound with no exit wound associated.

Path of Projectile: The projectile passes through the skin and scalp of the vertex of the head producing extensive fragmentation and fracture of the bony calvarium. The projectile then causes extensive softening and disruption of both hemispheres of the brain with a complete transection of the brainstem at the level of the midbrain. The projectile then comes to reside in the left posterior cranial fossa through the left hemisphere of the brain. Associated with the gunshot wound is a moderate amount of subgaleal hemorrhage corresponding to the large entrance wound defect as well as moderate subarachnoid hemorrhage diffusely involving the dorsum convexity of the brain with extension to involve the base of brain structures.

Trajectory of Projectile: The projectile travels primarily downward with minimal deviation to the left.

Recovery of Projectile: A markedly deformed high-powered rife projectile is recovered from the left posterior cranial fossa and is submitted to the investigating agency.

Present to the ulnar aspect of the right side of the hand is a graze-type injury. The injury proper measures 1½" x 2½" in dimension and due to the shallow nature of the injury, directionality cannot be determined. Scattered small abrasions to the lateral aspects of the left upper arm, possibly consistent with satellite injuries, ranging in size from ¼" – ½" in dimension. A small laceration is noted to the left elbow measuring ¾" in dimension.

EVIDENCE OF INTERNAL TRAUMA: Please refer to the aforementioned gunshot wound as described above for internal trauma.

Internal Examination:

OPENING INCISION AND BODY CAVITIES: The standard Y-shaped thoracoabdominal incision reveals a subcutaneous fat thickness of 3/8" at midabdominal level. The pleural, pericardial, and peritoneal cavities are smooth and shiny and reveal no accumulation of excess fluid or blood. The internal organs are normally arranged.

Do Not Release

MAGDALENO, JAVIER/2021-02444 (4)

**NECK ORGANS:** The hyoid bone and laryngeal cartilages are intact and normally formed. No fractures are identified. There is no evidence of hemorrhage in the strap muscles or soft tissues of the neck. The carotid sheaths and anterior cervical spine are without obvious abnormalities.

**CARDIOVASCULAR SYSTEM:** The heart weighs 410 grams. It is normally formed. The epicardial surface is smooth and shiny. There is a normal distribution of epicardial fat. The myocardium is firm, red-brown without focal softening, discoloration, or fibrosis. The chambers are not dilated, and the ventricular walls are normal in thickness (left ventricle 1.1 cm, right ventricle 0.2 cm). The endocardial surfaces show a typical trabecular pattern and are free of fibrosis or mural thrombus. The valves are normally formed, thin, and pliable with the exception of the aortic valve which shows marked atherosclerotic change and associated loss of compliance. The coronary ostia are patent. The coronary arteries are normal in origin and distribution. The right coronary artery is dominant. The coronary arteries show focally moderate atherosclerotic narrowing (up to .50% occlusion of the lumina area) that is easily involving the three main coronary arteries. There is no thrombotic occlusion. The aorta is patent and follows a normal course. There is moderate aortic atherosclerosis characterized by plaque formation.

**RESPIRATORY SYSTEM:** The right lung weighs 360 grams. The left lung weighs 310 grams. The lungs are similar in appearance. The pleural surfaces are smooth, shiny, light purple-tan with marked scattered anthracotic mottling. Sectioning reveals dense and congested, purple-tan parenchyma. There is no localized consolidation or infarction. No parenchymal mass lesions or abscesses are present. The larynx, trachea, and bronchi are normally formed. The mucosal surfaces of the airways are unremarkable. There is no airway obstruction. The pulmonary arteries are normally formed and free of thromboemboli.

**GASTROINTESTINAL SYSTEM:** The esophagus is normally formed, patent and shows a smooth, pink-tan mucosa. The stomach is normally formed. It contains 500 cc of brown pasty gastric contents with no readily identifiable particulate food matter or pill residue appreciated. No ethanol-like odor is noted. The gastric mucosa is pink-tan and shows a typical rugal pattern. No localized erosion, ulceration, or mass lesion is evident. The duodenum, small intestine, appendix, and colon are grossly normal.

**PANCREAS:** The pancreas is normal in size and configuration. Sectioning reveals a uniform, tan, lobulated parenchyma.

**HEPATOBILIARY SYSTEM:** The liver weighs 1320 grams. It is normally formed. The capsule is thin, smooth, and shiny. The cut surface is firm, red-brown and displays a typical lobular pattern. No parenchymal mass lesion is noted. The gallbladder is normally formed. It contains 10 cc of amber bile. There are no calculi. The gallbladder mucosa shows a typical finely reticulated appearance. The bile ducts are patent and of normal caliber.

**GENITOURINARY SYSTEM:** The right kidney weighs 180 grams. The left kidney weighs 160 grams. The kidneys are similar in appearance. The capsules strip with ease. The cortical surfaces are smooth, red-tan. Sectioning reveals a normal pattern of internal architecture.

**Do Not Release**

MAG 000278

(4)

MAGDALENO, JAVIER/2021-02444 (5)

Corticomedullary demarcation is distinct. No cysts or mass lesions are present. The pelves and ureters are patent and are of normal caliber. The bladder contains 500 cc of yellow translucent urine. The bladder mucosa is smooth, light pink-tan. The prostate and testes are unremarkable to inspection and palpation.

LYMPHORETICULAR SYSTEM: The spleen weighs 90 grams. It is normally formed. The capsule is thin, smooth, and shiny. The cut surface is firm, red-purple and shows a typical follicular pattern without evidence of fibrosis or neoplasia. The thymus is atrophic. Lymph nodes throughout the body are small and inconspicuous.

ENDOCRINE SYSTEM: The thyroid is symmetrical and normally formed. Sectioning reveals a uniform, firm, red-brown, colloid parenchyma. The adrenals are grossly unremarkable. The pituitary is grossly unremarkable.

SKELETAL SYSTEM: There is extensive and marked skull fracture as previously described.

HEAD: Reflection of the scalp does confirm diffuse subgaleal hemorrhage as previously described. The skull is extensively fractured but is otherwise normal in thickness. The dura is smooth and shiny. There is no dural neomembrane or sinus thrombosis. No subdural hemorrhage is present. Removal of the dura reveals confirms the extensive skull fracture as well as the projectile as described.

The brain weighs 1260 grams. The leptomeninges are thin and transparent. There is diffuse subarachnoid hemorrhage as previously described. The superficial blood vessels are fine and patent. The vessels at the base of the brain are free of atherosclerosis. The circle of Willis is normally formed. The cranial nerves are intact. The dorsal surface of the brain presents a symmetrical appearance with a normal convolutional pattern. There is no evidence of subfalcial herniation. The base of the brain shows no evidence of uncal or tonsillar herniation. The brainstem and cerebellum show the usual external configuration. There is no localized external softening or contusion of the brain with the exception of the aforementioned gunshot wound.

Multiple coronal sections of the cerebrum and transverse sections of the cerebellum and brainstem show the usual pattern of internal architecture without focal mass lesions and confirms the hemorrhagic wound tract as previously described. The ventricular system is of normal configuration and contains frankly bloody cerebrospinal fluid.

ASSISTANTS: Staci Rzepka

SPECIMENS FOR PATHOLOGY: Representative sections of all major organs are retained.

SPECIMENS FOR TOXICOLOGY: Peripheral/heart blood, vitreous, gastric, liver, bile, urine and brain.

PHOTOGRAPHS: Photographs were taken by Kristen Morrow.

Do Not Release

MAGDALENO, JAVIER/2021-02444 (6)

**DIAGRAMS:** Diagrams were by Dr. Fajardo.

**MATERIALS FOR CRIME LAB:** Clothing and recovered projectile.

**POLICE WITNESSES:** Dan Moody – RSO/CHU, A. Berain – CHP, K. Buchholtz – CHP, Kelly Nava – RCDA.

**MICROSCOPIC DESCRIPTION:** Microscopic examination is deferred.

_____                    _____
Mark A. Fajardo, M.D.                                                          Date   3/29/2021
Chief Forensic Pathologist

MAF/jam
MAF 3/25/2021

Do Not Release

JKM [handwritten]                                INDIU [handwritten]

**Worksheet and Inventory**

Decedent __Magdaleno, Javier__          File Number: __2021-02444__

Deputy: __Anderson__

Determined by: __✓__ Autopsy      _____ External Exam      _____ Partial Autopsy

Cause of Death:

(A) ___Pending Coroner Review_____ Int. _____

(B) _____ Int. _____

(C) _____ Int. _____

(D) _____ Int. _____

Other Significant Conditions _____

Pathologist: Dr. _____          Date : __2/1/2021__

| Medicolegal Case Inventory and Follow Up | For Certification | For File Completion |
|---|---|---|
| Toxicology: [ ] Rush [X] Blood From _pxh oh_ / _heart_ [X] Bile [X] Urine [X] Gastric [X] Brain [X] Liver [X] Vitreous [ ] Vitreous Electrolytes [ ] Subdural Blood [ ] Other | Comprehensive panel | |
| Histology: _____ cassettes in _____ containers; # stockjars _____ | | |
| Neuropathology: [ ] Brain [ ] Spinal cord [ ] Eyes [ ] Other | | |
| Reports: [ ] Law Enforcement [ ] Deputy Coroner [ ] Fire [ ] Other | | |
| Microbiology: [ ] Blood [ ] CSF [ ] Tissue [ ] Bacterial-Viral-TB-Other | | |
| Consultants: [ ] NEOGEN [ ] Anthropology [ ] Radiology [ ] Other | | |
| Records: [ ] Hospital [ ] ER [ ] Medical [ ] Paramedic [ ] Other | | |
| Scene Investigation (e.g., suspected SIDS) | | |
| Misc.: [X] X-Ray [ ] Photo [ ] Blood: Red-Yellow-Gray for _____ [ ] Other | Initials of Dr. for samples | Initials of Tech verifying |
| Forensic Biology: [ ] Rape Kit [ ] Swabs: Oral-Anal-Vaginal [ ] Nails [ ] Hair: Scalp-Pubic [X] Blood (Purple) [ ] Other | | |
| Evidence: [X] Clothing [X] Ballistics [ ] Trace [ ] Other | | |

___ PTM Completed ___ Computer Updated ___ DC Worksheet Completed

**Do Not Release**

MAG 000281

Name: _Mag daleno, Javier_  Date: _2/14/21_  Case Number: _2021-02444_



3x8"

Do Not Release

Forensic Pathologist: _Fajardo_ , M.D.



# Riverside County Sheriff-Coroner

## CHAD BIANCO, Sheriff-Coroner

MARK FAJARDO, M.D.
Chief Forensic Pathologist

Name of Decedent: Magdaleno, Javier    Coroner File #2021-02444

M/F Skin Color: __ WD/WN: __ Height: __ Ft. 64 In. Weight 150 lb. Age: __

Hair/TXTR Gry __ CLR __ In M 1 IN B 1 IN Eyes: Irides Brn __ Conj Cn __ Teeth/Oral __ Dentures

Torso: Ant __ Post __ Genital: +/- Uncirc Extremities: Upper __ Lower __

Rigor Mortis: 2+ __ Livor Mortis: P/NF Pos __ Temperature: Cor

Scars: ∅

Tattoos: ()

Clothing: Blue Jeans ... r Levi Jeans 505 33x30 ... 22 Fire route Black pocket.

Therapeutic Procedures: Blue 1 ... Kirkland white socks (3) ... George red lg polo.

Injuries: As br

Head __ 1260 gm
Brain
Neck

Cavities __ gm
Vessels

Heart 410 gm

L.V. 1.1 cm

R-Lung 360 gm

L-Lung 310 gm

Liver 1320 gm

Bile = 10 ml

Pancreas 90
Spleen 90 gm
Lymph nodes
Thymus: Y / N

R-Kidney 180 gm

L-Kidney 160 gm

Urine = 500 ml

Gonads
Endocrine
Digestive Tract 50 bw patty.
Gastric = 5 ml

App (Y) N
Musc-Skel

**DIAGNOSES:**

_____

_____

_____

_____

_____

Do Not Release

Examined By Dr.: _____ Date: 2/11/2021 Time: 8:15 (X) AM ( ) PM

MAG 000283

NAME OF DECEDENT: __Magr' 'eno, Javier__     CORQ' 'R FILE # 2021-02444

PATHOLOGIST: ____Fajardo____   DATE: 2|11|2021



4½×2½.

Do Not Release

MAG 000284

# EXHIBIT T

# Roger Clark

Police Procedures Consultant, Inc.
10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, rclark9314@aol.com

May 8, 2023

Kent M. Henderson, Esq.,
Gulzar, Henderson & Carrazco, L.L.P.
18301 Irvine Blvd.
Tustin, CA 92780

*Regarding:*   *Alma L. Figueroa De Magdaleno, et al., vs. County of Riverside, et al.,*
*Case No.: 5:21-cv-02027-JGB-SHK.*

Dear Mr. Henderson:

Thank you for retaining me to analyze and render opinions regarding the January 29,
2021 shooting death of Mr. Javier Gutierrez Magdaleno (Mr. Magdaleno) by Riverside
County Sheriff's Department (RCSD) Deputy Derek Thomas (Deputy Thomas), and
California Highway Patrol (CHP) Officer John Gette (Officer Gette). In my review of
this matter, I have reviewed the deposition transcripts, video recordings, audio recordings,
photographs, California POST learning domains, reports and other materials (as listed
below). I am informed that transcripts of recent deposition testimony of CHP Officers
Silva and Perez are pending. Please be advised that when the additional information is
provided, it is likely that a report of supplementary opinions may be necessary.

It is also necessary to state at the beginning of my report that I have not made credibility
determinations in expressing my opinions. That is, where there are differences in the
events proffered by the Defendants, and/or other witnesses, versus the allegations of the
Plaintiffs, and/or other witnesses, I do not opine for the trier of fact regarding who is the
more believable witness. I consider that the resolution of any such conflicts is in the
purview of a jury to decide.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears
and decides cases brought in court. My opinions rest on the training given to every
California POST certified law enforcement officer and the reasonable professional

MAG 000285

standard of care as expressed and required pursuant to the training provided to every
California POST certified law enforcement officer.

## Material Provided and Reviewed Thus Far:

1. Plaintiff's Second Amended Complaint for Damages;
2. Answer of Defendants County of Riverside and Derek Thomas to
   Plaintiffs' Second Amended Complaint for Damages;
3. Answer By Defendant California Highway Patrol to Second
   Amended Complaint;
4. Answer By Defendant John Gette to Second Amended Complaint
   and Demand for Jury Trial;
5. Deposition Transcript of Witness Larry Tashman with Exhibits;
6. Deposition Transcript of Defendant Deputy Derek Thomas with
   Exhibits;
7. Deposition Transcript of Defendant CHP Officer John Gette with
   Exhibits;
8. Deposition Transcript of Ryan Wooten with Exhibits;
9. Deposition Transcript of Mark Fajardo, M.D. with Exhibits.
10. Defendant's Responses:
    Demand Category No. 1
        - C.2 Witnesses_Redacted
        - E.3 Witness Statements_Redacted
        - E.3h. Summary of Interview with Witness Alma Lilia
        Magdaleno Figueroa
        - E.3i. Summary of Interview with Witness Juan Javier
        Magdaleno
        - E.3j. Summary of Interview with Witness Yoseline
        Magdaleno
        - E.4 Suspects Statements
        - F. Diagrams
        - H.1 CHP 271, Critical Incident, Potential Civil Liability
        Documentation Materials Checklist.
        - Table of Contents
    Demand Category No. 5:
        - 2021.01.29_17.37_01 Alma Intro
        - 2021.01.29_17.41_01 Alma Interview

Page 2 of 31

- 2021.01.29_19.38_01 Son Juan Javier Car and meds
- 2021.01.29_19.48_01 Alma Consent to search phone
- 2021.01.29_20.18_01 Son Juan Javier interview
- 210202_005
- 210224_001
- Part 1 Suspect Daughter Yoseian Magdaleno
- Part 2 Suspect Daughter Yoseian Magdaleno
Demand Category No. 9:
- Patrol Vehicle 1484491 Chart Photos
IMG_7397
IMG_7398
IMG_7399
IMG_7400
IMG_7401
IMG_7402
IMG_7403
IMG_7404
IMG_7405
IMG_7406
IMG_7407
IMG_7408
IMG_7409
IMG_7410
IMG_7415
IMG_7416
IMG_7418
IMG_7422
IMG_7427
IMG_7429
IMG_7430
IMG_7431
IMG_7432
- Patrol Vehicle 1549067 Chart Photos
IMG_7479
IMG_7480
IMG_7481
IMG_7482
IMG_7483
IMG_7484

MAG 000287

IMG_7485
IMG_7486
IMG_7487
IMG_7488,
IMG_7489
IMG_7490
IMG_7491
IMG_7493
IMG_7494
IMG_7495
IMG_7496
IMG_7497
IMG_7498
IMG_7499
IMG_7500,
IMG_7501
IMG_7502
IMG_7503
IMG_7504
IMG_7505
IMG_7506
IMG_7507
IMG_7508
IMG_7525
IMG_7526
IMG_7527
IMG_7528,
IMG_7529
- Patrol Vehicle 1430726 Chart Photos
IMG_7440
IMG_7441
IMG_7442
IMG_7443
IMG_7444
IMG_7445
IMG_7446
IMG_7447
IMG_7448
IMG_7449

MAG 000288

IMG_7450
IMG_7452
IMG_7453
IMG_7454
IMG_7455
IMG_7456
IMG_7457
IMG_7458
IMG_7459
IMG_7460
IMG_7461
IMG_7472
IMG_7474
IMG_7475
IMG_7476
IMG_7477
IMG_7530
IMG_7531
IMG_7532
IMG_7533
IMG_7534
IMG_7535
IMG_7536
IMG_7537
IMG_7538
IMG_7539
IMG_7540
IMG_7541
IMG_7542
IMG_7543
IMG_7544
IMG_7545
IMG_7546
IMG_7547
IMG_7549
IMG_7550
IMG_7551
IMG_7552

MAG 000289

IMG_7553
IMG_7554
IMG_7555
IMG_7556
IMG_7557
IMG_7558
IMG_7559
IMG_7561
IMG_7562
IMG_7563
IMG_7564
IMG_7565
IMG_7566
Demand Category No. 11
- Chapter 1
- Chapter 2
- Chapter 3
- Chapter 4
- Chapter 5
- Table of Contents
Demand Category No. 15
- 01292021 CHP 275 Magdaleno Incident
Documents Previously Produced to Plaintiffs' Counsel in
Magdaleno
- Additional Documents for Plaintiffs' Counsel
CAD Log Magdaleno
- Documents for Plaintiffs' Counsel in Magdaleno
CHP Air
IMG_5086
IMG_5087
IMG_5088
IMG_5089
IMG_5090
IMG_5091
IMG_5093
IMG_5094
IMG_5095
IMG_5096
IMG_5097

MAG 000290

IMG_5098
IMG_5099
CIIT Cover
E.1 Map
- Signed CHP Responses Magdaleno Doc Demands
3-24-2022
- Signed Declaration-Lt. Hesser
- Signed Declaration-Sgt. Kawanaka
- Signed McCloud Dec for Silva
- Signed McLoud Dec for Perez
- Signed POS CHP Responses Magdaleno Doc Demands
- Signed Privilege Log Gette Personnel File 3-24-2022
- Signed Privilege Log Perez 3-24-2022
- Signed Privilege Log Silva Personnel File 3-24-2022

11.    Defendant's Supplemental Disclosures
- Defendant's Supplemental Disclosures
AUDIO-VIDEO-PHOTOS
080.Photo re DMV Photo for Javier Magdaleno
081.Photos re Evidence
082.Photos re Aerial
083.Photo re Suspect At Scene
084.Photos from 49404 Residence
085.Photos of Bodybag at Scene.pdf"
086.Photos re Scene.pdf"
087.Photos re Police Vehicles From Scene
088.Photos re Vehicle and Processing
089.Photos re Weapons & Ammo
090.Photos re Officers & Weapons
092.Video Surveillance from Rite-Aid; 012921
093.Video of Incident from third party Melanie Hansey;
012921
094.Video from YouTube of Police Clearing Vehicle 012921
095.Video CHP Dashcam from Officer Gette; 012921
096.Video CHP Dashcam from Officer Perez; 012921
097.Video-1 CHP Dashcam from Officer Silva; 012921
098.Video-2 CHP Dashcam from Officer Silva; 012921
099.Video-3 CHP Dashcam from Officer Silva; 012921
100.Audio Radio Traffic RSO at Rite-Aid; 012921

MAG 000291

101.Audio CHP Radio Traffic re DV at Rite-Aid; 012921
102.Audio Interview Intro of Alma 12921-SPANISH
103.Audio Interview of Alma; 012921 -SPANISH
104.Audio Interview of Juan Javier Magdaleno re phone and medication collection; 012921
105.Audio Consent to Search Phones from Alma; 012922-SPANISH
106.Audio Interview with Juan Javier; 012921
107.Audio Interview with Family At Their Home; 020221
108.Audio re Delivery of Property to Family; 22421
109.Photo Screenshot of Front Doors of Rite-Aid
110.Photos of Scene & Magdaleno Post Incident by Dep. S. Anderson.01.29.21
111.Photos from Autopsy
152.Audio 9-1-1 Call from Rite-Aid re Women Stating Husband Trying to Kill Her; 012921
153.Audio Radio Traffic re Call from Rite-Aid re Women Stating Husband Trying to Kill Her; 012921
154.Audio Radio Traffic-2 re Search for Husband in Red Truck Trying to Kill Spouse; 012921
155.Audio Radio Traffic-3; 012921
156.Audio Radio Traffic-4; 012921
157.Audio re Briefing re Incident; 012921 NP Briefing
158.Audio re Call with RP Hazlewood & Inv. Alfaro re Vehicle Hit by Gunfire; 012921
159.Audio re Inv. Alfaro Visit to RP Hazlewood re Vehicle Hit by Gunfire; 012921
160.Audio re Inv. Alfaro Interview of Deborah Hazlewood re Vehicle Hit By Gunfire; 012921
161.Audio re Interview of Occupants at Search Warrant Residence Mauricio, Alexander Rosas; 012921
162.Audio re Interview Dep. Derek Thomas by Inv. Moody; 020321
163.Video re Critical Incident by Sheriff Bianco; 012921

MAG 000292

164. Video-1 from Drone re OIS; 012921-DJI_0122
165. Video-2 from Drone re OIS; 012921-DJI_0123
166. Video re Aerial Post Shooting; 012921
167. Video re Overview of Incident Area; 012921
168. Audio Interview-1 of Yoselin Magdaleno by Inv. Moody;
012921
168. Video BWC from Dep. Burgie re PA Announcements &
Clearing Vehicle. 012921
169. Audio Interview-2 of Yoselin Magdaleno by Inv. Moody;
012921
169. Video BWC from Dep. Burgie re Statement of witness
Hansey re Cell Video. 012921
170. Video BWC from Dep. Burgie re Canvass Interviews.
012921
171. Video BWC-2 from Dep. Burgie re Canvass Interviews.
012921.AVI"
172. Video BWC-3 from Dep. Burgie re Quick Convo with
Male in White Vehicle. 012921
173. Video BWC-3 from Dep. Burgie re Statement of Off Duty
Officer Tashman. 012921
174. Video BWC-1 from Dep. Stewart re PA Announcements
& Clearing Vehicle. 012921
175. Video BWC-2 from Dep. Stewart re Statement of Vanessa
Guerrero No OIS info.;
012921
176. Video BWC-3 from Dep. Stewart re Canvass Interview
Unit #125. 012921
177. Video BWC-4 from Dep. Stewart re Interview of Mauricio
Lopez. 012921
178. Video BWC-4 from Dep. Stewart re Canvass Interviews in
Mobile Park.; 012921
179. Video BWC-5 from Dep. Stewart re Canvass Interviews in
Mobile Park. 012921
179. Video BWC-6 from Dep. Stewart re Canvass Interviews in
Mobile Park. 012921
180. Video BWC-7 from Dep. Stewart re Canvass Interviews in
Mobile Park; 012921
COR000001 - COR000162
COR000163 - COR000275

MAG 000293

COR000276 - COR000381
COR000382 - COR000477
COR001507 - COR001547
COR001819 - COR001935
COR001936 - COR002026

12.    Plaintiff's Second Amended Complaint for Damages.
13.    POST Learning Domains:
    a.    #1 "Leadership, Professionalism, and Ethics"
    b.    #2 "Criminal Justice System"
    c.    #3 "Principled Policing in the Community"
    d.    #5 "Introduction to Criminal Law"
    e.    #15 "Laws of Arrest"
    f.    #16 "Search and Seizure"
    g.    #19 "Vehicle Operations."
    h.    #20 "Use of Force De-escalation"
    h.    #21 "Patrol Techniques"
    I.    #22 "Vehicle Pullovers"
    j.    #25 "Domestic Violence."
    k.    #33 "Arrest and Control"
    l.    #35 "Firearms/Chemical Agents"
    m.    #36 "Information Systems"

## Brief Overview of Events and Commentary:

In January of 2021, Mr. Magdaleno resided near the Coachella Valley area, in Indio, California. Mr. Magdaleno was 60 years old, and was not on probation or parole.

On January 29, 2021, Mr. and Mrs. Magdaleno were together in Mr. Magdaleno's pickup truck. They had spent the morning together and drove through the city of Thousand Palms, California. Some time after noon, Mr. and Mrs. Magdaleno engaged in a verbal argument and Mrs. Magdaleno exited the vehicle and entered a Rite Aid, located at 39155 Washington Street, Thousand Palms, California.

After Mrs. Magdaleno entered the Rite Aid and stated to an employee that she feared for her safety because her husband (Mr. Magdaleno) who was outside in the truck had threatened to kill her with a rifle. The employee called 9-1-1 and reported that there was a woman who feared for her safety, because her husband threatened to kill her.

MAG 000294

However, it should be noted that when she entered the Rite Aid, Mrs. Magdaleno had not
been actually injured. And although the Rite Aid caller mentioned that Mrs. Magdaleno
reported that there was a rifle in the vehicle, there had been no gunfire and there was no
report that Mr. Magdaleno had fired the rifle at Mrs. Magdaleno or anyone else.

At approximately 12:30 p.m., RCSD deputies including Deputy Thomas arrived on scene.
Deputy Thomas observed Mr. Magdaleno in the parking lot but he quickly entered his
truck and drove away before he could be detained. A pursuit ensued that included Deputy
Thomas and Officer Gette. Mr. Magdaleno fled south on Washington Street, east on
Country Club Drive, and then south on Jefferson Street. Units followed - red lights and
siren.

While southbound on Jefferson, Mr. Magdaleno, struck a white pick-up at 48th and lost
control of his vehicle. His pick-up careened 90 degrees to the right (west) and head-on
into the curb. Officer Gette, Deputy Thomas, and other units pulled to a stop. Officers
exited and positioned themselves using their vehicles as cover. The dash-cam videos
show that both the back window and the passenger side window of the pick-up trick were
heavily tinted and that you cannot not see Mr. Magdaleno or what he was doing. As
recorded, Mr. Magdaleno's vehicle did not appear to move further after he came to rest at
the curb. Additionally, It is uncontested that Mr. Magdaleno remained in his truck and
did not open any vehicle door or step outside of his truck from the time it came to rest
against the curb.

Withing seconds, Officer Perez shouted to the assembled officers, "he's got a rifle!"
Despite not being able to see Mr. Magdaleno through the tinted rear window, Deputy
Thomas immediately opened fire with his handgun 5 or 6 times without any pause (as
recorded). None of the rounds apparently wounded Mr. Magdaleno. After Deputy
Thomas fired his gun there was a pause. Next, Officer Gette shouted, "shots fired, shots
fired!." Next, after a pause, Officer Gette fired a volley, and after a distinct pause,
another volley from his patrol rifle (11 shots total). No other officers or deputies present
fired their guns.

It is important to note here that at least two occupied civilian vehicles were struck by
bullets from Officer Gette's rifle that traveled through Mr. Magdaleno's truck and into
their cars - additional physical proof of Officer Gette's panic when he pulled the trigger
of his rifle. It was fortunate indeed that no civilians were struck by Officer Gette's
reckless lack of shooting discipline.

MAG 000295

At the time he fired his weapon, Officer Gette was at the right (passenger side) of the
pick-up and was standing at a position of cover behind a large RV vehicle. He testified
that he had a view inside the cab through the passenger window of the cab. Officer Gette
also alleged that he saw Mr. Magdaleno with a rifle in hand. However, it is uncontested
that Mr. Magdaleno never fired his rifle that was in the truck at any time.

> Q.     Officer Gette, if I heard you earlier -- and you correct me if I'm
>        wrong -- you said that once you saw that rifle lowering as though it
>        was going to fire at you, you moved to fire but then found that you
>        could not because your gun was still in safety mode. Did I hear that
>        right?
>
> A.     That's correct. My first initial shots didn't fire because it was still on
>        safe. (Gette Deposition)

As noted Officer Gette testified that he had forgotten to release the safety and his rifle
would not fire - a clear indicator of lack of situational awareness. As recorded it was
only after his own shout of "shots fired" that Officer Gette fired a first volley of shots
from his patrol rifle into the passenger window and door of the pick-up. Apparently
Officer Gette was in a panic during the shooting, and has testified that he had *no memory*
*of shooting any more than 4 times in one sequence from his rifle.* (Emphasis added)
However it is uncontested in the record that he actually fired a volley of at least 4 rounds
after he shouted, "shots fired" and then, after a pause of approximately 5 seconds, he fired
a second volley for a total of 11 shots from his patrol rifle. The investigation at the scene
indicates that Mr. Magdaleno was fatally shot to the top of his head while inside the cab
of the truck from a bullet fired from Officer Gette's rifle. Additionally, based on the
autopsy results (Mark Fajardo, M.D.), Mr. Magdaleno was shot on top of his head, and
*the trajectory was top to bottom, i.e., a straight line from the top of his head down, and*
*toward his torso.* (Emphasis added) As such, it appears that Mr. Magdaleno ducked
down and could not have been looking at the defendants and pointing a gun at them.

> Q.     Based solely on your autopsy exam, are you able to state to a
>        reasonable degree of medical probability what the relative position
>        of the shooter was in relation to decedent at the time that the wounds
>        were made?
>
> A.     Only inasmuch as again, given the context surrounding this
>        decedent's death. Him being in a vehicle, he would have had to
>        present the top of his head to the shooter at the time that the bullet

MAG 000296

impacted him. So in that respect, he probably had his upper torso or
his head or his neck bent so that that presentation occurred. (Fajardo,
Page 36)

Q.   What was the trajectory for gunshot wound number one as we'll call
it?
A.   Referring to my report, it was pretty much this straight from the top
of the head to the bottom. It travels primarily downward with
minimal deviation to the left. (Fajardo, Page 33)

Q.   So other than the fact that the top of the head had to be generally
facing the shooter, can you give any more specifics as to the position
of the shooter or the decedent to a degree of medical probability
based upon your autopsy only?
A.   No. (Fajardo, Page 36)

Additionally, it must be noted that at the time of the shooting , Mr. Magdaleno's vehicle
was not moving whatsoever - perhaps even disabled. Thus, Mr. Magdaleno was trapped
inside the truck and obviously laying down on the seat and behind the solid passenger
door when he was fatally shot by Officer Gette.

## The Basic Tactical Steps Necessary in this Case:

While the safe apprehension of a fleeing criminal suspect in a vehicle is not an everyday
event in the general mix of police work, it is also not rare. Thus, all law enforcement
officers in California are given extensive training while in the POST Basic academy to
accomplish their safe apprehension. The training includes significant scenario role play,
simulation training and testing. It is an essential skill required before an individual is
granted police powers in California. Briefly stated, the tactical steps include:

### Containment:

This phase includes getting the subject – Mr. Magdaleno – under control by
restricting any opportunity to flee any further. Initially, this can be a
difficult problem when/while the subject is still in flight. However, in this
case Mr. Magdaleno spun out of control and came to a stop and was no
longer in flight. To the officers at the scene it was even possible that the

Page 13 of 31

MAG 000297

truck was disabled. At any rate, it never moves after coming to a stop. The tactical requirement at that point was to create a containment by establishing a perimeter with police units to blockade any future flight. Officers in the perimeter remain in the safety of "cover" to provide the time to relieve the emotional pressure on Mr. Magdaleno and create the time to coordinate the next steps for an eventual voluntary surrender, aka, "Surrender Self."

*Decompression:*

All living creatures, including human beings, have instinctive protective reflexes that will take control of the body during extreme stress. This instinctive response is commonly called the "flight-fight" response and it occurs when a human being perceives danger. As part of this instinctive response, the subconscious body takes over and the rational mind loses control. Humans will invariably flee or, when there is no other option, they will fight to either ward off the danger or to create an avenue of escape.

Trained and experienced officers have both seen and experienced this human response. It is a basic fact of life in the business of police work, and something every experienced officer is trained to cope with.

Competent officers are also trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance. This includes suddenly shooting without any reasonable indication of a credible threat. This is especially true with subjects in flight and stopped while in flight. Competent officers are also trained that as stress and/or anxiety increase, the ability for the contained subject to comply decreases. Thus, a decompression pause is necessary, to provide as much time as available so that rational activity can take place. This did not occur in this case. Rather, Deputy Thomas immediately began shooting at Mr. Magdaleno followed by Officer Gette and prevented any opportunity for Mr. Magdaleno to understand what to do next and surrender.

*Communication:*

MAG 000298

In this phase, an officer establishes contact with the contained subject (in this case Mr. Magdaleno) from a position of cover. During this time, unknown issues such as language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with safe apprehension become known, and are dealt with. Had the officers at the scene maintained a position of safety, they would have had the time to give instructions to Mr. Magdaleno and take him into custody.

Ignoring this key phase of contact often leads to a situation that deteriorates into confusion, and in which officers take their own independent actions (as occurred in this incident), rather than working together in a coordinated plan. The necessity for a calm and skilled officer-subject communication cannot be overstated. When this does not occur, officers and civilians alike can be needlessly and avoidably injured or killed.

*Instruction:*

Once the communication link has been established, a clear set of instructions, which contains enough detail to avoid surprises and assures understanding, is conveyed to the subjects. In this incident, Deputy Thomas should have explained to Mr. Magdaleno how to assume a position that would have facilitated a safe apprehension, and what not to do.

*Compliance:*

In this phase, the subject (in this case Mr. Magdaleno) are required to state/express their understanding of the instructions that were given to them by the communicating officer/negotiator. Mr. Magdaleno would have had an opportunity to ask/state any questions for clarification, and would have demonstrated their understanding of the instructions to the take-down team.

*Surrender:*

This phase requires the subject (in this case Mr. Magdaleno) to physically perform the acts that were communicated to them by the communicating SIS detective. Mr. Magdaleno would have been instructed, and then taken the steps to move into a place and position for officers to approach and take

Page 15 of 31

MAG 000299

him into custody without the use of lethal force. This could have included
Mr. Magdaleno voluntarily placing himself in a apprehension position with
his hands empty and at his back for handcuffing.

*Detention/Apprehension:*

This final phase includes the actual proper reasonable physical restraint of
Mr. Magdaleno (if necessary), a search for any weapons, and this safe
transport to a facility for booking.

In my opinion, there were sufficient patrol vehicles and officers at the scene athe end of
the pursuit to establish a tight perimeter and follow the basic steps to a safe apprehension.
Once Mr. Magdaleno's truck came to a stop and while he remained in his vehicle, time
was on the side of the RCSD Deputies and CHP Officers, and there was ample time to
coordinate a tactical plan, give the verbal orders to Mr. Magdaleno and take him into
custody. Instead, within ten (10) seconds after Mr. Magdaleno came to a stop, Deputy
Thomas and Officer Gette escalated the incident into a panic by a contentious volley of
shots.

## The Basic Rules (as trained to all officers) Regarding the Use of Deadly/Lethal Force:

Peace officers are trained that by accepting their badges and guns they must act at all
times in consideration of the extreme value our society places on all human life. Firing a
firearm at a human being is different from all other police uses of force. While there are
other police tactics and tools that can qualify as deadly force, none carry the same high
probability of death as the use of the officer's firearm. Accordingly, officers are trained
that they can only use firearms under the most extreme circumstances. These situations
are rare in the mix of daily police work. In fact, studies indicate that only a very few
police officers in the United States fire their weapons in the field during their entire
careers.

As stated above, POST teaches early on in the basic curriculum the legislative and
community expectations regarding their powers of arrest and use of force by POST
certified police officers.

MAG 000300

"The criminal justice system gives law enforcement two extraordinary
powers:

- The power of arrest; and
- The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian
dictator. Rather it comes from the will and consent of the people who put
their trust in law enforcement to use that power with the utmost of care and
restraint. This is why it is important to emphasize that peace officers do
with the utmost of care and restraint not confer "police powers" on
themselves. These powers come to the criminal justice system from the
people they serve."  (POST Learning Domain #2; "Criminal Justice
System," page 1-4.)

Additionally, an entire chapter in POST Learning Domain #20 (Chapter 3) is devoted to
the use of lethal force

"The use of deadly force is the most serious decision a peace officer may
ever have to make. Such a decision should be guided by the reverence for
all human life (including the officer's life and others that may be in
imminent danger) and, used only when other means of control are
unreasonable or have been exhausted."

"Reverence for all life is the foundation on which the use of deadly force
rests. The authority to use deadly force is an awesome responsibility given
to peace officers by the people who expect them to exercise that authority
judiciously. In the law enforcement/community partnership, peace officers
are expected to be self-disciplined, accountable, and in turn, the community
is expected to support its peace officers."  (POST Learning Domain #20,
Chapter 3, "Considerations Regarding the Use of Deadly Force.")

POST also trains: "Unreasonable force occurs when the type, degree and duration of force
employed was not necessary or appropriate."

Furthermore, POST specifies that there are a number of key factors that can affect which
force option is approved and appropriate under the concept of the "totality of
circumstances." (Learning Domain # 20 "Use of Force," Chapter 2.).

MAG 000301

POST training specifies that the use of force under the "totality of circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

Sufficiency of fear - Officers are trained that fear alone does not justify the use of deadly force. There must be a sufficiency of fear for the use of deadly force to be justified. (Penal Code Section 198). Officers are trained that there are three elements needed to establish sufficiency of fear.

- The circumstances must be sufficient to excite the fears of a reasonable person in like circumstances.
- The person must not act under the influence of fear alone. There has to be some circumstance or overt act apart from the officer's fear.
- The decision to use deadly force must be made to save one's self or another from great bodily injury or death.

Considerations when deciding to use deadly force - The decision of whether or not to use deadly force may be influenced by the officer's:

- training and experience
- judgment
- mental alertness
- emotional maturity
- existing facts and circumstances
- understanding of the law as it relates to agency policies concerning the use , and amount, of force that is objectively reasonable to achieve the law enforcement mission -(LD 20: Chapter 3 –Use of Deadly Force, page 3-6 & 3-7).

The POST standard of "Reasonable Fear" is defined as; A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances. POST defines "Unreasonable Fear" as: Generated in the officers' mind with no direct correlation to facts and situations. (Learning Domain # 20, Chapter 5. Emphasis added.). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective") "reasonable necessity" of

Page 18 of 31

MAG 000302

action to "imminent danger." (Learning Domain # 20, Chapter 3). Subjective fear is not enough.

A great deal of emphasis is placed on tried and proven tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

## POST Force Options

Subjects' resistance/actions to an arrest will determine the type of force used by peace officers. The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer. (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative* - Subject offers no resistance:

- More professional appearance
- Nonverbal actions
- Verbal requests and commands

*Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:

- Verbal requests and commands
- Officer's strength to take physical control, including lifting/carrying
- Control holds and techniques to direct movement or immobilize a subject

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:

- Control holds and techniques to control the subject and situation
- Use of personal weapons in self-defense and to gain

Page 19 of 31

MAG 000303

advantage over the subject
- Use of devices to secure compliance and ultimately
gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault
the officer or another person:
- Use of devices and/or techniques to secure compliance
and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to
gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly
the death of the officer or another person
- Utilizing firearms or any other available weapon or
action in defense of self and others

NOTE: Officers must take into account the *totality of the circumstances*
when selecting a reasonable force option. It is not the intent of this chart to
imply that an officer's force options are limited based on any single factor.

*Constant reevaluation requirement:*

Peace officers must use the force option appropriate for the situation as
conditions may change rapidly. Officers must continually reevaluate the
subject's action and must be prepared to transition as needed to the
appropriate force options.  (LD 20: Chapter 2 – Force Options, pages 2-6 &
2-7 )


## Opinions Thus Far:

1. Throughout the country, police departments for decades have trained
their officers in safe and accepted ways to contain, assess and arrest
subjects in order to avoid injuries – including lethal and/or potential
lethal injuries.  These tactics are so fundamental that failure to use
them are not to be excused.  Additionally, law enforcement officers
are trained that they are responsible for their tactical decisions when
they resort to lethal force rather than use obvious reasonable

Page 20 of 31

MAG 000304

alternatives available to them before resorting to lethal force. These
methods are well known among all police agencies and have been
proven effective for the safety and welfare of both law enforcement
officers and the public. In this incident Deputy Thomas and Officer
Gette failed to follow these trained and required methods. As a
result, they unnecessarily and excessively inflicted lethal force on
Mr. Magdaleno in violation of POST standards and law (as taught by
POST).

2.     Specifically, had Deputy Thomas and Officer Gette simply remained
in positions of cover and followed the basic tactical steps as outlined
above they would have precluded any use of lethal force.
Accordingly, in this set of facts, the use of lethal force by Deputy
Thomas and Officer Gette was excessive and unreasonable under the
circumstances. As noted above, Law Enforcement Officers are
trained that deadly force is a last resort that is only to be used in the
direst of circumstances and only in an immediate defense of life
(IDOL) situation. Since Mr. Magdaleno was contained in his truck,
Deputy Thomas and Officer Gette had the time and ability to remain
in cover. Any reasonable officer facing those facts and
circumstances (as were the other officers at the scene) would not
have shot at all, let alone 16 or more times.

3.     Officers are trained that when they resort to the use of lethal force
they are responsible for every shot they fire and to reassess the threat
or danger as they fire. Deputy Thomas and Officer Gette did not
reassess as required and collectively shot approximately 16 or more
times in three separate volleys.

4.     Officers are trained that a warning that deadly force is going to be
used should be given when feasible. Here, Deputy Thomas and
Officer Gette had time to give commands and give a warning that
deadly force would be used prior to the three volleys of shots.

5.     All officers in California are trained that they are responsible for
their tactical decisions when they resort to the use of lethal force.
Accordingly, the reasonableness of an officer's use of deadly force
includes consideration of their tactical conduct and decisions leading

Page 21 of 31

MAG 000305

up to the use of force. Here, a significant tactical error was Deputy
Thomas' and Officer Gette's unwillingness to remain in cover.
Their collective failure to coordinate a safe apprehension in this
regard was grossly negligent and showed a reckless indifference to
Mr. Magdaleno's rights and life.

6.    Taking video evidence at true, then Mr. Magdaleno did not aim a
      firearm at any officer, including Deputy Thomas and Officer Gette
      or utter any threats to harm any officer, and was not given a single
      order prior to being shot at.

7.    In particular, the video recordings document that Mr. Magdaleno
      never posed a credible threat to Deputy Thomas or Officer Gette
      whatsoever when they fired 16 -17 rounds into Mr. Magdaleno's
      vehicle.

8.    In conclusion an overarching opinion is that nether Deputy Thomas
      nor Officer Gette used the very basic and well known tactics and
      methods in their encounter with Mr. Magdaleno. In my opinion,
      their decisions and actions were a direct causal factor in the sequence
      of events resulting in Mr. Magdaleno's unnecessary and avoidable
      death. This includes their failure to stop and assess their shots before
      shooting again and Officer Gette's failure to hold his fire because of
      the innocent civilians in the background. Mr. Magdaleno was alone
      in the pickup truck. There were ample places of cover/safety. There
      were less lethal weapons available. His vehicle was stationary and
      likely disabled.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education. I
am a twenty seven year veteran of the Riverside County Sheriff's Department (LASD). I
was hired on December 1, 1965, and I retired from active service on March 31, 1993. My
career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen
years as a Lieutenant. I retired holding a California Peace Officer Standards and Training
(POST) Advanced Certificate, and I am a graduate of the POST Command College (class
#5, 1988). The POST Command College was a Masters level two-year course of study

MAG 000306

requiring a thesis, in Police Administration, with the diploma awarded by the California
Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those
duties included an 18 month assignment as a staff jail deputy and two years as an
Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on
the department as a patrol officer, field supervisor, jail watch commander and
administrator, station watch commander, and commanding officer of investigative units.
I was a field training officer while assigned as a patrol deputy, and I trained new officers
in POST and department approved patrol procedures, field investigations, apprehension
techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by
the patrol officers. Those cases included possible complaints relating to both
misdemeanor and felony crimes. They frequently required follow up investigations and
interviews before the exact nature of the case could be determined. As a field officer and
detective, I was trained in interview and interrogation methods and subsequently trained
other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives
as they took complaints and conducted preliminary investigations regarding criminal and
administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Riverside County
Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and
investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported
on the use of force and officer-involved shootings. I was also assigned by my Department
to sit as a member of Departmental review committees regarding the reasonable or
unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's
Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent
promotion to Lieutenant, I returned to the same facility approximately 10 years later.
During that time, I was assigned as a Jail Watch Commander, and as the Facility Training
and Logistics Administrator. At the time of my assignment, the MCJ held a daily
population in excess of 7,000 inmates, including a hospital, which was serviced by a staff

MAG 000307

of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve
Forces Bureau, I worked closely with the State of California Peace Officer Standards and
Training in revamping our Reserve Academy to bring it into state compliance. This
process gave me an expertise in the POST Basic curriculum. I also supervised the
training of cadets at our Reserve Training Academy. They were taught proper
investigation, interview, and apprehension procedures. Among other topics, I lectured the
Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and
Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the
Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations
Center.

During the last five and one half years of my career, I commanded a specialized unit
known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.),
which was created to investigate, locate, observe and arrest major (career) criminals. I
held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with
homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police
corruption. The majority of our cases were homicide cases, including the murder of
police officers. Arrests frequently occurred in dynamic circumstances including crimes in
progress.

My unit also conducted major narcotics investigations including undercover narcotics
buys, buy busts, and reverse stings. We frequently deployed at the request of
investigative units, such as Narcotics, which provided the initial investigative leads for
our operations. These narcotics cases usually involved multiple kilogram quantities of
drugs and amounts of money ranging from one hundred thousand to more than one
million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide
investigations. In that regard, the unit processed, under my command and supervision,
various aspects (depending on the complexity of the cases involved) of approximately
1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

MAG 000308

Additionally, the majority of the over 2,300 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police

MAG 000309

Accountability Project held at Loyola Law School, Los Angeles, California. I was
selected (September 23, 2010) to present on the topic of: "Using POST Modules to
Establish Police Officer' Standard of Care" at the National Police Accountability Project,
National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March
30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on
the topics of "Ethics, Police Investigations, the California POST Curriculum, and the
M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the
Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the
topic: "Ethically Working with Experts from the Prospective of a Police Expert." On
October 15, 2015 I was the invited presenter at a Community Forum in Victorville,
California on the topics of Police Procedures, Community Policing, Use of Force, and
features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to
present on the topic of: "Use of force litigation under California's negligence standard
and the impact of AB 392" at the National Police Accountability Project held at Loyola
Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured
(at request) at the University of California - Irvine, School of Law, Civil Rights Litigation
Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights
Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert
testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045
(D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and
widespread immigration raids in Chaparral, New Mexico, implemented pursuant to
Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring
into a person's immigration status, which has been adopted nationwide and has also been
presented to the United States Senate, the Secretary of Homeland Security, and other
government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of
Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was
quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police
Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463,
485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second
published case involving Police Detective Investigations. *Torres, et al. v. City of Los
Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to
the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies
Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip
and cavity searches, hiring, training, discipline and supervision, and which resulted in

MAG 000310

significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9ᵗʰ Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9ᵗʰ Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14ᵗʰ Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Magdaleno v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shtrar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication)

MAG 000311

and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal
force and searches. My opinions supported argument in the Ninth Circuit case: *Chien
Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for
publication), regarding the use of lethal force. My opinions supported argument in the
Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et
al*, Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions
supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for
publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al*,
Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser
weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-
15606 (for publication), *Christian Longoria, et al v. Pinal County, et al*, Originating Case
No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.
My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego*,
864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.
My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian
Pitzer*, Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of
qualified immunity and use of deadly force. I participated as a retained expert in the
USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal
Justice, et al.*, Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My
opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case
No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al*, D.C. Case
No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified
Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos;
Jenelle Bernacchi, v City of Newport Beach, et al.*, Nos. 16-56791 (for publication) and
which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force
and mental illness. My opinions (and quoted by name) supported argument in the Ninth
Circuit Case *S.R. Nehad, et al, v. Browder, et al.*, No. 18-55035 (for publication)
regarding the use of lethal force and custom and practice. My opinions supported
argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of
Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG,
regarding Detective Investigations and Qualified Immunity. My opinions supported
argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane
Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria
Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and
*Jonathan Michael Castro v. County of Los Angeles, et al*, D.C. Case No. CV 10-5425
DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-
custody suicidal prisoners and qualified immunity. My opinions supported argument in
the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v.*

Page 28 of 31

*County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al,* D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al,* Case No.: CV 20-5027 CBM (Asx).. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.* D.C. No. 4:19-cv-00301 KAW regarding use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al., regarding the use of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles,* 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.,* 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No.* B264946 *Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for

MAG 000313

all Law Enforcement Officers in California and taught extensively in the POST Basic
Learning Domain #9: "Crimes Against Children," pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my
opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of
Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the
Delaware Attorney General to review and provide my opinions regarding the shooting
death of Jeremy McDole. The AG report was published May 12, 2016. I provided a
written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that
included requested training opinions. I have also consulted with, and provided written
opinions at the request of the U.S. Attorney (New York), the Santa Clara County District
Attorney, and the San Francisco District Attorney. I was selected by
the Los Angeles County District Attorney as a member of FACCT - an independent team
assigned to re-examine fatal use of force incidents by law enforcement officers and
recommend further action when appropriate. On November 7, 2021, I was an Honoree of
the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a
recognized defender of Constitutional Rights. I was the retained Use of Force consultant
regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-
0522-L NLS) and which was taken under formal consideration by the Inter-American
Commission on Human Rights (an international human rights tribunal) on November
2022.

I have been found competent by both Federal and State Courts to render opinions as to
responsibilities as occurred in this case. A number of my cases have involved law
enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER
International's products, including the Model M26, Model X26 and Model X2 ECDs. I
own each, along with the download software. I have reviewed all the TASER training
materials and am familiar with the risks and tactics associated with these potentially lethal
devices. I have qualified as an expert on TASER products and testified both in deposition
and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F.
Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S.
Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal
acceptance/certifications as an expert in the general use and deployment of the TASER
weapon (including Taser International product warnings/bulletins sent to every agency
using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in

MAG 000314

*William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK
(AJWx) and on February 22, 2018 in *Marla Hernandez; A.J., Jr., et al, v. City of Los
Angeles, et al,* USDC Case No. 2:16-o-02689 AB (JEMx), and on May 3, 2018 in Heleine
Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on
November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-
00236 BAS-NLS.* There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and
experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have
testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed May 8,
2023 at Santee, CA.

Roger A. Clark

Page 31 of 31

MAG 000315

# ROGER A. CLARK

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

## EXPERIENCE

### Police Procedures Consultant (self employed)
April 1, 1993 to Present.................................................................. 29 years

I have been certified by Federal and State courts as expert in jail and police
procedures in Federal and State Courts.  I select my cases carefully and have
consulted in approximately 2400 cases thus far since my retirement from the
Los Angeles County Sheriff's Department.

### Substitute Teacher, Madison School District
August 1994 to 2003....................................................................... 9 years

I substitute teach at all levels in the school district (elementary to high school).
As a volunteer, I wrote and managed a $85,000.00 federal grant for our
Central High School.  This grant is in its sixth year and has generated
$510,000.00 for the school.

### District Liaison, State of Idaho Department of Juvenile Corrections
August 1, 1995 to March 1, 1997.............................................1 year, 7 months

I represented the new Department of Juvenile Corrections to the ten counties
in the Seventh Judicial District.  As such, I worked closely with Probation
Officers, County Commissioners, Judges, other state agencies, private care
providers, etc. in the implementation of the new Idaho Juvenile Corrections
Act of 1995.  I wrote or participated in the writing of several federal grants for
the District.  I conducted training - both formal and informal - and developed a
series of new therapy programs for juveniles with private care providers.  I
also served as the Director of the Detention Center and the State Placement
Coordinator during this time.

-1-

MAG 000316

Los Angeles County Sheriff's Department
December 1, 1965 to March 31, 1993.................................27 years 4 months

Note:  In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn
and 3,000 civilian personnel and a daily County Jail inmate population of
23,000.

### Service as a Lieutenant (15 Years, 0 Months):

### 1. Field Operations Region I
NORSAT                                11/15/87 to 3/31/93   64 months

I commanded a specialized unit created to investigate, locate, observe and
arrest major (career) criminal offenders. This unit was designed as a
multijurisdictional effort for the cities in the northern region of Los Angeles
County.  The command consisted of four (4) Sergeants, seventeen (17)
Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3)
civilian employees.  The 1992 budget set at $1.5 million.  The arrest rate
averaged 500 career criminal arrests per year with a 97% conviction rate and
no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.

### 2. Executive Offices
Reserve Forces Bureau        05/01/84 to 11/15/87  42 months

I was the administrative officer to a specialized bureau responsible for
coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

-2-

MAG 000317

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies
programs for their effective utilization throughout the Department; develops
and tracks training programs; sponsors activities designed to promote growth
and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to
  level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.

3.    **Field Operations Region I**
      **Crescenta Valley Station**      04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel
serving a population of 50,000 (including the Contract City of La
Canada-Flintridge) and a total area of 250 square miles. During my four years
service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence
  by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81
  to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community
  emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station
  morale.

-3-

MAG 000318

4.     **Custody Division**
       **Central Jail**          04/01/78 to 04/01/80  24 months

The Los Angeles County Central Jail is the largest jail facility in the State of
California, with a daily inmate population of seven thousand (7,000), an
assigned staff of six hundred (600), and two hundred (200) civilian personnel.
My service at this command was equally divided into two major assignments:

* Training and Logistics Lieutenant (04/01/79 to 04/01/8).
* Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

* "Hot Fire" Training program, which is now a State (POST) mandated
  training module for all custody personnel throughout California.
* The "Defend in Place" fire safety operational plan for jail facilities.
* New fire safety specifications for jail bedding and mattresses.
* The development of fire safe jail mattress material.
* The development of a facility emergency response plan.
* The computerization of training, timekeeping, and scheduling for the
  facility (800 sworn and 200 civilian personnel).
* "Spouse day at CJ"—A program for spouses of employees.

**Service as a Sergeant (6 Years, 4 Months):**

5.     **Administrative Division**
       **Federal Surplus Property**   01/12/76 to 04/01/78  27 months

This program was entirely my idea and developed while I was assigned at my
previous assignment (Emergency Operations Bureau). The unit provides
millions of dollars in free federal excess and surplus food and property from
clothing to heavy equipment and aircraft to the department each year. I am
very proud of this contribution to the Department.

During this time I remained staff (Personnel Sergeant) of the Emergency
Operations Bureau. This was simply a technical (paper) transfer.

6.     **Patrol Division**
       **Emergency Operations**    02/01/74 to 01/12/76  23 months

I was among the original personnel that formed this unit which blended the

-4-

activities of the Department's planning   unit with emergency operations planning and preparation.  I was assigned as the Personnel and Logistics Sergeant.

Significant contributions while assigned at this command are:

• Formation of a new County Emergency Operations Center.
• Participation in the 1974 Federal earthquake studies of Los Angeles County.
• Development of the Department's specialized Field Command Post equipment.
• Development of the Department's Field Booking Team.
• Collateral assignment to the Patrol School

7.  **Patrol Division**
    **Civil Defense Bureau**      12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

8.  **Patrol Division**
    **San Dimas Station**      12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.

9.  **Technical Serviced Division**
    **Communications Bureau**      12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

10.  **Patrol Division**
     **San Dimas Station**
     **Detective Bureau**      01/01/70 to 12/01/71  **23 months**

-5-

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11.    **Patrol Division**
       **San Dimas Station Patrol**    01/29/68 to 01/01/70  24 months

I performed all duties assigned to Station Patrol: Jailer, Desk, Watch Deputy, Patrol, and Traffic.

12.    **Technical Services Division**
       **Transportation Bureau**    11/01/67 to 01/29/68  02 months

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

13.    **Custody Division**
       **Central Jail**    05/06/66 to 11/01/67  18 months

I returned to my previous assignment at the Central Jail after graduation from the Academy. I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

14.    **Administrative Division**
       **Academy**    01/17/66 to 05/06/66  04 months

I was a Sheriff's trainee assigned to Class #110.

15.    **Custody Division**
       **Central Jail**    12/01/65 to 01/17/66  01 month

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

-6-

| P.O.S.T. Command College (Class #5) | POST | 1988 |
|---|---|---|
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

-7-

MAG 000322

# Roger A. Clark

### Police Procedures Consultant, Inc.
10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com
May 8, 2023

Kent M. Henderson, Esq.,
Gulzar, Henderson & Carrazco, L.L.P.
18301 Irvine Blvd.
Tustin, CA 92780

*Regarding:*     *Alma L. Figueroa De Magdaleno, et al., vs. County of Riverside, et al., Case No.: 5:21-cv-02027-JGB-SHK.*

Dear Mr. Henderson:

My Fee Schedule is as follows:

- Travel time at the rate of $50.00 per hour.
- (Travel via automobile to and from San Diego to Los Angeles 8 hours $400.00)
- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.
- A retainer fee of $4,000.00 when initially retained will be used against the above listed fees. Subsequent billings at the rates specified.
- A "rush fee" of $500.00 for work required less than three weeks from notice/retention.
- An invoice will be submitted periodically upon request reflecting the activities and charges associated with the account. Payment is due upon receipt of the invoice.

There is no formal contract required. My Federal Tax ID Number is **72-1576857.**

Sincerely,

Roger A. Clark

Page 1 of 1

MAG 000323

# Roger Clark

Police Procedures Consultant, Inc.
10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

## UPDATED LIST OF SWORN TESTIMONY FOR RULE 26

### May 8, 2019 to May 3, 2023
(Revised May 3, 2023)

**Deposition:** May 8, 2019, M.J.L.H. (Hurtado), et al, v. City of Pasadena, et al. Case No.: 2:18-cv-03249 JFW (SSx)

**Deposition:** May 20, 2019, Jayd Schroeder, v. Rialto Police Department, Case No. 5:18-cv-00427 SP,

**Deposition:** May 30, 2019 Mary H. Garcia, individually and successor-in-interest to Estate of Phillip Soto Garcia Jr., et al., vs. Sergeant Ayala; et al., Case No.: 5:15-cv-839- SJO (Asx),

**Trial:** June 5, 2019, Schroeder, Jayd v. Wright, Steven and Parcher, Nicholas, Case No. 5:18-cv-00427-SP,

**Deposition:** June 10, 2019, Jason Anderson, v. City of Vallejo, et al. Case No. 2:17-cv-00137-JAMDB,

**Trial:** June 24, 2019, Tony Nunez, et al. v. City of San Jose, et al. Case No. 17-cv-03860 LHK.

**Deposition:** July 8, 2019, Sierra Rivera, et al, v. County of Sacramento, et al. Case No.: 2:18-cv-00056 WBS EFB,

**Deposition:** July 19, 2019, John Gocke vs. United States of America, et al., Case No.: 5:16-cv-01560 MWF (DTBx).

**Deposition:** July 22, 2019, Dennis Todd Rogers, Jr., et al vs. County of Los Angeles, et al., Case No.: 2:17-cv-05236-AB-E and Janet Williams vs County of Los Angeles, et al., Case No.: 2:17-cv-05640-AB-E.

**Trial:** July 25, 2019, E.V., A Minor, (Sanchez) et al, v. City of Anaheim, et al. Superior Court (Orange County) Case No: 30-2015 00770859 CU-MC-CJC.

**Trial:** July 29, 2019, Lucy Olango, v. City of El Cajon, et al. Superior Court. San Diego County (California) Case No. 37-2017-00005331 CU-PO-CTL.

MAG 000324

Deposition: July 30, 2019. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No.: 4:18-cv-05755-YGR.

Deposition: August 13, 2019. L.D. (DeLeon), et al. v. City of Los Angeles, et al. USDC Case No.: 2-16-cv-04626 PSG.

Deposition: August 22, 2019. Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

Deposition: August 29, 2019. Betty Casey, et al. v. Richard W. Sanders, et al. USDC Case No: 7:17-cv-00145 KKC-EBA.

Hearing: August 30, 2019. People v. Joshua Justiniano. Superior Court, Ventura County, (California) Case No 2018008290.

Deposition: September 3, 2019. A.B. (Birtcher), et al. vs. County of San Diego, et al., Case No.: 3:18-cv-01541-MMS-LL.

Trial: September 5, 2019. People v. Joshua Justiniano. Superior Court, Ventura County, (California) Case No 2018008290.

Deposition: September 16, 2019. Joseph Lee Green, et al, v. City of Stockton, et al. Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

Deposition: September 18, 2019. Erwin Duero-Young vs. City of Oceanside, et al. Case No.: 3:18-cv-01569-H-MDD.

Deposition: September 23, 2019. Estate of Tyler S. Rushing, Scott K. Rushing, and Paula L. Rushing, vs. AG Private Protection, Inc.; Edgar Sanchez, City of Chico Police Department, et al., Case No. 2:18-cv-01692-MCE-AC.

Deposition: September 25, 2019. Tyrone Johnson, vs. County of San Bernardino, et al. Case No. 5:18-cv-01054-DMG-GJS

Deposition: October 1, 2019. Susan M. Huntzinger, et al., vs. Toby Coyle, Individually and in his Capacity as a Kentucky State Police Officer, Case No.: 5:17-cv-00184-KKC.

Trial: October 2, 2019. Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

Trial: October 3, 2019, and October 7, 2019. Marcus Vaughn, et al. v. City of Los Angeles, et al. Case No. 2:16-cv-03086 AB-AJW.

MAG 000325

**Deposition:** October 8, 2019. The Estate of Clemente Najera-Aguirre, et al, vs. County of Riverside, et al, Case No.: 5:18-cv-00762-DMG-SP.

**Deposition:** October 10, 2019. Daniel Andrews v. City of Henderson, et al, Case No.: 2:18-cv-01625-RFB-PAL.

**Deposition:** October 18, 2019. Darcy Harper vs. City of Merced, et al., Case No.: 1:18-cv-00562 LJO SKO.

**Deposition:** October 21, 2019. 1934, Estate of Athony Soderberg, et al, v. City of Los Angeles, et al, Case No. 2:18-cv-03861 FMO-JPR.

**Deposition:** November 5, 2019. Nicholas K. Vieira, vs. Joseph Zalec, City of Antioch, County of Sacramento, Case No.: 3:18-cv-05431 VC.

**Trial:** November 6, 2019. Dionne Smith-Downs, et al v. City of Stockton, et al. Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:** November 14, 2019. Ann Janette Cortez vs. City of Los Angeles, et al., Case No.: 2:18-cv-03248-CAS-JPR.

**Deposition:** November 18, 2019. Alexander Herd, et al. v. County of San Bernardino, et al. USDC Case No.: 5:18-cv-01244-AB-SP.

**Deposition:** November 19, 2019. Christopher D. Hall, Administratrix of the Estate of William Allen Young, vs. Russell Braun, et al. Case No.: 3:17-CV-00481-DJH-RSE.

**Deposition:** November 25, 2019. Adrian Miranda, vs. City of Casa Grande, et al., Case No. S1100CV201801191.

**Deposition:** November 26, 2019. Matthew Kass v. Alameda, et al.; Case No.: 3:18-cv-01302-CRB.

**Deposition:** December 6, 2019. Jennifer Landeros, Individually and as Successor in Interest to Daniel Landeros, et al., v. City of Elk Grove, et al. Case No.: 2:17-cv-02598-KJM-CKD.

**Deposition:** December 11, 2019. Richard William Kollin v. City of Tehachapi, et al. Case No. 1:18-cv-00617-LJO-JLT.

**Deposition:** December 13, 2019. Richard Donastorg, vs. City of Ontario, et al. Case No.: 5:18-cv-00992-JGB-SP.

MAG 000326

**Deposition:** January 6, 2020. James M. Lacy, et al, v. County of San Diego, et al. Superior Court (San Diego County), Case No. 37-2018-00017428, CU-PO-CTL

**Deposition:** January 13, 2020. J.M. et al., vs. County of Stanislaus, et al., Case No.: 1:18-cv-01034-LJO-SAB.

**Deposition:** Marco Contreras v. City of Compton, et al. Case No. 2:17-cv-08834 FFM.

**Trial:** January 15, 2020. Joseph Lee Green, et al, v. City of Stockton, et al, Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

**Deposition:** January 16, 2020. Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:** January 22, 2020. Robert Strong v. City of Vallejo, Jarrett Tonn, Andrew Bidou, et al., Case No.: 2:18-CV-01246-WBS-AC.

**Trial:** January 24, 2020 and January 28, 2020. L.D. (DeLeon), et al. v. City of Los Angeles, et al. USDC Case No.: 2-16-cv-04626 PSG.

**Trial:** February 4, 2020 & February 5, 2020. Rebecca Brown, et al v. City of San Diego, et al. Case No. 15-CV-1583-DMS-WVG

**Deposition:** February 14, 2020. Zared Rodriguez Suarez, v. City of Salinas, et al., Case No.: 3:18-cv-056515-VC.

**Trial:** February 20, 2020. James M. Lacy, et al. v. County of San Diego, et al. Superior Court, San Diego County, Case No. 37-2018-00017428 CU-PO-CTL

**Trial:** December 26, 2019 & February 25, 2020. 1972. People v. Rafael Garcia and Raquel Garcia,. Superior Court (Riverside County) Case No. RIF 1702728.

**Trial:** February 26, 2020. Phillip Murry v. North Las Vegas Police Department, et al. Case No.: 2:17-cv-00157-APG-CWH.

**Trial:** February 11, 2020, February 12, 2020, February 21, 2020 and February 28, 2020. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No,: 4:18-cv-05755-YGR.

**Deposition:** March 2, 2020: Monique Morgan v. City of Los Angeles and Leovardo Guillen USDC Case No.: 2:17-cv-06693.

**Deposition.** March 26, 2020. Gilberto Fajardo, v, City of San Bernardino, et al. Case No. 1:16-

Page 4 of 19

MAG 000327

at-00364.

Deposition: March 31, 2020, Shane Horton, by his guardian ad litem, Yvonne Horton, v. City
of Santa Maria, et al. Case No. 2:14-cv-06135 SJO-PJW.

Deposition: April 9, 2020, Bob Anderson, Administrator of the Estate of Charles Christopher
McClure, et al., vs. City of Fulton, Kentucky, et al., Case No.: 5:18-cv-00032-TBR.

Deposition: April 16, 2020, Mora et. al. v. City Of Garden Grove et al. Case No: 8:19-cv-
00418-JLS-JDE.

Deposition: April 20, 2020, Travis Mihalovic, v. City of Turlock, et al. Case No.
1:17-cv-01742 LJO-SAB.

Deposition: April 22, 2020. Charmane Henderson, individually and as successor-in-interest to
Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.:
2:18-cv-03918-MWF-E.

Deposition: April 28, 2020. Estate of Clifford Tucker, by Donald Scott Tucker, Personal
Representative, vs. Marquette County, Keith Romback And Mark Ulvila, Case No. 2:19-cv-
00078.

Deposition: May 4, 2020. Adorthus Cherry v. Modesto Police Sgt. James "Derrick" Tyler and
Lt. Terry Seese, No. 1:18-cv-01268-LJO-EPG (EDCA).

Deposition: May 5, 2020. Charmane Henderson, individually and as successor-in-interest to
Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.:
2:18-cv-03918-MWF-E.

Deposition: May 12, 2020, Quanice Hayes, vs. City of Portland, and Officer Andrew Hearst,
Case No. Case No. 3;18-cv-00988-AC.

Deposition: May 14, 2020, Jason B. Perkins, Plaintiff, v. City of Modesto, et al., Case No.:
1:19-cv-00126-LJO-EPG.

Deposition: June 2, 2020, Antony Jackson, et al. v. City of Los Angeles, et al. Case No.
2:19-CV-02254-GW-RAO.

Deposition: June 4, 2020, Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case
No. 2:18-cv-09936.

Deposition: June 9, 2020, AGG a minor, et al. v. City of Hayward, et al. Case No.:
4:19-cv-00697 DMR.

MAG 000328

Deposition: June 12, 2020. Remi Hamilton, et al. v. City of Covina, et al. Case No.: 2:18-CV-09822 JAK (MAAK).

Deposition: June 15, 2020. Wilbert Winchester, v. Oakland Housing Authority, et al. Case No. 3:19-cv-02653-JCS.

Deposition: June 24, 2020: Samuel Kolb, et al, v. Placer, County, et al. Case No. 2:19-cv-00079 DB.

Deposition: June 30, 2020. Thomas Irwin plaintiff, v. Officer J. Santiago, in his individual capacity, Officer R. Roberts, in his individual capacity, Officer B. J. Ivy, in his individual capacity, and City of Garland, Case No.: 3:19-cv-2926-B.

Deposition: July 6, 2020. Michael Scott Taylor, et al., v. Calaveras County, et al. Case No. 1:18-at-00403, BAM.

Deposition: July 9, 2020. Anyka Harris, et al. v. City of Tulare, et al. Case No. 1:18-cv-01135, LJO-SKO .

Deposition: July 13, 2020. Tammy Shidler and Gary Shidler v. County of San Bernardino USDC Case No. 5:19-cv-00503-CAS-SHKx.

Deposition: July 17, 2020. The Estate of VU ANH NGO, et al. v. County of Riverside, et al. Superior Court Case, RIC 1902381.

Deposition: July 20, 2020. Sheldon Lockett et al. v. County of Los Angeles, et al. Case No. 2:18-cv-05838 PJW.

Trial: August 12, 2020. James Adams, v. State of California, et al. Case No. 3:16-cv-02161 W-NLS.

Deposition: August 18, 2020. Carlos M. Gomez, Sr. vs. City of Vacaville, a public entity, Vacaville Police Officer, William Boehm, et al., Case No.: 2:18-cv-02968.

Deposition: September 24, 2020. Black & Brown Liberation, et al (ACLU of Indiana), v. City of Fort Wayne, et al. Case No. 1:20-cv-00240 (Indiana) DRL-SLC

Trial: October 7 & 8, 2020; 1318. Christian Longoria, et al., v. Pinal County (Arizona), et al. Case No. 2:15 CV 00043 PHX SRB

Deposition: October 24, 2020. Susan Peck (Paul Mono deceased), et al. v. County of Orange, et al., Case No. 2:19-cv-04654.

MAG 000329

Deposition: October 27, 2020. Jennifer Buenrostro-Briano, et al v. Farmersville Police
Department, et al. Case No. 1:19-cv-01382 LJO-SAB.

Trial: October 30, 2020. Leslie A. Merritt, Jr. vs. State of Arizona, et al., United States District
Court, District of Arizona, Case No.: CV17-4540-PHX-DGC.

Deposition: November 9, 2020. Florentina Pelayo, (Petrica Muntean), v. City of Anaheim, et al,
Case No.:8:19-cv-02318, DOC (ADSx).

Deposition: December 4, 2020. Melanie Dunne, et al, v. City of Las Cruces (New Mexico), et
al. Case No. D-307-CV-2018-02315.

Deposition: December 14, 2020. Cristobal Solano; M.H., et al. v. County of Orange, et al.;
USCD Case No. 8:19-cv-00549-JVS-ADS.

Deposition: December 22, 2020. John F. Dunham v. County of Monterey, et al. Case No.:
3:18-cv-04467-EDL.

Deposition: December 28, 2020. Cameron Vincent, v. City and County of San Francisco, et al.
Case No: 19-cv-0329..

Deposition: January 6, 2021. Rashid Adan vs. City of San Diego and Officer Jason Langley,
Case No.: 3:19-cv-1523-LAB-AHG.

Deposition: January 11, 2021. Sabrina Paloni, et al, v.City of Albuquerque, et al. Judicial
District Case No. D-202-CV-201800015.

Deposition: January 14, 2021. William Bernal, and Celia Bernal, Plaintiffs, vs. Sacramento
County Sheriff Department, et al., Case No.: 2:19-cv-00482-MCE-AC.

Deposition: January 22, 2021. Tracy Jenkins, as Personal Representative of the Estate of
Theoddeus R. Gray, et. al. v Tom Price, Jessie Smith, James Ziemiecki, Trevor Head, Travis
Kaufman and City of St. Clair Shores, Michigan (19-10383)

Deposition: January 27, 2021. Jose Magana, (Omar Magana), v. City of Los Angeles, et al.
Case No. 2:19-cv-03631 CAS-AGR.

Deposition: February 1, 2021. Estate of Logan Johnsrud, et al. v. Deputy Nathan Dean and
Wood County, Wisconsin., Case No. 20-CV-108.

Deposition: February 3, 2021. Harry Donald Lemly, Jr., v. California Department of Parks and
Recreation, et al. Case No. 8:19-CV-01603 DOC DFM.

MAG 000330

Deposition: February 9, 2021.  Christopher Ramos, v. County of Alameda et al,  Case No. 4:19-cv-05715 DMR

Deposition: February 10, 2021.  Casmir Anumudu vs. David Salvador, Andrew Essig, et al.,  Case No.: 2:19-cv-04045-ODW.

Deposition: February 18, 2021.  Abraam Sweiha. v. Alameda County, et al; Case No.: 3:19-cv-03098-LB.

Deposition: February 19, 2021.  Albert Anthony Arteaga, v. City of Oakley, et al..  Case No. 3:19-cv-05725

Deposition. February 22, 2021.  Jeannie Atienza, v Andrew Hall Case No.: 3:19-cv-03440.

Preliminary Hearing.  February 23, 2021 and February 24, 2021.  People v. Terrance Stangle Case No 20013301.

Deposition: February 26, 2021.  D.T., a minor by and through his guardian Tanika Tyler  vs. San Diego Metropolitan Transit Services, et al., Case No.: 3:19-cv-1523-LAB-AHG.

Deposition: March 3, 2021  James Stewart, et al. v. County of Yuba, et al., Case No.: 2:19-cv-01744-TLN-DB.

Deposition: March 4, 2021.  Judy O'Neil, v. City and County of San Francesco, et al.; Case No.: 3:17-cv-07190-JCS.

Deposition: March 11, 2021.  Vincent Henderson vs. Harris County Sheriff's Department, Rick Hickman, Michael Richard, Dan Richards, A/K/A Dan Richardson, and Deputy Brisco, Case No.: 4:18-CV-413

Deposition: March 18, 2021 Cynthia Ames, individually and as a successor in interest of Henry Simmons, deceased, v. County of San Bernardino, et al., Case No.: 5:18-cv-01362-SJO-FFM.

Deposition: March 19, 2021 Zakhary Gabriel Mallett, v. County of Los Angeles, et al  Case No.: 2:19-cv-8506.

Deposition: March 24, 2021.  Lourdes Toman, et al. v. City of Fullerton, et al.  Case No.: 8:20-cv-00046 DOC-KES.

Deposition: April 1, 2021.  Matthew Burghardt, as guardian of Matthew B. Burghardt, and Christian Beard v. Officer Ezekiel Ryan, and Officer Kristopher London.  Consolidated Case Nos.:5:18CV00325, and 5:18CV02788.

Deposition: April 9, 2021 (continued from December 4, 2020)  Melanie Dunne, et al, v. City of

Page 8 of 19

MAG 000331

Las Cruces (New Mexico), et al. Case No. D-307-CV-2018-02315.

Deposition: April 13, 2021. Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

Deposition: April 14, 2021. Songhai Smith, v. City and County of Los Angeles, et al. Case No. 2:20-cv-03118-RGK.

Deposition: April 15, 2021. James B. Shelton v. John Brandon et. al., Case No. 4:19-cv-00023 (Tennessee).

Deposition: April 23, 2021. M.A., et al. v. County of San Bernardino, et al. Case No. 8:20-cv-00567-and Z.M.A. v. County of San Bernardino, et al. Case No. 5:20-cv-00589-JFW-SHK

Deposition: May 3, 2021. Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

Deposition: May 10, 2021. David Andrews, Plaintiff, vs. County of Orange; Robert Seamans; Stephen Harder, et al., Case No.: 8:20-cv-00925-JLS-ADS.

Trial: May 12, 2021. Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case No. 2:18-cv-09936 .

Deposition: May 18, 2021. Sophia Larios, v. City of Long Beach, et al. Case No.: 2:18-cv-10486 PSG (PJWx)

Deposition: May 19, 2021. Shellie Cooke, v. City ot Los Angeles, et al. Case No. 18STCV00882.

Deposition: May 21, 2021. Bellagio Brown, Vs. City of Ontario; Gabriel Gutierrez, et al., Case No.: 5:20-cv-00476-DMG-SHK.

Deposition: May 24, 2021. Kenneth Chamberlain, Jr. v. City of White Plains (New York), et al. Case No. 12-CV-5142 (CS).

Deposition: June 2, 2021. J.A.J., et al., vs. Efrain Jimenez, et al., Case No.: 1:18-cv-01138 DAD-SKO.

Trial: June 11, 2021. Richard Donastorg, vs. City of Ontario, et al. Case No.: 5:18-cv-00992-JGB-SP.

Trial: June 11, 2021. Harry Donald Lemly, Jr., v. California Department of Parks and Recreation, et al. Case No. 8:19-CV-01603 DOC DFM.

MAG 000332

Deposition: June 14, 2021. Paul R. Conforti, and Humana Caresource, vs. City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace, et al., Case No.: 2020CV000758.

Deposition: June 15, 2021, Rosa "Patti" Andrade, et al., vs. City of Tucson, et al, Case No. C20194291.

Deposition: June 16, 2021, Barry John Montgomery, Jr. v. County of Los Angeles, et al. Case No. BC692204.

Trial: June 23, 2021. People v. Richard Lechuga, Superior Court(San Diego County), Case No. CE395395, DA No. NIBT461.

Trial: July 6 & 7, 2021. Jose Gomez, v. City of Houston, et al. Case No. 18-cv-1224.

Deposition: July 13, 2021. Nicholas Robinson v. City of San Jose, et al. Case No.: 5:19-CV-06768NC.

Deposition: July 15, 2021. Michael Moore vs. City of Los Angeles, et al. Case No.: -cv-03053-AB-AGR..

Trial: July 19, 2021 and July 20, 2021. Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

Trial: July 22, 2021. The Estate of Vu Anh Ngo, et al. v. County of Riverside, et al. Superior Court Case, RIC 1902381.

Deposition: July 30, 2021. Donnie Woodral v. County of Stanislaus, et al. Case No.: 1:20-cv-00372

Deposition: August 2, 2021. Darryl Speer v. County of San Bernardino USDC Case No. 5:20-cv-00044-JGB-SPx.

Deposition: August 5, 2021. Juan Jose Bermudez, v. County of San Bernardino, et al. Case No. 5:20-CV-438 JGB (SHKx).

Depostion: August 9, 2021. Marco Ortiz, v. San Joaquin County, et al. Case No.. 2:20-cv-00217-JAM-CKD.

Trial: August 12, 2021 Darryl Speer v. County of San Bernardino USDC Case No. 5:20-cv-00044-JGB-SPx.

Deposition: August 16, 2021. Cynthia Heffner Roberts, et al v. Manuel Cruz, Individually, Case No. 3:19-CV-186 RGJ-RSE (Kentucky).

MAG 000333

Deposition: August 17, 2021. Gerardo Wence, v. Rayann Cruz. Contra Costa County Superior Court Case No.: CIVMSC18-02060.

Deposition: August 20, 2021. B.P., et al, v. County of San Bernardino, et al. Case No.: 5:19-cv-01243, JGB-SP.

Deposition: August 24, 2021. Rosa Ester Brizuela, et al, v. City of Sparks; et al. Case No.3:19-CV-00692-MMD-WGC.

Deposition: August 25, 2021. Robin Leeann Moore-Brown, et al, v. ·City of North Las Vegas, et al. Case No. 2:20-CV-01649-GMN-DJA.

Trial: August 26, 2021. Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

Deposition: September 8, 2021. Lisa Novak and Patrick Novak, et al, v. City of Madera, et al. Case No.: 1:20-cv-00301-DAD-SKO.

Deposition: September 10, 2021 & October 19, 2021. Joseph Lopeteguy, v. Kern High School District, et al. Superior Court Case No. BCV-17-100576, and Gilbert Valdez, Jr., and Jarald Wyatt v. Kern High School District, et al. Superior Curt Case No. BCV-17-102617.

Deposition: September 13, 2021. Delon Thurston, vs. City of Vallejo, et al., Case No.: 2:19-cv-01902-KJM-CK.

Deposition: September 16, 2021. Estate of Angela M. Zuniga et al, v. San Bernardino County, et al. Superior Court Case No CIVDS1620852

Deposition: September 20, 2021. Xavier Hermosillo, an individual; Olga Hermosillo, an individual and as successor in interest for Decedent, Luis Hermosillo, vs. County of Orange, et al. Case No. 8:20-cv-01387-JVS-(ADSx).

Deposition: September 24, 2021. Diane Lang (Donnell Lang) v. City of Redding, et al, Superior Court (Shasta County) Case No. 193947.

Deposition: October 8, 2021. Patrick Pursley, v. City of Rockford, Illinois, et al. Case No. 3:18-cv-50040.

Deposition: October 18, 2021. Estate of Toby Diller, et al. v. City of San Diego, et al. Case No.: 20CV1003

Deposition: October 21, 2021. Cherish Thomas, v. City of Rio Vista, et al. Case No.:

MAG 000334

2:20-cv-00899 KJM-DB.
Client Attorney:

Deposition: November 3, 2021. Brejanea Burley, et al., v. County of Los Angeles, et al., State
of California Superior Court (Los Angeles County), Case No. TC027341.,

Deposition: November 17, 2021. Elijah McKnight vs. Sheriff Tyler Brown, et al. Case No.:
1:20-cv-03678-PAB-SKC.

Deposition: November 18, 2021. People v. Douglas Alan Bohren, Superior Court, San Diego
County (California), Case No.: CT No. M264544.

Deposition: November 19, 2021. Dione Mendoza, et al. v. County of San Bernardino, et al.
Case No. 5:19-cv-01056 JGB-SHK.

Deposition: November 22, 2021. R.H., A minor (Eric Jay Hames Deceased), v. City of
Redding, et al., Case No.: 2:20-cv-01435-WBS-DMC.

Deposition: November 29, 2021. R.A., and M.A., (Randolph Aguirre Deceased), et al, v. City
of La Habra, et al. Case No. 8:20-cv-01829 CJC (ADSx)

Deposition: November 30, 2021. Brent Gustine, v. County of San Diego, et al., Case No.: 3:19-
cv-00903-LAB-NLS.

Deposition: December 2, 2021. Adeline Lorraine Herrera, et al, v. City of Montebello, et al.
Case No.: 2:20-cv-00590-MWF-SK

Deposition: December 8, 2021. Jorge Enrique Serrano Robles Senior, and Yuridia Dolores
Miranda, et al. vs. County of Los Angeles, et al, Case No.: 2:20-CV-6648-ODW-PLA.

Deposition. December 9, 2021. Jeffrey Drevdahl v. City of Fairfield, et al. Case No.:
2:20-cv-00859-WBS-DB.

Deposition: December 13, 2021. Darla Drinan, vs. United States of America, Joshua Bisch,
Douglas Christner, et al., Case No.: CV 20-1634-GW-SHKx

Deposition: December 14, 2021. Alexandrew Orellana v. County of Riverside, et al. USCD
Case No. 5:19-CV-01263-JGB-SHK

Deposition: December 14, 2021. Luke Carlson, et al v. City of Redondo Beach, et al. Case No.
2:20-cv-00259-ODW (AFMx).

Deposition: December 29, 2021. Kevin Howard v. City of West Covina, Officer Matthew

Page 12 of 19

MAG 000335

Munoz, Officer Joshua Brenes, Officer Doug Weischedel and Officer C. Gonzalez, Case No.:
2:19-cv-08281-CMB-MRW,

Deposition: January 6, 2022, Donelle Wear (Blanchard), v.United States of America., et al,
Case No.: 8:20-cv-02438-JVS-DFM, consolidated with Case No.: 8:20-cv-00459-JVS-DFM,

Deposition: January 17, 2022, Angela Hernandez, (Steven Schiltz, deceased), v. City of
Huntington Beach, et al, Orange County Superior Court Case No. 30-2020-01137606 CU-CR-
CJC

Deposition: January 21, 2022, CJ Montano vs. City of Los Angeles Chief Michael Moore, et
al., Case No.: 2:20-cv-07241.

Deposition: January 28, 2022, Kelly Lynch vs. City of Los Angeles, Sergeant Lankford, Officer
Wall, Officer Brandt, et al., Case No.: 2:20-cv-07931,

Trial: February 15, 2022Susan Huntzinger, et al, v, Toby Coyle, et al.USDC (Kentucky) Case
No. 5:17-cv-00184 KKC

Trial: February 17, 2022. People v. Terrance Stangle, Superior Court (San Francisco County),
Case No 20013301, IIB #A 2019.10.07, ISD #2019-0045,

Trial: February 22, 2022. Angela Hernandez, (Steven Schiltz, deceased), v. City of Huntington
Beach, et al. Superior Court (Orange County) Case No. Case No. 30-2020-01137606, CU-CR-
CJC.

Deposition: February 25, 2022. Tracy Garrett, v. Lieutenant Eric Nipper, et al. USDC
(Kentucky) Case No: 5:20-CV-64 KKC-MAS,

Trial: March 1, 2022. Lydia Vasquez-Brenes and Ricardo Brenes, v Las Vegas Metropolitan
Police Department. USDC Case No.: 2:12cv1635-JCM-VCF,

Deposition: March 15, 2022. Brian Joshua Cook, vs. County of Los Angeles, et al., Case No.:
2:19-cv-02417-JVS-KS:

Deposition: March 16, 2022. Elena Mondragon v. City of Fremont, et al.; Case No.: 5:18-cv-
01605-NC.

Deposition: March 21, 2022. Lisa Marie Close vs. City of Vacaville and Stuart K. Tan, Case
No.: 2:17-cv-01313-WBS-DB.

Trial: March 30, 2022. Curtis Jacob Davis, v. Wakulla County, et al. Superior Court (Wakulla

MAG 000336

County, Florida) Case N. 15-ca-FLA BAR NO.: 0739685.

Deposition: April 4, 2022. Rosalinda Ibarra v. Lee, et al.; (Oklahoma) Case No. 20-cv-00598-TCK-SH

Deposition: April 4, 2022. Rex G. Smith v. Shaun Parsley, City of Concord, et al. Superior Court, (Contra Costa County) Case No.: MSC20-01316

Trial: April 6, 2022. Rosa "Patti" Andrade, et al., vs. City of Tucson, et al. Case No. C20194291.

Deposition: April 7, 2022 Jeanne Llera (Gomez), et al. v. Las Vegas Metropolitan Police Department, et al. Nevada Case No. 2:20-cv-01589 RFB-BNW.

Deposition: April 8, 2022 V.V., et al. v. City of Los Angeles, et al.; Case No. 2:21-cv-01889-MCS-PD

Deposition: April 11, 2022. Edgar Sanchez vs. City of San Jose, Christopher Weber, Melissa Villasenor, et al., Case No.: 20-CV-05919-JD.-cv-10758

Deposition: April 11, 2022. Clark, et. al. v. City of Sacramento, et al. Case No: 2:19-cv-00171-JAM (JDP).

Deposition: April 12, 2022. Annie Lee Oliver, Jeremy Wright, and Jeremy Wright as Personal Representative of the Estate of Michael Benford v. Pemiscot County; Tommy Greenwell, Individually and in His Official Capacity; et al. Case No. 19-CV-00137 (SNLJ).

Deposition: April 13, 2022. March 1, 2022. Lourdes Vaughan (Richard Posadas Deceased) et al. v. City of Arvin, et al. Case No.: 1:20-CV-00473-NONE-JLT

Trial: April 15, 2022. Rex G. Smith v. Shaun Parsley, City of Concord, et al. Superior Court, (Contra Costa County) Case No.: MSC20-01316.

Deposition: April 19, 2022. Estate of Eric Esteban Briceno, Deceased, et al, v. County of Los Angeles, et al. Case No.: 2:21-cv-01388-SB-E

Deposition: April 20, 2022. Breya A Barollo, vs. County of Los Angeles, Alex Saldana, Edward Gonsalves, et al., Case No.: 2:21-cv-01909-FMO-AGR.

Deposition: April 22, 2022. Nathan Schneider v. County of Sacramento, et al. Case No.: 2:20-cv-00383 TLN-EFB.

MAG 000337

Deposition: April 28, 2022. 2318. Anthony Echevarria, v. City of Santa Monica, et al. Case No.: 2:21-CV-05603 SVW-AGR.

Deposition: April 29, 2022. Jose Luis Rodriguez, Jr. v. City of Salinas, Et Al. (Kile, Pritt, Neff). Case #: Monterey County Superior Court 20CV001293.

Deposition: May 2, 2022. Deandre Bolden, v. Contra Costa County, et al. Case No.: 3:20-CV-04254 SK.

Deposition: May 9, 2022. William Wynne, Administrator of the Estate of Andrew Lenetis, vs. Town of East Hartford, Officer Kevin Beetman, and Officer Kwanza Clayton, Case No.: 3:20-cv-01834.

Deposition: May 17, 2022. Cindy Wagner vs. Shasta County, Shasta County Sheriff's Department, et al., Case No.: 2:20-CV-000403-JAM-DMC.

Deposition: May 24, 2022  Maria Elena Vazquez, et al. v. City of San Jose, et al. Case No.: 5:19-cv-08441-EJD.

Trial: May 25, 2022. Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case No. 2:18-cv-09936.

Trial: June 1 & 2, 2022. The Estate of Cecil Elkins, Jr., et al., v. California Highway Patrol, et al., Case No.: 1:13-CV-01483-AWI-SAB.

Deposition: June 3, 2022. Rosalina Calonge vs. City of San Jose, a Municipal Public Entity; Edward Carboni, et al., Case No.: 20-CV-07429 NC.

Deposition: June 9, 2022. R.E., et al. v. State of California, et al.; Case No. 2:21-cv-06072-SB-KS.

Deposition: June 14, 2022. Charles Hayes v. Las Vegas Metropolitan Police Department, Case No.: 2:20-cv-02048-KJD-BNW.

Trial: June 16 &17, 2022. Mondragon v. City of Fremont, et al.; Case No.: 5:18-cv-01605-NC.

Deposition: June 20, 2022. Greg Banks, and Alexis Avalos, vs. Michael Mortimer; Ryan White; City of Antioch; Dawnmarie Delucchi, et al, Case No.: 4:18-cv-07931-HSG.

Trial: July 14, 2022. V.V., et al. v. City of Los Angeles, et al.; Case No. 2:21-cv-01889-MCS-PD

MAG 000338

**Deposition:** July 19, 2022; Israel Hernandez and Jully Romero, vs. City of Los Angeles, OfficerJames Welch, Detective Jose Chavez, el al., Case No.: 2:19-cv-00441.

**Trial:** July 28, & 29, 2022; Jennifer Landeros, Individually and as Successor in Interest to Daniel Landeros, et al., v. City of Elk Grove, et al. Case No.: 2:17-cv-02598-KJM-CKD.

**Trial:** August 4, 2022, State of Texas v. Russell Butler, Burnet County, (Texas) District Court Case No.: DA-19-0029

**Deposition:** August 8, 2022, Candido Sesma, et al. v. State of California (CHP), et al. Case No. 5:21-cv-01694 JWH-KK.

**Deposition:** August 17, 2022, John Hermann v. County of San Bernardino, et al. Case No.: 5:20-cv-01682-JAK-SP.

**Deposition:** August 18, 2022, I.C.E. Agent Demetrik Herd, v. County of San Bernardino, et al. Case No. 5:20-CV-02335-JWH-KKX.

**Deposition:** August 19, 2022, Deposition #2335, Benjamin Montemayor, v. City of Los Angeles, et al. Case No.: 2:21-cv-03124 CBM (ASx) (Related to Case No. 2:20-cv-05027-CBM (Asx).

**Deposition:** August 22, 2022, Cole Wilkins v. Wesley VanDiver and Joseph Morrison.; Case No. 8:20-cv-02417-JSL (DFMx)

**Deposition:** August 23, 2022, Mario Carrasco, v. Glendora Police Department, et al. Case No.: 2:21-cv-05965-MWF-AS.

**Deposition:** August 25, 2022, Vega-Colon v. City of Wethersfield, et al. Case No: 3:21-cv-00175 (KAD).

**Disciplinary Hearing:** September 7, 2022Hillsborough County (Florida) Sheriff's Department v. Deputy Kirby Lavallee Case No.: 1208-036

**Deposition:** September 15, 2022, Kimberly Perez, et al. v. County of Sacramento, et al. Case No.: 2:21-cv-00356-TLN-JDP

**Deposition:** September 20, 2022, S.C.D.P.,(Brian Statler, Jr. Deceased), et all. v. City of Inglewood, et al. Case No.: 2:19-cv-10712-DMG-MRW.

**Deposition:** September 21, 2022, Vangv. City of Sacramento, et al.;Case No.:2:19-cv-00374-JAM-JDP

**Deposition:** September 22, 2022, Kelly Lorenz and Alykhan Popat v. Superior Court of San Bernardino, et al. Case No. 5:22-cv-00143-PA-JPR

Page 16 of 19

MAG 000339

Deposition: September 23, 2022, Gary Salzman, et al., vs. County of Los Angeles, et al., Case
No.: 21-CV-4604-PA-SK.

Trial: October 12, 2022, Kimberly Marroquin, vs. Unidentified LAPD Officer (Dimaggio Rico);
Captain Richard Paul Stabile; City of Los Angeles, et al., Case No.: 2:21-cv-07607-RGK-JEM.

Trial: October 14, 2022, and October 19, 2022, Vang v. City of Sacramento, et al.,;Case
No.:2:19-cv-00374-JAM-JDP

Trial: October 18, 2022, Diane Lang (Donnell Lang) v. City of Redding, et al, Superior Court
(Shasta County) Case No. 193947.

Deposition: October 20, 2022, Michael George Tater and Kyla Skye Staniskis (Shannon
Michelle Tater deceased), v. City of Huntington Beach, et al. , et al. Case No.: 8:20-cv-01772
Case No. 8:20-cv-01772-MEMF-JDEx.

Deposition: October 26, 2022, Cyrus Greene, vs. Bay Area Rapid Transit, a Municipal
Corporation; P. Chehal (#684), Individually; T. Matthews (#716) Individually, et al., Case No.:
4:21-cv-00113-DMR.

Deposition: October 28, 2022, Nicholas Ramirez, v. City of San Jose, et al., Case
No.:5:21-CV-08127-VKD

Deposition: November 3, 2022. Akaysia Pearson, et al. v. Otto Aragon, et al., Case No. 3:20-
05726-CRB

Deposition: November 9, 2022, John Bien, Vs. City of Fresno, Brad Oliver, et al., Case
No:1:20-CV-01159-AWI-BAM.

Deposition: November 11, 2022. Hector Hernandez, et al. v. City of Fullerton, et al. Case No.:
8:20-cv-01747-CJC-JDE

Trial: November30, 2022 and December 1, 2022. People v. Ricky Butler, 2022. San
Bernardino County (California) Superior Court DA Case No. 2017-00-0042929.

Deposition: December 19, 2022. Angelina Smalls (Branch) , et al, v. City of Tacoma, et al.,
Case No.: 3:22-cv-05013.

Deposition: December 22, 2022. Joseph L. Garces vs. City of Santa Paula, a municipal entity,
Officer Chris Rivera; Case No.: 2:21-cv-06730.

Deposition: December 23, 2022. City of Santa Ana, et al. v. Orange County Association for

Page 17 of 19

MAG 000340

Mental Health DBA Mental Health Association of Orange County, et al., Case No.
30-2020-01124174-CU-MC-CJC.

**Deposition:** December 28, 2022, Scottlynn Moorman, (Minor), v. City of San Bernardino, et al.
Case No. CIVDS1818724

**Deposition:** December 30, 2022, Bryanna Berry v City of San Jose Officer Lindsay Parodi
(4426), CASE NO.: 5:21-cv-8436

**Deposition:** January 4, 2023, Cecilia Vargas, et al. v. County of San Bernardino, et al. Case
No.: 5:20-cv-02646-JGB-KK.

**Deposition:** January 10, 2023, Estate of Oral W. Nunis, et al v. City of Chula Vista, et al. Case
No.: 3:21-cv-01627-AJB-DEB

**Deposition:** January 12, 2023, Estate of Nicholas Burgos, et al. v. County of Los Angels, et al.
Case No. : 2:21-cv-05566.

**Deposition:** January 19, 2023, Myles Ramsey, v. City of Santa Ana, Peter Beaumarchais,
Jeremy Reguerin, Ronald Sandoval, Christopher; Shynn, and Peter Thai. Case N.: 8:21-cv-
00825-JLS-KES.

**Deposition:** January 20, 2023, Abbie Gray, v. City of Los Angeles, et al. Superior Court (Los
Angeles County) Case No. BC6869939

**Deposition:** February 1 2023, Ayana Maroney, vs. County of Riverside, Deputy Mark
Rodriguez, Deputy David Ruiz; et al., Case No: 5:21-cv-00497-JGB (SPx).

**Deposition:** February 6, 2023, Irina Rusanovskaya, et al, v. City of Los Angeles, et al. Superior
Court (Los Angeles County) Case No. 20STCV33203

**Deposition:** February 9, 2023, David Cordero, v. City and County of San Francisco, et al. Case
No.: 3;19-cv-01834.

**Deposition:** February 13, 2023, Ignacio Escalante, v. County of Los Angeles, et al. Superior
Court (Los Angeles County) Case No.: 19STCV29783.

**Deposition:** February 15, 2023, Edwin Williams, v. County of San Bernardino, et al. Superior
Court (San Bernardino County), Case No. CIVDS1600447

**Deposition:** February 16, 2023, Julie Fernandez, v. City of Los Angeles; et al., Case No.:
2:20-cv-07306.

MAG 000341

**Deposition:** February 17, 2023. David Baxter, v. City of Hemet, et al.. Case No.: 5:21-cv-01331-JWH(SPx)

**Deposition:** February 22, 2023. Kyle Peterson v. County of Los Angeles, et al. Case no: 2:21-cv-05510-JAK-ADS.

**Deposition:** February 23, 2023. Jarett Jakarr Waddell v. City of Burbank, et al. Superior Court (Los Angeles County) Case No.: 21STCV4560.

**Deposition:** February 24, 2023. Marla Teresa Gonzalez, (Eloy Maris Gonzalez Jr., Deceased) v. County of Stanislaus, et al.   Case No: 1:21-cv-01091 DAD-HBK

**Deposition:** March 9, 2023. Eric Reason, et al v. Sergeant Virgal Thomas, and City of Richmond, et al. Case No.: 2:20-cv-1900 WBS-JDP

**Deposition:** March 14, 2023. Charles Hayes v. Kern County et al. Case No.: 1:19-cv-01722 BAK

**Trial:** March 22, 2023 and March 23, 2023. Irina Rusanovskaya, et al, v. City of Los Angeles, et al. Superior Court (Los Angeles County) Case No. 20STCV33203.

**Trial:** March 30, 2023. Marina Borawick, v. City of Los Angeles, et al. Case No. 2:17-cv-02036 BRO-JC

**Trial:** April 19, 2023. D.T., a Minor by and Through His Guardian Tanika Tyler vs. San Diego Metropolitan Transit Services, et al., Case No.: 3:19-cv-1523-LAB-AHG.

**Trial:** April 21, 2023 & April 24, 2023. The Estate of Clemente Najera-Aguirre, et al, vs. County of Riverside, et al. Case No.: 5:18-cv-00762-DMG-SP.

**Trial:** April 24, 2023. Christian Pineda, vs. City of Los Angeles; Chief Michel Moore; Colton Haney, and Stephen McClean, Case No.: 2:21-cv-06470-CBM-ASx.

**Deposition:** May 3, 2023. The Estate of Jose Alfredo Castro Gutierrez, et al, v. The City of San Diego, et al. Case No:. 21-cv-01292 E-BGS

MAG 000342